UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CIVIL NO. 1:05-CV-10324

JAY ODUNUKWE, ESQ.  )
    PLAINTIFF        )
                     )
V.                   )
                     )
FLEET BANK BOSTON,   )
    DEFENDANT        )

## Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment for Liability under 42 U.S.C. § 1981

### 1. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *One Nat'l Bank v. Antonellis*, 80 F.3d 606, 608 (1st Cir. 1996) (citation and internal quotation marks omitted). There are no material facts in controversy in connection with the violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, et seq. and discovery took place in this case at the administrative level. Therefore, the court should allow the motion for summary judgment on liability under section 1981.

## 2. <u>Statement of Facts</u>

On May 14, 2002, the plaintiff went to the Medway Fleet bank located at

108 Main Street in Medway Massachusetts to make a bank transaction. When he

entered the bank at approximately 11:45am, the bank was open for business.

Odunukwe Aff. ¶2. The plaintiff was a Fleet bank customer in good standing for

many years prior to the incident on May 14, 2002. He joined the line of customers

waiting to transact some business in the bank. When he got to a teller window, he

presented to the teller a check for $1,100 drawn on Fleet bank, made out in his

name and endorsed by him. He also presented a valid Massachusetts driver's

license and a valid American Express credit card to the teller. Aff. ¶3. The teller

took the check and his identification cards, looked at them and pushed them back

to him saying they are inadequate and that he will not be served. He asked her what

constitutes adequate identification and she said; a government issued identification

with a picture or a passport and a major credit card. He told her that his

Massachusetts driver's license qualified as a government issued identification and

the American Express credit card is a major credit card. Aff. ¶3-4. The teller then

raising her voice told him that she will not accept his identification cards and that

he should leave. Aff. ¶5. Plaintiff told her that he will not leave since he had valid

and proper identification. She still refused to attend to him. Aff. ¶6. He reached

into his wallet and produced a third identification; his Suffolk university alumni

2

identification with his picture on it. The teller looked at it and said that it is not acceptable and only good at Suffolk University. She then told him in a loud voice to leave and that he will not be served. Aff. ¶7.Totally surprised and embarrassed, he requested to speak to the Manager. Aff. ¶ 8. The manager came over to the teller's window, glanced at his check and his identification cards, said something to the teller, then pushed the check and his Massachusetts driver's license, American Express credit card and Suffolk University identifications back to him and said that they are unacceptable. The manager told him that he would not be served and that should leave the bank. Aff. ¶ 9. He asked the manager why my identification cards are unacceptable and she simply told him to leave. He informed her that he will not leave since he presented valid identification cards as required by law. He again requested to be served.  Aff. ¶10.

The manager then told him to leave the bank and that he will be forcibly evicted if he did not leave. He did not move. Aff. ¶11. While all this was taking place, there was a long line of customers in the bank. He felt totally humiliated, embarrassed, disgraced. He was made to feel totally worthless. Aff. ¶12.


The manager then took the check and his identification cards and placed them on a vacant teller window and told him to step away from the teller window and that she will talk to him as soon as she finishes what she was doing. Aff. ¶13.

He stepped away from the teller window and went to the side. A few moments later the manager called him into her office. Aff. ¶14. Inside her office, she went to her desk, sat down, picked up the phone and made a quick phone call and then dropped the phone. Aff. ¶15. She gave him back his check and identification cards and said that he will not be served and that he must leave the bank and should he refuse to leave that he will be forcibly removed. Id. 16. He again asked for an explanation to figure out what is going on and the manager simply stated that his identification cards were inadequate. Id. 17. He told her that what the bank had done to him is wrong, unfair and illegal. He told her that he was totally humiliated and disgraced in front of a lot of people for no reason. He told her that it is very obvious that he was the only black customer in the bank and that they have succeeded in discriminating against him. He told her that he will file a complaint against the bank with Fleet Bank Management for the discriminatory practice. She then ordered him again to leave her office and the bank immediately. He left the bank. He was totally distraught and in shock as he left the bank and headed to his car. Upon regaining his composure, he drove to another Fleet Bank located in Medfield Massachusetts about two miles away. At the Medfield Fleet bank, he presented the same Massachusetts driver's license, American Express credit card and check to the teller. The teller cashed his check after reviewing his identification cards and he also was made a deposit. Id. 18-20. He was disgraced

4

and humiliated; he was made to feel worthless. He felt completely inadequate and useless. The treatment and humiliation he received at the Medway Fleet bank caused him much pain, anguish and distress resulting in anxiety, weight loss and sleeplessness. It was a life changing experience and it has a tremendous negative impact on his life. Id. 19-26.     Plaintiff exhausted his administrative remedies and the MCAD entered a finding of probable cause to credit his claim of discrimination against the defendant.

### 3. Legal Discussion

The defendant violated Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, et seq., is liable for damages for emotional distress, interest, costs and attorney fees, and, above all, punitive damages.

The definition of "make and enforce contracts" in section 1981 extends the reach of the statute to situations beyond the four corners of a particular contract; the extension applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001) (explaining that, in a "commercial establishment" context, liability will attach when a plaintiff "receive[s] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.")

