UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:05-cv-10324NMG

```
_____
                                )
JAY ODUNUKWE, ESQ.              )
                    Plaintiff,   )
                                )
        v.                       )
FLEET BANK BOSTON,              )
                    Defendant.   )
_____)
```

**MEMORANDUM IN SUPPORT OF CROSS-MOTION OF DEFENDANT FLEET BANK BOSTON (*SIC*) FOR SUMMARY JUDGMENT**

I.    **Introduction**

This is an action in which plaintiff Jay Odunukwe alleges that the defendant Fleet Bank Boston (*sic*) ("Fleet")[1] discriminated against him on the basis of his race when the Fleet branch in Medway, Massachusetts refused to cash a check for him on May 14, 2002 and allegedly told him to leave the branch.  Plaintiff asserts that he complied with the bank's check cashing identification policy, which requires a non-Fleet customer seeking to cash a check over $500 to present two forms of approved identification.  Specifically, plaintiff claims that he presented a Massachusetts driver's license and an American Express credit card to the Medway branch, both of which would be acceptable forms of identification, as well as a Suffolk University alumni identification card.  According to Fleet, plaintiff presented a Massachusetts driver's license and a Suffolk University alumni identification card.  The Suffolk University alumni identification card is not

---

[1] There is no entity called Fleet Bank Boston.  Plaintiff appears to be referring to Fleet National Bank, which has since merged with Bank of America.  As the actions of a Fleet branch are at issue in this case, the defendant in this case will be referred to as "Fleet."

approved identification under the policy, and therefore plaintiff was not able to cash his check because he did not present two approved forms of identification. At no time did plaintiff present an American Express credit card for identification at the Medway branch.

While the parties dispute numerous issues of fact pertaining to this case,[2] Fleet does not believe that these issues prevent this Court from granting summary judgment in its favor, because plaintiff is unable to present sufficient evidence on an essential element of his claim, namely that Fleet discriminated against him on the basis of his race. Plaintiff has filed Plaintiff's Motion for Partial Summary Judgment for Liability Under 42 U.S.C. §1981 ("Plaintiff's Motion for Summary Judgment"). Fleet has opposed this motion ("Opposition") and, pursuant to Rule 56 of the Federal Rules of Civil Procedure, files the instant cross-motion for summary judgment. As is explained below, plaintiff has failed to demonstrate that there is a genuine issue of fact regarding an essential element of his claim, namely that he was discriminated against because of his race, and thus summary judgment must be granted in Fleet's favor. This Court should reject plaintiff's effort to elevate an innocuous situation into an incident of racial discrimination.

## II.    **Procedural History**

Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD proceeding") in or about July 2002, alleging race

---

[2] The disputed issues of fact include but are not limited to: the number and types of identification plaintiff presented at the Medway branch and at the Medfield branch where he cashed the check and made a deposit; plaintiff's conduct and statements to the teller and branch manager at the Medway branch; the conduct and statements of the teller and branch manager at the Medway branch; whether plaintiff was told he had to leave the Medway branch or he would be forcibly removed.

discrimination as a result of the alleged failure of the Medway Fleet branch to cash his check. Plaintiff's deposition was taken during the course of the MCAD proceeding.

Plaintiff subsequently filed a civil action in Superior Court in Suffolk County on or about December 10, 2004 and served the complaint on Fleet on or about January 21, 2005. Fleet removed the action to this Court on February 17, 2005. Fleet filed a Motion for More Definite Statement on March 1, 2005, which plaintiff opposed. The Motion for More Definite Statement asserted that plaintiff should be required to provide a more definite statement as to the legal bases upon which he seeks to hold Fleet liable. The Motion for More Definite Statement is currently pending before this Court. As a result, no Answer has been filed, no Rule 16 Scheduling Conference has taken place, and no discovery has been conducted in this case.

On June 7, 2005, plaintiff filed Plaintiff's Motion for Summary Judgment.[3] On June 8, 2005, this Court issued a Notice of Scheduling Conference, which scheduled the conference to take place on August 16, 2005.

III.    **Statement of Material Facts as to which there exists a genuine issue to be tried and as to which there exists no genuine issue to be tried**

Fleet sets forth the following statement of facts in support of its Cross-Motion for Summary Judgment. As is explained in its Opposition, disputed issues of fact exist in this matter, and they are set forth below in subsection B. However, as is explained in subsection B, there is no disputed issue of fact on an essential element of plaintiff's claim, namely that he has been discriminated against on the basis of his race. All evidence cited below is attached to the accompanying Affidavit of Carol E. Kamm,

---

[3] Plaintiff's Motion for Summary Judgment essentially responds to the Motion for More Definite Statement, as plaintiff asserts that Fleet is liable under 42 U.S.C. §1981.

which shall be referred to as **"Kamm Aff.,"** and is submitted in support of Fleet's

Opposition and the instant Cross-Motion.

        *A.*     *Fleet's Statement of Facts*

1.      Plaintiff was born in Nigeria.

2.      On May 14, 2002, plaintiff went to the Medway Fleet bank located at 108 Main

Street in Medway, Massachusetts ("Medway Fleet branch") to cash a check.

Plaintiff was not a Fleet customer as of May 14, 2002 and had never previously

been inside the Medway Fleet branch.  (Deposition of Jay Odunukwe dated

August 5, 2004, at 18-20 **[Kamm Aff., Ex. 1]**.

3.      Plaintiff presented a check for $1100.00 to be cashed.  Fleet's check cashing

identification policy required a non-Fleet customer cashing a check over $500 to

present two types of acceptable identification.  Pursuant to this policy, teller

Marybeth McHardy asked plaintiff for two forms of acceptable identification.

Plaintiff presented a valid Massachusetts driver's license and a student

identification to teller Marybeth McHardy.  Ms. McHardy told plaintiff that his

driver's license was an acceptable form of identification, but that the student

identification was not, and that she could not cash his check.  (Affidavit of

Marybeth McHardy) **[Kamm Aff., Ex. 2]**.

4.      Plaintiff never presented an American Express card to Ms. McHardy.  If he had,

there is no question that she would have processed his transaction. (Affidavit of

Marybeth McHardy) **[Kamm Aff., Ex. 2]**.

5.      Plaintiff became irate and asked to speak with the manager.  Ms. McHardy called

her manager, Jean Brennan, over to assist her.  Plaintiff asked to speak with "the

man" and was quite disruptive.  Ms. Brennan informed him that she was the manager and asked plaintiff to come into her office so that she could assist him. Plaintiff agreed to do so. (Affidavit of Marybeth McHardy) **[Kamm Aff., Ex. 2]**; (Affidavit of Jean Brennan, ¶3 **[Kamm Aff., Ex. 3]**; (Deposition of Jay Odunukwe, at 38) **[Kamm Aff., Ex. 1]**.  Plaintiff estimates that his interaction with Ms. McHardy lasted five minutes (Deposition of Jay Odunukwe, at 43) **[Kamm Aff., Ex. 1]**.

6.    Ms. Brennan brought plaintiff into his office.  She told him that, as a non-Fleet customer cashing a check over $500, he was required to present two valid forms of identification in order to cash his check, and his expired student ID was not a valid form of identification.  She told him that she would call the maker of the check, Fleet customer Joy Odunukwe.  If Ms. Odunukwe verified that she had given him the check, that Ms. Brennan would cash it with just the Massachusetts license.  (Affidavit of Jean Brennan, ¶3) **[Kamm Aff., Ex. 3]**.

7.    Plaintiff does not dispute that Ms. Brennan made a telephone call while he was in her office, and he does not recall who she called or what was said. (See Affidavit of Plaintiff, ¶15; Deposition of Jay Odunukwe, at 40-41 **[Kamm Aff., Ex. 1]**.

8.    Ms. Brennan called Ms. Odunukwe at work, but she was not working that day. Ms. Brennan also called Ms. Odunukwe's home number and there was no answer. After these attempts to reach Ms. Odunukwe were unsuccessful, Ms. Brennan told plaintiff that she was sorry, but she was unable to cash his check.  Plaintiff did not accept this answer and asked her repeatedly why she refused to cash his check. Finally, he appeared to accept that his check was not going to be cashed and left

the bank.  (Brennan Affidavit, ¶¶3-4) **[Kamm Aff., Ex. 3]**.  Plaintiff estimates

that he was in Ms. Brennan's office approximately three to four minutes.

(Deposition of Jay Odunukwe, at 42-43) **[Kamm Aff., Ex. 1]**.