This is a very straight-forward example of such a violation. The bank is a commercial establishment. The plaintiff, who is of black (African Nigerian decent), received check cashing services in a markedly hostile manner and in a manner objectively reasonable to call discriminatory. Odunukwe drove to the Medway Fleet bank to make a bank transaction. When he entered the bank at approximately 11:45 a.m., the bank was open for business. Plaintiff joined the line of customers waiting to transact business with the bank. When he reached the teller window, he presented a check for $1,100.00, drawn on Fleet bank, made out in his name and endorsed by him. He also presented a valid Massachusetts driver's license and a valid American Express credit card. The teller took the check and his identification cards, looked at them and handed them back to him and told him that the identifications were inadequate and that he will not be served. Odunukwe asked the teller exactly what constituted adequate identification. She replied that a government issued identification with a picture or a passport and a major credit card. He told her that his Massachusetts driver's license qualified as a government issued identification and the American Express credit card was a major credit card.

The teller, raising her voice, told him she would not accept his identification cards and that he should leave the bank because he would not be served. He refused to leave. The teller still refused to serve him. Odunukwe reached for his wallet to produce a third identification card; his Suffolk University alumni

6

identification with his picture on it. The teller rejected this third means of identification. She told him, again in a loud voice, to leave. He then requested to see the Manager. The Manager came over to the teller's window, took a quick glance at his check and his identification cards, said something to the teller, and then pushed the check and his Massachusetts driver's license, American Express credit card and Suffolk University identifications back to him. The manager told him that he would not be served and that he should leave the bank. He then asked the manager why his identification cards were unacceptable and the manager simply told him to leave. He informed the manager that he would not leave since he presented valid identification cards as required by the law. He again requested to be served at the bank. The manager told him that he would be forcefully evicted if he did not leave. Odunukwe did not move.

The manager then took the check and his identification cards and told him to step away from the teller window. He stepped away from the teller window and went to the side. A few minutes later, the manager called him into her office. She then made a quick phone call and then dropped the phone. She gave the check and identification cards back to Mr. Odunukwe and told him that he would not be served and that he must leave the bank and should he refuse, he would be forcefully removed.

Odunukwe then asked for an explanation to figure out what is going on and the manager stated that he would not be served and that he should leave the bank or he would be removed. He then told her that what they were doing to him was wrong, unfair and illegal. He told her that he would file a complaint against the bank with Fleet Bank Management. Odunukwe then left the bank.

Plaintiff drove to another Fleet bank, located in Medfield Massachusetts, approximately two miles away. At the Medfield Fleet bank, he presented the same Massachusetts driver's license, American Express credit card and check to the teller. The teller cashed his check and accepted his deposit after reviewing his identification cards.

A merchant (the bank), acting out of racial animus, impeded a customer's (plaintiff's) ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001). The complaint is predicated upon a federal statute that traces its origins to section 1 of the Civil Rights Act of 1866, 14 Stat. 27 (1866). This statute, now codified in 42 U.S.C. § 1981, prohibits both public and private racial discrimination in certain specified activities (including the making and enforcement of contracts). *Runyon v. McCrary*, 427 U.S. 160, 168-75 (1976). To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority (plaintiff is), (2) that the defendant discriminated against him on

8

the basis of his race (he certainly was treated differently and very shabbily than the other people in the bank), and (3) that the discrimination implicated one or more of the activities enumerated in the statute. *Morris v. Dillard Dep't Stores, Inc.*,277 F.3d 743, 751 (5th Cir. 2001). There is sufficient nexus between the asserted discrimination and some contractual right or relationship for summary judgment.

The case law suggests the nature of the requisite nexus. The Supreme Court originally gave section 1981 a narrow focus, declaring that the statute "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989). But Congress widened the interpretive lens when it enacted the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071 (1991). Section 1981, as amended, reads in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . .

* * *For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." That Act amended section 1981 by expanding the phrase "make and

9

enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The preeminent case is *Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir. 1996). There, two black customers were browsing innocently in a retail store. The assistant manager became suspicious and called the police. Id. at 412. The police arrived, hassled the two men (one of whom had completed his purchase and the other of whom had purchased nothing), found no evidence of wrongdoing, and departed (uttering racially derisive comments). Id. The customers sued, accusing the store of violating section 1981. The Seventh Circuit rejected the suit on the ground that the plaintiffs could not "point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 . . . specifically, the right to make and enforce a contract. They were denied neither admittance nor service, nor were they asked to leave the store." Id. at 414. Here, by contrast, the plaintiff was denied service and asked to leave the bank with which he conducted business. In *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1117-18 (10th Cir. 2001), cert. denied, 122 S. Ct. 1071 (2002), the Tenth Circuit ruled that a woman of African-American descent who allegedly had been ejected from a store on the basis of her race could not pursue a section 1981 claim because she had neither attempted nor planned to make any specific purchase (and, accordingly, could not

prove any interference with a contractual relationship). Id. The court made plain

that "the mere expectation of being treated without discrimination while

shopping" will not support a claim under section 1981. Id. at 1118. In contrast, the

court upheld a judgment for another African-American woman, ejected at the

same time, who was attempting to redeem a coupon that she had received

incidental to a previous purchase. Id. at 1103-05. The court concluded that the

coupon was tantamount to an option contract, and that the store could be held

liable for its race-based denial of the right to redeem it. Id. at 1104. The

distinction drawn by the Tenth Circuit between the two plaintiffs aptly illustrates

the need for a contractual nexus in a suit premised on 42 U.S.C. § 1981. This case

is distinguishable from Garrett v. Tandy Corp., 295 F.3d 94 (1st Cir. 2002)

because the plaintiff here has an ongoing commercial relationship with this bank

unlike a person passing through a store.

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon the attorney of record for each other party
by mail (by hand) on 6/7/05

Robt O. T

and that the parties
conferred prior to
this filing without
resolution.

Respectfully submitted,

Robert O. T

Robert O. Berger
11 Beacon Street, Suite 1210
Boston, MA 02108
617-423-7575
BBO# 038900