9.      Fleet's check cashing identification policy in effect in May 2002 required

plaintiff, as a non-Fleet customer cashing a check over $500, to provide two

forms of approved identification.  The policy listed the forms of approved

identification.  Student identification cards are not included on this list. ( Brennan

Affidavit, ¶5 and Ex. A thereto) **[Kamm Aff., Ex. 3]**.

10.     After leaving the Medway Fleet branch, plaintiff went to the Fleet branch in

Medfield, Massachusetts ("Medfield Fleet branch").  He presented a check for

deposit to the account of Joy Odunukwe in the amount of $1,333, and a check

drawn on Ms. Odunukwe's account in the amount of $1,100 to be cashed.  He

presented a Massachusetts driver's license, and another form of identification that

was not an approved form under Fleet's check cashing identification policy.

Pamela Martin, branch operations manager at the Medfield Fleet branch in May

2002, made an exception to the check cashing identification policy, and

authorized the teller to cash plaintiff's check for $1,100 without proper

identification, because he was depositing a check in Ms. Odunukwe's account for

more than the amount of the check he was cashing.  (Affidavit of Pamela Martin,

¶¶2-3 & Ex. A thereto) **[Kamm Aff., Ex. 4]**.  See also Deposition of Jay

Odunukwe, at 22-23 and Dep. Ex. 1; *id*. at 46-48 and Dep. Ex. 2 (identifying the

check he cashed and the deposit he made at the Medfield branch) **[Kamm Aff.,

Ex. 1]**.

11.    Fleet's check cashing identification policy states that the type of identification, numbers (except for credit cards) and expiration date are to be noted on the front, top portion of the check. (Martin Affidavit, ¶4 and Exhibit B thereto, at page 3 of 8) **[Kamm Aff., Ex. 4]**. If a credit card is used as a form of identification, the type of credit card and expiration date are to be recorded on the check. In addition, the credit card number must be written on the journal tape that records the transaction. (Id.) As Ms. Martin attests, there is no credit card type and expiration date recorded on the check plaintiff cashed, nor is there a credit card number written on the journal tape. The check plaintiff cashed in this case has only one form of identification noted on the front of the check, which is plaintiff's driver's license number. (Id., ¶4 and Exhibit A thereto) **[Kamm Aff., Ex. 4]**.

12.    Plaintiff did not attempt to make a deposit at the Medway Fleet branch. (Brennan Affidavit, ¶8) **[Kamm Aff., Ex. 3]**. Plaintiff also testified that he did not attempt to make a deposit at the Medway Fleet branch. (Deposition of Jay Odunukwe, at 47-48) **[Kamm Aff., Ex. 1]**.

13.    Plaintiff testified that neither Ms. McHardy (the teller) nor Ms. Brennan (the manager) had mentioned his race or made any derogatory comments to him on May 14, 2002. (Deposition of Jay Odunukwe, at 56) **[Kamm Aff., Ex. 1]**.

    B.    <u>*Issues of Fact and Issues as to which there are no genuine issues to be tried*</u>

As is clear from Plaintiff's Motion for Summary Judgment and Fleet's Opposition thereto, there are a number of factual disputes between the parties, including:

- The number and types of identification plaintiff presented to the Medway branch (see responses in Opposition to Plaintiff's Affidavit, ¶¶3-19);

- how plaintiff conducted himself at the Medway branch and what he said to the teller and branch manager (see responses in Opposition to Plaintiff's Affidavit, ¶¶3-19);

- what the teller and branch manager said to plaintiff at the Medway branch (see responses in Opposition to Plaintiff's Affidavit, ¶¶3-19);

- whether plaintiff was told to leave the Medway branch or he would be forcibly removed (see responses in Opposition to Plaintiff's Affidavit, ¶¶3-19); and

- The number and types of identification plaintiff presented to the Medfield branch (see response to ¶¶20-21).

Despite the fact that the parties do not agree on the number and types of identification plaintiff presented to the Medway and Medfield Fleet branches, Fleet believes there is no genuine issue of fact regarding this issue, because the Affidavits of Marybeth McHardy, Jean Brennan and Pamela Martin overwhelmingly demonstrate that plaintiff did not use an American Express card as a form of identification in either branch. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986)("judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"); *Petitti v. New England Telephone & Telegraph Co.,* 909 F.2d 28, 30 (1st Cir. 1990) (summary judgment is proper if evidence is so one-sided that one party must prevail as a matter of law).

Even if this Court should determine that a question of fact exists on that issue, however, there is no factual dispute and no genuine issue to be tried regarding whether

plaintiff was subjected to racial discrimination.  Plaintiff has presented <u>no</u> evidence that

anything that happened at the Medway branch was because of his race.

## IV.    __Summary Judgment Standard__

A motion for summary judgment shall be granted "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has

affirmed that

> Rule 56 mandates the entry of summary judgment, after adequate time for
> discovery and upon motion, against a party who fails to make a showing
> sufficient to establish the existence of an element essential to that party's
> case and on which that party will bear the burden of proof at trial.  In such
> a situation, there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the
> nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Evidence that is merely colorable

or is not "significant[ly] probative" cannot deter summary judgment.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (quotation and citation omitted). As the Court

noted, "[o]ne of the principal purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a

way that allows it to accomplish this purpose."  *Celotex,* 477 U.S. at 323-34.

The First Circuit has stated that "[g]enuine issues of material fact are not the stuff

of an opposing party's dreams.  On issues where the nonmovant bears the burden of

proof, he must present definite, competent evidence to rebut the motion.  This evidence

cannot be conjectural or problematic . . . . "  *Mesnick v. General Electric Co.*, 950 F.2d

816, 822 (1st Cir. 1991) (citations and quotations omitted). Plaintiff's obligation to produce enough proof to enable his case to get to a jury "cannot be satisfied by conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001); *id.* at 29 (affirming grant of summary judgment on §1983 claim, court noted that "[a]ccusations of bias are not self-elucidating," and plaintiff's allegation of bias were unsupported "rank conjecture" that could play no role in summary judgment calculus).

In this case, plaintiff has presented no evidence of any discriminatory intent. As a result, there is no genuine issue of fact to be tried on an essential element of plaintiff's claim, namely whether he was discriminated against on the basis of his race. For this reason, Fleet's Cross-Motion for Summary Judgment must be granted, as Fleet is entitled to judgment as a matter of law. *Mesnick*, 950 F.2d at 822.

## V.    Argument

### A.    *Summary Judgment must be granted on plaintiff's claim of race discrimination under 42 U.S.C. §1981, because there is no genuine issue of fact to be tried on an essential element of his claim, namely whether he was discriminated against on the basis of his race.*

Summary Judgment must be granted on plaintiff's claim under 42 U.S.C. §1981 for race discrimination in plaintiff's behalf must be denied, because plaintiff is unable to make a sufficient showing on the essential element of his claim concerning whether he was discriminated against on the basis of his race. *Celotex*, 477 U.S. at 322-23. Plaintiff bears the burden of proof on this essential element at trial, and judgment on Fleet's behalf is mandated by his failure to make a sufficient showing on this issue.

Section 1981 prohibits intentional discrimination based on race with respect to the right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property . . . ." 42 U.S.C. §1981(a).  To state a claim under section 1981, plaintiff must show:

> (1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute.

*Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002) (citing *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)).  Plaintiff's Motion for Summary Judgment argues that he was discriminated against in the right to make and enforce an alleged contract with Fleet to cash a check. *See* 42 U.S.C. §1981(b).

Plaintiff satisfied the first element of this claim, namely that he is a member of a racial minority.  Plaintiff's claim founders, however, on the second essential element, that Fleet discriminated against him on the basis of his race.  As is explained above in Section III of this Cross-Motion, plaintiff is unable to make a sufficient showing of discriminatory intent.  "The conclusion of discrimination must have 'specific, nonconclusory factual' support...," and plaintiff has presented no such evidence in this case.  *Scott v. Macy's East, Inc.*, 2002 WL 31439745, *4-5 (D. Mass. Oct. 31, 2002)(Gertner, J.) (quoting *Judge v. City of Lowell*, 160 F.3d 67, 77 (1st Cir. 1998), *overruled on other grounds in Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004)) (in granting summary judgment on §1981 claim, court held that plaintiff's claim of a freeze placed on his credit card implicated a contract right, but that plaintiff had failed to present sufficient evidence of race discrimination when "sum total of evidence offered by [plaintiff is his] own conviction that he was a victim of racial

profiling" and an inadmissible statement of an American Express representative) (copy attached hereto as Exhibit A).

Even if all of plaintiff's factual allegations are accepted as true, he would have shown only that the teller and the branch manager refused to cash his check when he presented sufficient identification and told him to leave the branch.  He testified that no comments were made about his race by either the teller or the branch manager, nor were any derogatory comments made to him. (Statement of Facts, section III above, ¶13).  He has produced no evidence of white customers being treated differently than he was.  None of his allegations directly show any discriminatory intent, nor do they raise an inference of racial animus.[4]  *See Overby v. Chase Manhattan Bank & J.P. Morgan Chase*, 351 F. Supp.2d 219, 224 (S.D.N.Y. Jan. 3, 2005) (court granted summary judgment on plaintiff's "make and enforce" contracts claim under §1981, finding no evidence to support an inference that defendant had intent to discriminate against plaintiff

---

[4] Any inference of discrimination is particularly unwarranted in this case, even under plaintiff's version of the facts.  It is unreasonable to assume that Fleet intended to discriminate against plaintiff on the basis of race when bank policy required a non-Fleet customer cashing a check over $500 to present two acceptable forms of identification; the teller looked at plaintiff's identification, informed him that he needed a driver's license and major credit card, and went to the branch manager for assistance; the branch manager also looked at plaintiff's identification and informed him that he needed a driver's license and major credit card, and went to the extra effort of attempting to reach Ms. Odunukwe, the maker of the check.  A branch manager intent on discriminating against plaintiff would not have invited plaintiff into her office and made phone calls in an effort to assist plaintiff in being able to cash his check.  In addition, no inference can be drawn from the fact that plaintiff cashed the check in the Medfield branch, as the situations were not similar.  In Medfield, plaintiff deposited a check in Ms. Odunukwe's account at the same time he attempted to cash the check at the Medfield branch, and the deposit was for an amount that was more than the value of the check he was cashing.  There is no dispute that plaintiff did not attempt to deposit a check at the Medway branch.  There is also no dispute that the check that plaintiff cashed in Medfield does not note any credit card type or expiration date on it, as would be required under bank policy.  (Statement of Facts, section III above, ¶¶2-13).

when defendant failed to suggest investment options to plaintiff, as plaintiff produced no evidence that white customers were treated differently, nor could discriminatory intent be inferred from fact that plaintiff was asked for identification when depositing $19,000 check); *Wiggins v. Rhode Island*, 326 F. Supp.2d 297, 311 (D.R.I. 2004) (court held that plaintiff's "factual proffer" on issue of intent did not "raise[] any inference of racial animus in decision to stop, search, forcibly restrain, or arrest plaintiff; evidence included false testimony by police officers, completion of reports and tickets with false information, not stopping for plaintiff after first alleged traffic infraction, and assorted other criticisms of officers). Plaintiff can point to no competent evidence that the actions of the teller and branch manager "stemmed from something other than a race-neutral reaction" to the encounter with plaintiff. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 347 (1st Cir. 1995) (summary judgment on §1981 affirmed, as plaintiff presented no competent evidence that defendants intentionally discriminated against her on account of her race; court ruled that, "absent probative evidence that Domina's petulance stemmed from something other than a race-neutral reaction to the stressful encounter plainly evidenced in the summary judgment record, including [plaintiff's] persistence (however justified)," district court properly excluded conclusory lay opinions of discrimination).  Plaintiff's lack of evidence on this essential element of his claim mandates summary judgment in Fleet's favor.

"Disputes generally arise out of mutual misunderstanding, misinterpretation and overreaction, and without more, such disputes do not give rise to an inference of discrimination." *Alexis*, 67 F.3d at 347-48 (quoting and citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 18 (1st Cir. 1989), *overruled on other grounds in*

*Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004))[5]

(internal quotations and citations omitted).  In this case, there is nothing more.  There is

only plaintiff's overreaction to what was, at most, a misunderstanding regarding

acceptable forms of identification for a non-Fleet customer to cash a check.  "Given the

absence of any meaningful evidence of discriminatory intent," Fleet's Cross-Motion for

Summary Judgment must be granted for failure to satisfy this essential element of his

claim.  *Wiggin*, 326 F. Supp.2d at 311.

**VI.**    **Conclusion**

For the reasons set forth above, Fleet's Cross-Motion for Summary Judgment

should be allowed, and plaintiff's complaint should be dismissed with prejudice, because

plaintiff will be unable to demonstrate that a genuine issue of fact exists concerning an

essential element of plaintiff's claim, namely whether he was discriminated against on

the basis of his race.

<div style="margin-left:50%">

BANK OF AMERICA, erroneously named
FLEET BANK BOSTON
By its Attorneys,


    /s/ Carol E. Kamm
Donn A. Randall, BBO# 631590
Carol E. Kamm, BBO # 559252
Bulkley, Richardson, and Gelinas LLP
One Post Office Squire, Suite 3700
Boston, Massachusetts 02109
Telephone:  (617) 368-250
Facsimile:  (617) 368-2525

</div>

Dated:  June 21, 2005
(doc. # 300900)

---

[5] Bas on Supreme Court precedent, the *Educadores* decision overruled the
heightened pleading requirement for civil rights imposed in *Judge v. City of Lowell,*
*supra,* and *Dartmouth Review v. Dartmouth College.*  The obligation of the party with the
burden of proof to produce significantly probative evidence of discrimination, in
opposition to a summary judgment motion on civil rights claims, is unaffected by the
*Educadores* decision.



**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Raymond SCOTT, Plaintiff,
v.
MACY'S EAST, INC., Kenneth Sanabria, Kimberly
Jones, John Ouellette, Russell
Jenkins, and the Town of Braintree, Defendants.
**No. Civ.A.01-10323-NG.**

Oct. 31, 2002.

Black credit card holder sued store, its security officers, town police department and arresting officers, seeking damages for his arrest on disorderly conduct charges, occurring after officers notified credit card company of suspected stolen credit card use, police were summoned to interrogate holder about suspected use of stolen cards and holder became angry. Defendants moved for summary judgment. The District Court, Gertner, J., held that: (1) right of holder to contract on same basis as white persons was not violated; (2) holder was not denied property rights similar to those of white persons; (3) holder was not denied equal right to use of public accommodations; (4) arrest of cardholder for disorderly conduct did not violate his equal protection rights; (5) arrest did not violate his Fourth Amendment rights; (6) security officers did not violate Massachusetts civil rights statute; (7) officers did not violate Massachusetts deceptive practices statute; (8) security officers were not liable for false arrest, intentional infliction of emotional distress, negligence, or slander under Massachusetts law.

Judgment for defendants.

West Headnotes

**[1] Civil Rights** 1041
78k1041 Most Cited Cases
(Formerly 78k118)
There was interference with right of black credit card holder to engage in contracting, violative of statute granting all persons contractual rights of whites if

done with intent to discriminate, when credit card company put freeze on card after receiving warning from security personnel at store that black credit card holder was suspected of using stolen card. 42 U.S.C.A. § 1981.

**[2] Civil Rights** 1041
78k1041 Most Cited Cases
(Formerly 78k118)
Black credit card holder failed to show store's intent to discriminate based on race, as required for claim that holder was denied contractual rights of white persons, when security personnel at store notified credit card company of possible stolen credit card use, after which holder's card was frozen and he was interrogated and eventually arrested by police for disorderly conduct; while holder claimed he was singled out for attention because of his race, he did not refute store's claim that security officers took action after observing him engaging in conduct consistent with use of stolen credit card. 42 U.S.C.A. § 1981.

**[3] Civil Rights** 1071
78k1071 Most Cited Cases
(Formerly 78k130)
Black credit card holder failed to show store's intent to discriminate based on race, as required for claim that holder was denied same property rights as white person, when security personnel at store notified credit card company of possible stolen credit card use, after which holder's card was frozen and he was interrogated and eventually arrested by police for disorderly conduct; while holder claimed he was singled out for attention because of his race, he did not refute store's claim that officers took action after observing him engaging in conduct consistent with use of stolen credit card. 42 U.S.C.A. § 1982.

**[4] Civil Rights** 1049
78k1049 Most Cited Cases
(Formerly 78k123)
Black credit card holder failed to show store's intent to discriminate based on race, as required for claim that holder was denied right to equal use of public accommodations, in violation of federal and state statutes, when security personnel at store notified credit card company of possible stolen credit card use, after which holder's card was frozen and he was interrogated and eventually arrested by police for disorderly conduct; while holder claimed he was

Not Reported in F.Supp.2d                                                                                    Page 2
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

singled out for attention because of his race, he did not refute store's claim that officers took action after observing him engaging in conduct consistent with use of stolen credit card. 42 U.S.C.A. § 2000a et seq.; M.G.L.A. c. 272, § 98.

**[5] Arrest** 🔑63.4(15)

35k63.4(15) Most Cited Cases

**[5] Constitutional Law** 🔑223

92k223 Most Cited Cases

Police officers called to investigate possible use of stolen credit card did not deny credit card holder equal protection of law when they arrested him for disorderly conduct after he became angry about allegedly being profiled as wrongdoer because of his race, and refused to quiet down; there was no evidence that officers would have treated white person any differently, in similar circumstances. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[6] Arrest** 🔑63.4(15)

35k63.4(15) Most Cited Cases

Arrestee's admission that he committed acts sufficient to support arrest for disorderly conduct precluded claim that arrest violated his Fourth Amendment rights. U.S.C.A. Const.Amend. 4.

**[7] Civil Rights** 🔑1049

78k1049 Most Cited Cases
(Formerly 78k123)

**[7] Civil Rights** 🔑1088(4)

78k1088(4) Most Cited Cases
(Formerly 78k133)

Failure to show that any civil rights of black credit card holder were violated

precluded claim that security personnel of store were liable under Massachusetts civil rights statute for alerting credit card company to possible use of stolen credit card, or that police called to scene violated statute by arresting card holder when he became disorderly upon discovering he was under investigation. M.G.L.A. c. 12, § § 11H, 11I.

**[8] Consumer Protection** 🔑6

92Hk6 Most Cited Cases

Failure to provide sufficient evidence that security force of store used racially discriminatory words or committed racially discriminatory deeds precluded claim that store engaged in racial harassment, in violation of Massachusetts unfair or deceptive trade practices statute, by notifying credit card company of suspected use of stolen credit card by black person

who was actual holder of card. M.G.L.A. c. 93A, § § 2, 9.

**[9] False Imprisonment** 🔑15(2)

168k15(2) Most Cited Cases

Store security officers were not liable for false arrest of credit card holder, under Massachusetts law, after they notified credit card company of suspected use of stolen card, police were summoned, holder became angry while being interrogated outside of store, and was arrested for disorderly conduct; security officers had nothing to do with decision to arrest.

**[10] Damages** 🔑57.25(1)

115k57.25(1) Most Cited Cases
(Formerly 115k50.10)

Store security officers did not intentionally inflict emotional distress upon credit card holder, under Massachusetts law, by alerting credit card company of suspected use of stolen card, which resulted in freezing of card, dispatch of police, and holder's arrest for disorderly conduct when angered over situation; officers' conduct was not sufficiently egregious.

**[11] Negligence** 🔑252

272k252 Most Cited Cases

Credit card holder failed to satisfy breach of duty requirement, for negligence claim under Massachusetts law, against security officers of store who contacted credit card company due to suspicion that holder was using stolen card; existence of duty was predicated on statutory duties found not to have been breached.

**[12] Libel and Slander** 🔑54

237k54 Most Cited Cases

Security officers in store did not slander credit card holder, under Massachusetts law, when they reported to credit card company suspicion that card being used by holder to make numerous purchases was stolen; it was not slanderous to transmit accurate statement of facts, and allow recipient to draw conclusion that criminal activity was involved.

*MEMORANDUM AND ORDER*

GERTNER, J.

I. *INTRODUCTION*

*1 For their role in a credit card fraud investigation that culminated in Plaintiff Raymond Scott's confrontation with police at a shopping mall, Scott

Not Reported in F.Supp.2d                                                                                                    Page 3
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

brings numerous causes of action. Scott sues Defendants Macy's East, Kenneth Sanabria, and Kimberly Jones (the "Macy's Defendants") and the Town of Braintree, John Ouellette, and Russell Jenkins (the "Braintree Defendants"). Against the Macy's Defendants he alleges violations of 42 U.S.C. § § 1981 and 1982; violations of state and federal public accommodations laws; violation of the Massachusetts Civil Rights Act ("MCRA"); unfair trade practices in violation of the Massachusetts General Laws, Chapter 93A; and state common law torts of false imprisonment, slander, negligence, and intentional infliction of emotional distress. Against the Braintree Defendants, Scott alleges state and federal civil rights violations.

At its core, this case involves an allegation of racial profiling. Scott believes--and he may well be correct--that race played a role in his treatment at the South Shore Mall on June 29, 1999. [FN1] The law, as I describe below, requires some measure of proof, and in a civil case, it is the claimant who bears the burden of proof. When the word of one party runs up against the word of another, as here, it is not the law's place to comment as to whose word means more. The defaults are set to favor the defendant, black or white. While Scott may have made out his claim if he (or his counsel) had conducted a meaningful investigation, where he has not, summary judgment will lie.

> FN1. Commentators have suggested that the power of racial assumption is often irresistible--that, to some extent, improper attendance to race unconsciously infiltrates the sort of judgment calls that Sanabria and Jones must make in the course of their employment. Miriam Kim, *Discrimination in the Wen Ho Lee Case: Reinterpreting the Intent Requirement in Constitutional and Statutory Race Discrimination Cases*, 9 Asian L.J. 117, 139-40 (2002) (reviewing psychological studies of unconscious stereotyping through cognitive short-cutting); Ian F. Haney-Lopez, *Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination*, 109 Yale L.J. 1717, 1769 (2000) (referencing the "large class of cases in which persons engage in discrimination but do not understand themselves to be discriminating" to challenge intentional discrimination models).

Both the Macy's Defendants [docket entry # 26] and the Braintree Defendants [docket entry # 29] move for summary judgment on all claims. For the reasons set forth below, I GRANT both motions.

II. *FACTS*

The unfortunate incidents giving rise to this case occurred on June 29, 1999, in the South Shore Plaza shopping mall in Braintree, Massachusetts. On the evening of June 29, Plaintiff Raymond Scott, an African-American man, visited Defendant Macy's East, Inc.'s department store at the South Shore Plaza mall with a friend, Trevor Watson. Defendants Kenneth Sanabria and Kimberly Jones were working in the Macy's store that evening in their capacity as "security associates." It is the task of security associates to wander the floors in plain clothes and keep their eyes open for shoplifters.

On his way to the store's security office, Defendant Sanabria first noticed Scott and Watson shopping in the "collections" area of Macy's men's department, where designer clothes from such popular names as Ralph Lauren and Tommy Hilfiger adorn the racks. Scott and Watson were gathering stacks of clothes to purchase, seemingly without much attention to the price or size of individual items. It is the Macy's Defendants' position that Scott and Watson were shopping "rapidly"; Scott disputes this characterization, pointing to his own deposition testimony that when he goes to the store, "I go in and know what I want and get it and leave." Sanabria proceeded to the security office and encountered Defendant Jones. As the two stopped to talk, they observed Scott passing by with an armload of merchandise.

**\*2** Sanabria and Jones testified at deposition that they were trained to identify shopping behaviors consistent with the use of stolen credit cards. Moreover, it is Macy's practice to give its security associates anti-discrimination training, in an effort to ensure that its employees focus on the behavior--and not the race--of shoppers as they scan the floors for suspicious activity. It was Sanabria and Jones's conclusion that Scott and Watson's behavior merited more attention. Accordingly, Jones returned to the security office, where she could monitor the two shoppers' activity via security camera. [FN2]

> FN2. According to Jones's deposition, she and Sanabria both personally saw the behavior deemed suspect, discussed it, and went their separate ways--Jones to the security office and Sanabria upstairs to the jewelry department. Sanabria's deposition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

makes no mention of any encounter with Jones: as he tells it, he spotted Scott and Watson, noted their behavior, stopped by the security office and returned upstairs. Though the stories are not contradictory--Sanabria may well have omitted the detail of his encounter with Jones--the plaintiff views the two stories as sufficiently in conflict as to render "the credibility of Jones and/or Sanabria highly questionable." I do not agree. In any case, my findings on summary judgment do not depend on Jones or Sanabria's credibility.

While in the security office, Jones received a call from "Amy," a saleswoman in the men's department. Amy was concerned about two men in the department who were making repeated trips to the sales counter to add to a pile of clothes they wanted to purchase. Jones continued to follow Scott and Watson on her monitors and Scott and Watson continued to heap clothes on the sales counter, without much attention to size or price. Jones called Sanabria back down to the security office and reported Amy's observations to him.

Scott ultimately purchased seventeen items in the men's department, charging the items to an American Express Gold Card referencing a corporate account for *The Source. The Source* is a hip-hop magazine of national circulation, founded and owned in part by Scott. Scott's name was on the credit card. American Express approved a charge of around $750.00. Scott and Watson then left the department with their purchases, whereupon Sanabria and Jones approached Amy and asked after the number of the credit card Scott had used.

Scott and Watson went on to purchase $180.00 in cologne and a $500.00 gift certificate at the fragrance counter. At the fragrance counter, as Jones watched from a distance, Scott and Watson began to divide their purchases into separate bags. Jones viewed this practice, like the rapid, apparently indiscriminate selection of clothing items, to be consistent with the use of a stolen credit card. At no time did Sanabria, Jones, or any other Macy's employee confront Scott and Watson about their behavior, though Jones did follow them out into the mall concourse. Scott made further purchases with the American Express card at Champs, a sporting goods store.

Sanabria called American Express's fraud hotline to report what he and Jones had seen. [FN3] The basis for this decision, according to the testimony of

Sanabria and Jones, was that Scott and Watson were purchasing clothing indiscriminately and in large amounts, that they did so rapidly and in several trips to the sales counters, that the two shoppers charged large amounts to a single credit card, and that they divided their items into separate bags. Sanabria and Jones testified at deposition that the plaintiff's race did not factor into their decision.

> FN3. In his deposition Sanabria says he dialed up American Express after Scott and Watson left the fragrance counter and Sanabria consulted with the saleswoman. Jones testified that Sanabria made the call while Scott and Watson were still at the counter.

After Sanabria read off the credit card number, American Express put Sanabria on hold and tried to contact the named cardholder: Raymond Scott. The attempt was unsuccessful--as Scott was still at the mall--and American Express placed a "temporary freeze" on the account. A decision was made to call the Braintree Police Department. Shortly thereafter, Defendant police lieutenant Russell Jenkins and Defendant patrolman John Ouellette arrived at the mall to discuss the matter with Sanabria.

**\*3** At Lady Foot Locker, another store in the mall, Scott proffered the American Express card once more. By now the temporary freeze was in place. The clerk at Lady Foot Locker received a message from American Express asking her to call them about the proposed use of Scott's card. The clerk complied, spoke briefly with American Express, and handed the telephone to Scott. The representative of American Express told Scott that Macy's had observed "two black men ... fraudulently using the card." Scott responded that he and Watson were the black men and that the card was his. Scott was put on hold.

While Scott was on hold, another employee at Lady Foot Locker informed him that Defendants Ouellette and Jenkins had arrested Watson. Scott handed the phone to the sales clerk and left the store to ascertain what had happened.

The parties' depositions dispute what happened next, and no testimony was taken from third party witnesses. According to the Braintree Defendants, Scott approached them hurriedly and, as a crowd gathered, "yelled offensive, vulgar, and racially charged epithets" at Jenkins. Jenkins asked for Scott's identification and tried unsuccessfully to calm him down. Although he provided photo identification,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 5
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

Scott refused to show Jenkins his credit card. Jenkins cautioned Scott about his loud, disruptive behavior and explained that persistence in this course of conduct would result in his arrest for disorderly conduct. Scott then challenged Jenkins to a fight. Jenkins informed Scott that he was under arrest, as promised, for disorderly conduct. Ouellette intervened and sprayed Scott twice with pepper spray before Scott ceased resisting arrest and submitted to handcuffs. Ouellette and Jenkins had to drag Scott from the scene.

Scott's version of his interaction with the police differs considerably. According to Scott, he approached the police at a regular, nonthreatening pace and never resorted to vulgar or abusive language while they were questioning him. When asked to produce ID, he suggested to the police that the inquiry was the result of racial profiling. Scott then asserted his rights, told Jenkins "that he was violating me, that it was embarrassing." Scott then refused to be quiet, refused to submit to arrest, "[a]nd basically the next thing Officer Ouellette maces me and they tackled me to the ground, started punching me, macing me again when I was on the ground, then dragged me out on my knees out of the mall." At this point, "when they was macing and beating ... me," Scott may have used foul language.

However, notwithstanding Scott's characterization of the facts in this litigation, he pleaded guilty to resisting arrest and admitted to sufficient facts on the charges of disorderly conduct and assault and battery of a police officer. (The case was then continued without a finding.) Ouellette and Jenkins were tried and acquitted of criminal charges of excessive force.

III. *DISCUSSION*

**\*4** Under Federal Rule 56, summary judgment appropriately disposes of a claim when the pleadings, depositions, interrogatory responses, admissions and affidavits on file suggest that there is no genuine issue of material fact and the movant is entitled to judgment on the claim as a matter of law. Fed.R.Civ.P. 56(c). It is incumbent upon a court confronted with a summary judgment motion to view the facts in the light most favorable to the nonmovant, and all reasonable inferences from these facts are to be drawn in its favor. *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 42 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000).

A. *42 U.S.C. § 1981*

In pertinent part, 42 U.S.C. § 1981 recognizes the same right of all persons "to make and enforce contracts ... as is enjoyed by white citizens." Suit is available against private actors under both statutes, *Patterson v. McLean Credit Union,* 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), but to support a cause of action, discrimination must be race-based and intentional. *Dartmouth Review,* 889 F.2d at 17. It is therefore Scott's burden to show that the Macy's Defendants interfered with his right to make contracts because of his race.

1. *Is a § 1981 Right to Contract Involved?*

[1] A threshold question, raised by defendants, is whether a § 1981 right to contract is involved at all. In *Garrett v. Tandy, Inc.,* 295 F.3d 94 (1st Cir.2002), the court found that plaintiff's right to contract was not involved in facts similar to, but not identical to those at issue here. Radio Shack employees followed a black shopper around the store, "monitor[ing] his movements." *Id.* at 96. Upon learning, after the plaintiff's departure, that merchandise was missing, the store falsely accused the plaintiff of theft. *Id.* The *Garrett* court rejected the plaintiff's § 1981 claim, adopting a position of strict adherence to the statute's language: the statute requires a *per se* interference with the plaintiff's ability *to contract. Id.* at 100.

While under *Garrett,* the Macy's Defendants' surveillance of Scott does not implicate § 1981, their role in deactivating Scott's American Express card does. For a time, Scott was denied the ability to contract with American Express (and arguably Lady Foot Locker as well, though he might have paid for his purchases in cash).

The Macy's Defendants have an answer for this as well: they point to a case in the Southern District of New York with facts almost identical to those before this Court. In *Nevin v. Citibank N.A.,* 107 F.Supp.2d 333 (S.D.N.Y.2000), security officers at the Lord & Taylor department store in New York took note of an African-American shopper's high-volume credit-card purchases and tipped off the credit card company and police. *Id.* at 337-38. The credit card company refused subsequent charges at another store and, while on the telephone with the clerk, asked to speak to the cardholder plaintiff. *Id.* at 349. The plaintiff never spoke to the company to settle the question. *Id.* The *Nevin* court therefore concluded that "Nevin was the cause of her own distress," *id.,* and dismissed the claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*5** Following *Nevin,* the Macy's Defendants' view--that Scott's snap decision to forestall resolution of his credit card freeze to attend to his friend's arrest extinguishes his § 1981 claim--is analogous to an argument of contributory negligence. The analogy is misplaced. A § 1981 violation complete with racial discrimination is more akin to an intentional tort, for which contributory negligence is not a defense, *Restatement (Second) of Torts § 481,* than an act of negligence. Moreover, the direct consequence of Macy's Defendants' action was an impairment of Scott's ability to make and enforce contracts. Scott's failure to correct the situation at the first opportunity contributed to the *duration* of the impairment, but not the impairment itself. I therefore reject the *Nevin* court's analysis on that score.

2. *Is There Evidence of Race Discrimination?*

[2] The more serious impediment to recovery concerns proof of racial discrimination. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc., 67 F.3d 341, 347-48 (1st Cir.1995)* ("As Alexis points to no competent evidence that Domina and McDonald's intentionally discriminated against her on account of her race, the district court correctly ruled that this section 1981 claim was not trialworthy"). It is important to say at the outset that here, as in other discrimination cases, Scott does not have to come forward with direct evidence of racial discrimination. Courts have taken due notice of the fact that a plaintiff can rarely uncover specific statements or documentary evidence indicating racism. As a consequence, though claims brought under the Equal Protection Clause of the Fourteenth Amendment, for example, require proof of discriminatory intent, a plaintiff may prove that intent with circumstantial evidence. *Judge v. City of Lowell, 160 F.3d 67, 77 (1st Cir.1998).* The conclusion of discrimination must have "specific, nonconclusory factual" support, however. *Id. at 75.* A plaintiff must summon evidence from which racial discrimination might be inferred.

Here, for example, Scott might have conducted discovery of Macy's past conduct. Documentary or testimonial evidence might have revealed prior complaints of discrimination or a pattern of activity suggesting that minority shoppers caught the eye of security officials more than white shoppers did. *Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-67, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)* (finding such evidence probative of discrimination). Comparing the treatment Scott received from the Macy's Defendants on this occasion with the treatment accorded to white shoppers behaving similarly might alone support an inference of discrimination. *Garrett v. Tandy, Inc., 295 F.3d 94, 108 (1st Cir.2002)* (Boudin, J., concurring in part and dissenting in part) (**"And, if Garrett's behavior was no different than that of other shoppers who visited Radio Shack at the same time (save as to his race), and if he alone was identified to the police, an inference of racial discrimination is more than speculation."**).

**\*6** Quite apart from pattern and practice and evidence, Scott could have buttressed his claim in the instant case with the testimony of third party witnesses who observed him shopping. Or he could have submitted credit card receipts, which are usually time-stamped, to refute the Macy's Defendants' allegations that he was shopping so fast as to raise suspicions of credit card fraud.

The plaintiff has explored none of these avenues to circumstantial proof of discrimination. Instead, the sum total of evidence offered by Scott in support of his allegations of racial discrimination is (1) Scott's own conviction that he was a victim of racial profiling, and (2) the American Express representative's statement to Scott--inadmissible, as I describe below--that a Macy's employee had reported that "two *black* men were fraudulently using the card." Scott's instincts, whether or not they are rationally based or reflect the reality of his treatment at Macy's, cannot alone support a legal conclusion of discrimination. *See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir.1989)* ("[M]erely juxtaposing the fact of one's race with an instance of discrimination is insufficient to state a claim").

All the plaintiff can muster to corroborate his view is the American Express representative's statement, which he offers as evidence that Sanabria and Jones keyed on Scott's race. Sanabria and Jones deny that the statement was made. No one from American Express has been offered to testify to the statement. Rather, plaintiff says that this is what one American Express representative said to him about what Sanabria said to another operator. The statement is inadmissible hearsay. I may not consider it on summary judgment. *Weston-Smith v. Cooley Dickinson Hospital, Inc., 153 F.Supp.2d 62, 69 (D.Mass.2001); see also Pakizegi v. First Nat. Bank of Boston, 831 F.Supp. 901, 909 (D.Mass.1993)* (finding the statement of a bank manager, relayed to the plaintiff through her supervisor, inadmissible as evidence of discrimination on summary judgment).

Scott challenges the stories of Jones and Sanabria, but not in a meaningful way. He points out inconsistencies in the stories and suggests that they bear on the Macy's Defendants' credibility as witnesses. However, none of the disjuncts in testimony are material or dispositive here. And here again, Scott has failed to take steps that might meaningfully challenge the testimony. He has not challenged their testimony that their training as security officials led to their focusing on Scott. He has not, for example, sought to look at the training materials and compare his conduct with the standards articulated there.

In the final analysis, Scott bears the burden of production and proof in this case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." (emphasis added)). Scott has neither refuted the justifications of the Macy's Defendants nor produced affirmative evidence--even circumstantial--of racial discrimination. He has not met that burden.

**\*7** One caveat here: I do not suggest that Scott was wrong to think that race played a role in his treatment at the South Shore Mall on June 29, 1999. [FN4] The law, however, requires some measure of proof, and in a civil case it is the claimant who bears the burden of proof. When the word of one party runs up against the word of another, it is not the law's place to comment as to whose word means more. The defaults are set to favor the defendant, black or white. While Scott may have made out his claim if he had dug further, where he has not, summary judgment will lie.

FN4. Commentators have suggested that the power of racial assumption is often irresistible--that, to some extent, improper attendance to race unconsciously infiltrates the sort of judgment calls that Sanabria and Jones must make in the course of their employment. Miriam Kim, *Discrimination in the Wen Ho Lee Case: Reinterpreting the Intent Requirement in Constitutional and Statutory Race Discrimination Cases,* 9 Asian L.J. 117, 139-40 (2002) (reviewing psychological studies of unconscious stereotyping through cognitive short-cutting); Ian F. Haney-Lopez, *Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination,* 109 Yale L.J.

1717, 1769 (2000) (referencing the "large class of cases in which persons engage in discrimination but do not understand themselves to be discriminating" to challenge intentional discrimination models).

B. *42 U.S.C. § 1982*

[3] Section 1982 affords "[a]ll citizens of the United States ... the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The assertable rights under § 1982 are closely tied to the language of the statute--a claim is not viable unless there is interference with a plaintiff's ability to acquire, keep, or alienate property. **Garrett v. Tandy, Inc., 295 F.3d 94, 103 (1st Cir.2002)** (applying to § 1982 the logic that governed its limited reading of § 1981).

The Macy's Defendants certainly did nothing in derogation of Scott's § 1983 rights while he was in the store. However, the steps taken afterward that resulted in the freeze on Scott's credit card are, to my mind, actionable upon a showing of racial discrimination. Again, however, the plaintiff's claim must fail, because the plaintiff has mustered no cognizable evidence that Scott's race at all factored into its analysis.

C. *Federal and State Public Accommodation Laws*

[4] Federal law establishes Scott's entitlement to "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race [or] color...." 42 U.S.C. § 2000a. Chapter 272, § 98 of the Massachusetts General Laws likewise forbids racial discrimination "relative to the admission of any person to, or his treatment in, any place of public accommodation." The parties do not dispute that Macy's is a place of public accommodation as set out in both statutes.

The Macy's Defendants' first line of defense is that their distant surveillance and report of their findings to the police and American Express do not implicate either statute. They point out that at no point did Sanabria or Jones interfere with Scott's shopping at Macy's. Scott moved freely through the store and made his purchases without incident.

*Nevin* supports the view that Macy's "hands-off" approach was sufficient to warrant summary judgment against Scott--at least under the federal law. *Nevin,* 107 F.Supp.2d at 348 ("[T]he Lord & Taylor Defendants cannot be liable under [the public accommodations statute] because Plaintiff was at no time denied access to the store, service in the store, extension of credit while in the store or any other amenities that the store offers its customers.").

**\*8** I respectfully disagree. A defendant should not be immunized from liability under the public accommodation laws merely because the consequences of racism befall the plaintiff *after* his visit. The drafters of the Civil Rights Act could not have intended to require the admittance of racial minorities to places of public accommodation, while still authorizing proprietors to arrange for their unjustified arrest after they have come and gone.

Had Scott offered evidence that racial animus or racially tainted suspicions of credit fraud prompted the actions taken by the Macy's Defendants in this case, or shown the Macy's Defendants' claims to be pretextual, Scott's claims under state and federal public accommodations laws could have gone to the jury. But--yet again--the absence of that evidence makes this claim as untenable as the § 1981 claims. *Id.* at 349 (rejecting Ms. Nevin's public accommodation claim against her credit card company for her failure to demonstrate racial bias).

D. *42 U.S.C. § 1983*

[5] According to his complaint and opposition papers, Scott alleges that the Braintree Defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment and the Fourth and Fifth Amendments. The papers do little to elucidate the theories underlying these claimed violations. The lines that follow demonstrate my best attempt to fill in the gaps.

Defendants Ouellette and Jenkins claim qualified immunity, such that they are not liable under § 1983 if "a reasonable official could have believed [the] actions [at issue] were lawful in light of clearly established law." *Febus-Rodriguez v. Betancourt-Lebron,* 14 F.3d 87, 91 (1st Cir.1994) (quoting *McBride v. Taylor,* 924 F .3d 386, 389 (1st Cir.1991)) (internal quotation marks omitted). It is the Braintree Defendants' position that no constitutional violation occurred.

1. *Equal Protection*

To establish a violation of equal protection principles under the 14th Amendment, Scott must prove intentional discrimination, that the officers treated him differently than they would white citizens because of his race. *See Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (finding evidence of discriminatory impact insufficient to make out a violation of the Equal Protection Clause). Again, as described above, since a plaintiff can rarely produce specific statements indicative of racism, a plaintiff may offer circumstantial evidence to meet the requirement, so long as the conclusion of discrimination must have "specific, nonconclusory factual" support. *Judge,* 160 F.3d at 77.

But Scott has provided no evidence of discriminatory animus against the Braintree Defendants. His submission is entirely directed at the Macy's Defendants. As to Ouellette and Jenkins, Scott claims only that "the precipitating events which gave rise to the government actors becoming involved were the product of racial profiling and the governmental agents continued the egregious conduct and magnified it." Even if the record before me supported finding an issue of fact as to the alleged discrimination by the Macy's Defendants--and it does not--crucial to Scott's case is some showing that Ouellette or Jenkins intended discrimination. *E.g., Cason Enters., Inc. v. Metropolitan Dade Cty.,* 20 F.Supp.2d 1331, 1340 (S.D.Fla.1998) (holding that "evidence of discrimination by others cannot be used to impute liability" to a defendant in a § 1983 Equal Protection claim) (citing *Boykin v. Blooomsburg Univ. of Penn.,* 893 F.Supp. 378, 394 (M.D.Pa.1993) ("Liability ... under § 1983 cannot be imposed vicariously.")). He has not made that showing. He has not suggested that white citizens who behaved as he, vis-a-vis the Braintree Defendants, would have been treated differently. Nor has he meaningfully contested the officers' account of his behavior. *See* below. Accordingly, I find no basis to preserve Scott's Equal Protection claim against the Braintree Defendants.

2. *Fourth and Fifth Amendment*

**\*9** [6] An arrest is reasonable for Fourth Amendment purposes when made on probable cause that the arrestee has committed a crime; qualifiedly immune officials escape liability if their belief that probable cause existed was reasonable. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

223, 13 L.Ed.2d 142 (1964)). The crime for which Scott was brought into custody was disorderly conduct.

 Scott and the Braintree Defendants offer materially different views of the events in the mall concourse leading to Scott's arrest. [FN5] Standing alone, the gap between the two stories would be sufficient to thwart the Braintree Defendants' bid for summary judgment. But Scott faces a significant hurdle: his own admission of facts sufficient to support the offenses of disorderly conduct and assault and battery of an officer. *Hopkins v. Medeiros,* 48 Mass.App.Ct. 600, 613, 724 N.E.2d 336 (2000) ("An admission to sufficient facts may be introduced against the defendant in a subsequently litigated civil suit arising out of the same incident on the theory that the proceeding was the functional equivalent of a guilty plea, with the same degree of finality." (quoting Flannery et al, *Massachusetts Evidence* § 3.51(b) (internal quotation marks omitted))). Scott may not evade summary judgment in this case with deposition testimony that contradicts his sworn admission of facts sufficient to establish the offense. [FN6] *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1st Cir.1994), *cited in Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 ("The lower courts ... have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

> FN5. Because it is undisputed that Scott approached the police in the mall concourse and initiated the discourse, no inquiry is necessary into the constitutionality of the "stop."

> FN6. Thus, while Scott is not formally estopped by his guilty plea from contesting the reasonableness of his arrest, he may not avoid summary judgment with his own admissions. Independent testimony of third party witnesses to his exchange with the Braintree police, for example, would give rise to a genuine issue of material fact if it supported Scott's version of the events.

 To be sure, a civil rights plaintiff's admission to sufficient facts to support the offense ultimately charged does not necessarily lead to the conclusion

that, at an earlier point, namely the time of his arrest, officers had probable cause to believe that a violation occurred. Where, as here, the underlying charge concerns the circumstances of the arrest, where the officers were on the scene to witness the events now contested, and where plaintiff agreed to the officer's version of the events leading to Scott's arrest for disorderly conduct, the distinction is moot. Scott's allegation that the arrest accomplished a Fourth Amendment violation cannot stand.

 Scott also identifies a Fifth Amendment violation in support of his § 1983 action. As best as this Court can ascertain from Scott's pleadings and opposition papers, Scott proposes a due process theory, arguing that excessive force was used by Officers Ouellette and Jenkins in arresting him. This claim is in fact properly brought under the Fourth Amendment. *Saucier v. Katz,* 533 U.S. 194, 204, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). As to the resort to pepper spray and efforts to subdue Scott physically, the plaintiff must show not only that such gestures were unlawful, but that the officers were unreasonable in deeming them lawful. *Id.* at 205. *Saucier* further points out that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.* On this theory as well, then, the guilty plea and the admissions to sufficient facts mandate summary judgment to the Braintree Defendants.

 E. *Massachusetts Civil Rights Act (Mass. Gen. Laws c.12, § § 11H, 11I*

 **\*10** [7] Scott brings claims against both the Macy's and Braintree Defendants under the MCRA, Mass. Gen. Laws c.12 § § 11H and 11I, which grants persons a cause of action for civil rights violations. The MCRA authorizes suits against private actors. *Bell v. Mazza,* 394 Mass. 176, 181- 82, 474 N.E.2d 1111 (1985). To make out a claim under the MCRA the plaintiff must show that "(1) [his] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth[ ] (2) ha[s] been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion." ' *Swanset Development Corp. v. City of Taunton,* 423 Mass. 390, 395, 668 N.E.2d 333 (1999). Arrest and detention is "intrinsically coercive" for MCRA purposes. *Sarvis v. Boston Safe Deposit and Trust Co.,* 47 Mass.App.Ct. 86, 92-93, 711 N.E.2d 911 (1999).

Not Reported in F.Supp.2d                                                                   Page 10
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

The Macy's Defendants find the third element lacking in this case: Neither Sanabria nor Jones interacted with Scott. There was no opportunity for threats, intimidation or coercion. Scott responds that Massachusetts law recognizes a "joint venture" theory by which the coercive acts of police may be imputed to private parties. *Id.* In *Sarvis* a bank called the Nantucket police to have tenants removed from premises subject to foreclosure, notwithstanding the tenants' right to a summary eviction proceeding. The bank acted "fully expecting that the plaintiffs would be arrested if the police saw them at the property." *Id. at 92, 711 N.E.2d 911; see also id. at 93, 711 N.E.2d 911* ("The arrests were motivated, inferentially, by the defendants' desire to remove the plaintiffs from the property without having to observe their right to summary process.").

Though *Sarvis'* language seems to suggest that willfulness or intent might be a requirement of an MCRA violation, that is not in fact the case. When "the natural effect of the defendant's action was to coerce [the plaintiff] in the exercise of his rights," a claim under the MCRA is viable. *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 100, 502 N.E.2d 1375 (1987) (citing *Batchelder v. Allied Stores Corp.,* 393 Mass. 819, 822-23, 473 N.E.2d 1128 (1985)). This inquiry is analogous to the "foreseeability" causation standard in negligence actions.

Scott's arrest by the Braintree Defendants, though under a different charge (disorderly conduct) than the Macy's Defendants might have anticipated, was certainly a foreseeable result of Sanabria's overtures to the police. What thwarts Scott's MCRA claims against both the Macy's and Braintree Defendants, however, is the absence of any underlying civil rights violation. Having failed to establish that the Braintree Defendants' coercion accomplished, contributed to, or was directed at any unlawful end, the MCRA claims cannot stand.

F. *Chapter 93A*

[8] Chapter 93A of the Massachusetts General Laws gives consumers a right of action for unfair or deceptive trade practices. *Mass. Gen. Laws c. 93A, § § 2, 9*. Racial harassment is an established unfair trade practice under Chapter 93A. *Ellis v. Safety Ins. Co.,* 41 Mass.App.Ct. 630, 640, 672 N.E.2d 979 (1996) ("Racial harassment in the course of doing business is conduct fairly described as immoral, unethical, or oppressive for the purposes of G.L. c.93A."). The *Ellis* court denied summary judgment

to the defendants because the plaintiffs had adequately countered the defendants' motion "with verified allegations of racially discriminatory words and deeds." *Id.* Scott's unsubstantiated offerings do not satisfy this standard. [FN7]

> FN7. In his opposition, Scott makes no independent argument in support of his Chapter 93A claim. His position is instead that the claim under Chapter 93A is viable for the same reasons that his claims under the MCRA and public accommodation laws should survive summary judgment. Rejection of those claims as unsupported by any showing of racial animus eviscerates any theory of racial harassment.

G. *Common Law Tort of False Imprisonment*

**\*11** [9] In Massachusetts "[f]alse imprisonment is the intentional, unjustified confinement of a person, directly or indirectly, by force or by threat, of which that person is conscious or by which he or she is harmed." *Nault v. United Parcel Servs., Inc.,* 2001 WL 417249, at \*6 (Mass.Super.Ct. Feb. 27, 2001) (citing *Ortiz v. Hampden Cty.,* 16 Mass.App.Ct. 138, 140, 449 N.E.2d 1227 (1983)). The burden of proof falls on the defendant to show that the confinement was justified by law. *Shine v. Vega,* 429 Mass. 456, 463 n. 13, 709 N.E.2d 58 (1999). "[I]f an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement." *Sarvis,* 47 Mass.App.Ct. at 98, 711 N.E.2d 911.

The basis for Scott's arrest was his alleged disorderly conduct, and not the credit card fraud that the Macy's Defendants suspected. The disorderly conduct at issue occurred (allegedly) in the presence of the Braintree Defendants. The behavior that precipitated the arrest occurred after the Macy's Defendants' involvement. Police made their own determination as to the appropriateness of an arrest on a ground independent from that raised by the Macy's Defendants.

Scott can point to no acts on the part of the Macy's Defendants that constitute the "legal cause" of his arrest. Neither Sanabria nor Jones so much as approached Scott and Watson. It was the Braintree police officers who stopped and ultimately detained him. Macy's relies on the *Nevin* court's dismissal of that plaintiff's false imprisonment claim on the ground that although Lord & Taylor's tipoff triggered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the police investigation, subsequent actions by the police were not imputable to the store. *Nevin,* 107 F.Supp.2d at 348.

The *Nevin* court's view jibes with the Supreme Judicial Court's ruling in *Kidder v. Whitney,* 336 Mass. 307, 145 N.E.2d 684 (1957), that liability in tort for a police officer's actions will attach to a third party only "where the misconduct of the police officer resulted from the orders given by a representative of the defendant." [FN8] *Id.* at 309, 145 N.E.2d 684. The Macy's Defendants here neither misled nor gave orders to Defendants Ouellette and Jenkins. Their responsibility for Scott's detainment is sufficiently attenuated, in my view, as to preclude liability under the law.

> FN8. It is worth noting that *Kidder* does not apply to liability under the MCRA, which, as we have seen, has fashioned a joint venture doctrine that can impute liability to private parties for a police officer's acts. Indeed, *Kidder* itself, which predated the MCRA by a number of years, prudently and prophetically characterized this principle as "the general rule ... in the absence of a statute." *Kidder,* 336 Mass. at 309, 145 N.E.2d 684.

H. *Common Law Tort of Intentional Infliction of Emotional Distress*

[10] "[O]ne who, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another is subject to liability for such extreme emotional distress even though no bodily harm may result." *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144, 355 N.E.2d 315 (1976). Conduct is extreme and outrageous when it transgresses "all possible bounds of decency" and is "utterly intolerable in a civilized community." *Agis,* 371 Mass. at 145, 355 N.E.2d 315. The Macy's Defendants point to other rhetoric from the courts requiring a showing of a "high order of reckless ruthlessness or deliberate intolerance." *Conway v. Smerling,* 37 Mass.App.Ct. 1, 8, 635 N.E.2d 268 (1994).

***12** The Macy's Defendants conduct hardly rises to this level. *See Thorpe v. Mutual of Omaha Ins. Co.,* 984 F.2d 541, 545-46 (1st Cir.1993) (holding that an insurance company's resort to a private investigator to verify the extent of a policyholder's disability was not extreme and outrageous). Just as Scott musters no evidence of substance to support his case for racial

discrimination, his claim on this theory fails for want of a showing of bad faith generally.

Moreover, taking either story of the confrontation-- Scott's or the Braintree Defendants'--at face value, it is hard to resist a finding that the acts of either the police or Scott himself broke off the chain of causation. The plaintiff does not point to any independent emotional distress caused purely by Macy's investigation. To the extent that they accede to the Braintree Defendants' view that Scott approached them in obvious agitation, there may be evidence of distress caused by Macy's. But I do not see how, barring the production of admissible evidence that the Macy's Defendants' suspicions were baseless, Scott expects to demonstrate anything close to "extreme and outrageous conduct" at trial.

According to Scott, this tort by its very nature presents issues--including the kind and severity of the defendant's conduct and the distress suffered by the plaintiff--best determined by the jury. *Thorpe* squarely opposes the plaintiff's view of this tort as a jury-intensive inquiry: the First Circuit affirmed the trial court's decision to direct a verdict for the defendant on an intentional emotional distress claim. *Thorpe,* 984 F.2d at 545-46. Summary judgment must enter for the Macy's Defendants on this claim.

I. *Common Law Tort of Negligence*

[11] The Macy's Defendants vigorously dispute every inch of the negligence analysis: duty, breach, causation, and damages. *See Baker v. Fed. Kemper Life Assurance Co.,* 400 Mass. 850, 853, 512 N.E.2d 941 (1987). Macy's strongest point is that it, through Sanabria and Jones, breached no duty owed to Scott. Scott responds that the Macy's Defendants in fact breached statutory duties announced in the MCRA and public accommodation laws. This argument entrusts Scott's negligence claim to the merits of its statutory claims, and for that reason it must fail.

Scott's articulation of his negligence claim makes it legally redundant: the claim is only supportable on a finding of a statutory violation, which Scott has also pleaded. For that matter, a showing of a public accommodation law or MCRA violation only establishes duty and breach. Whereas the statutory claims would be complete, Scott would have to go the extra mile to prove causation and damages . [FN9]

> FN9. As I have already noted, causation is a thorny issue, as the Macy's Defendants

argue that the damage plaintiff cites--Scott's macing and arrest, violently accomplished-- was not the reasonably foreseeable result of Macy's call to the police. *See Poskus v. Lombardo's of Randolph, Inc.,* 423 Mass. 637, 638-40, 670 N.E.2d 383 (1996) (finding that an intervening third party act of negligence broke the chain of causation between the defendant's negligence and the plaintiff's damage). *But see Marra v. Botta Corp.,* 356 Mass. 569, 572, 254 N.E.2d 418 (1970) (holding that the intentional--even criminal--acts of third parties do not break the chain of causation if they are reasonably foreseeable).

The negligence claim, as Scott theorizes it, rises and falls with his MCRA and public accommodation claims against the Macy's Defendants. It is not clear why the plaintiff advanced this theory, which subsumes the statutory causes of action but with additional elements of proof.

*J. Common Law Tort of Slander*

**\*13** [12] The Massachusetts slander tort imposes liability for a defendant's defamatory false statements to a third party. *Jones v. Taibbi,* 400 Mass. 786, 791-94, 512 N.E.2d 260 (1987). "An imputation of crime is defamatory per se." *Id. at 792, 512 N.E.2d 260.* The plaintiff claims two instances of slander: specifically, that the Macy's Defendants told American Express and the Braintree police that Scott was shopping with a stolen credit card.

The Macy's Defendants do not dispute that such statements were false or defamatory; rather, they hang their argument chiefly on the contention that the statements were never made. Citing the deposition testimony of Sanabria and Jones, they argue that Sanabria, in his phone calls to American Express and the police, reported only his observations and his suspicions about credit card fraud. These were truthful statements, as were those both Sanabria and Jones made to police on the scene.

Massachusetts law affirms that it is nonslanderous to relay truthful facts that leave the listener to reach his own conclusions as to unlawfulness. *Dulgarian v. Stone,* 420 Mass. 843, 851, 652 N.E.2d 603 (1995); *see also Nevin,* 107 F.Supp.2d at 343 (noting that, under New York law, the truthful relation of facts in support of a mistaken suspicion of criminal conduct is not slanderous, but that statements of mistaken legal conclusions of criminality are slander *per se* ).

Scott's case therefore turns on precisely what the Macy's Defendants told American Express and the Braintree Police. Scott relies on his own deposition testimony, specifically, his memory of his telephone conversation with the American Express representative. According to Scott, the representative explained that the Macy's Defendant had told American Express that "two black men were fraudulently using the card." But again, this report is inadmissible hearsay, and so an insufficient basis to create a triable issue of fact. *Fitzgerald v. Town of Kingston,* 13 F.Supp.2d 119, 127 (D.Mass.1998) (granting summary judgment to a defamation defendant when the plaintiff relied solely on a newspaper report of the alleged defamatory statement). Sanabria's testimony as to what he told American Express stands unrebutted.

Scott gives no evidence regarding the content and wording of the Macy's Defendants' reports to police. I am therefore required to accept the testimony of Sanabria and Jones that the reports were so delicately phrased as not to pass as slanderous. And even if Scott offered hard evidence of a slanderous statement here, a qualified privilege attaches to defamatory statements made to police about third parties for criminal investigations. *Hutchinson v. New England Telephone & Telegraph Co.,* 350 Mass. 188, 191, 214 N.E.2d 57 (1966) ( "Public policy demands that police investigations should not be thwarted by inability to obtain answers from persons who know the facts but fear civil actions."). The qualified privilege immunizes a speaker from liability for defamation barring a showing that the statements were made with knowledge of their falsity or reckless disregard for the truth. *Id.; Mendez v. M.S. Walker, Inc.,* 26 Mass.App.Ct. 431, 433-34, 528 N.E.2d 891 (1988). The Macy's Defendants maintain that Sanabria and Jones scrupulously investigated the alleged credit card fraud (albeit from a distance) before referring the matter to the police, and the record bears that out.

*IV. CONCLUSION*

**\*14** The failure of proof compels me to GRANT the Macy's and Braintree Defendants' motions and to enter judgment for the defendants.

SO ORDERED.

2002 WL 31439745 (D.Mass.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 13
2002 WL 31439745 (D.Mass.)
**(Cite as: 2002 WL 31439745 (D.Mass.))**

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV10323_____(Docket)
(Feb. 21, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.