UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:05-cv-10324NMG

|  |  |
|---|---|
| ——————————————————— ) | |
| JAY ODUNUKWE, ESQ.                   ) | |
|                Plaintiff,      ) | |

JAY ODUNUKWE, ESQ.  
               Plaintiff,         )

     v.                     )

BANK OF AMERICA  
               Defendant.     )

## MEMORANDUM IN SUPPORT OF RENEWED MOTION OF DEFENDANT BANK OF AMERICA FOR SUMMARY JUDGMENT

**I.     Introduction**

       This is an action in which plaintiff Jay Odunukwe alleges that the defendant Bank of America (*sic*) ("Fleet")[1] discriminated against him on the basis of his race when the Fleet National Bank, N.A. branch in Medway, Massachusetts refused to cash a check for him on May 14, 2002 and allegedly told him to leave the branch.  Plaintiff asserts that he complied with the bank's check cashing identification policy, which requires a non-Fleet customer seeking to cash a check over $500 to present two forms of approved identification.  Specifically, plaintiff claims that he presented a Massachusetts driver's license and an American Express credit card to the Medway branch teller and branch manager and was told that they could not cash his check.

---

[1] The correct name of the defendant is "Bank of America N.A."  The incident at issue took place at a branch of Fleet National Bank, which has since merged with Bank of America.  As the actions of a Fleet branch are at issue in this case, the defendant in this case will be referred to as "Fleet."

As is explained below, plaintiff is unable to demonstrate that there is a genuine issue of fact regarding an essential element of his claims, namely that he was discriminated against because of his race. Thus, summary judgment must be granted in Fleet's favor. This Court should reject plaintiff's effort to elevate an innocuous situation into an incident of racial discrimination.

## II.    **Procedural History**

Plaintiff filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD proceeding") in or about July 2002, alleging race discrimination as a result of the alleged failure of the Medway Fleet branch to cash his check.

Plaintiff subsequently filed a civil action in Superior Court in Suffolk County on or about December 10, 2004 and served the complaint on Fleet on or about January 21, 2005. Fleet removed the action to this Court on February 17, 2005. Fleet filed a Motion for More Definite Statement on March 1, 2005, which plaintiff opposed. On June 7, 2005, plaintiff filed Plaintiff's Motion for Partial Summary Judgment for Liability under 42 U.S.C. §1981 ("Plaintiff's Summary Judgment Motion"). Fleet opposed Plaintiff's Summary Judgment Motion and filed a Cross-Motion of Defendant Fleet Bank Boston for Summary Judgment. A Rule 16 scheduling conference was held on August 16, 2005, at which this Court granted Fleet's Motion for More Definite Statement and ordered plaintiff to file an amended complaint setting forth his causes of action. The parties expressed a willingness to mediate this action, and the Court denied the parties' summary judgment motions without prejudice. A mediation was held on February 23, 2006 before Magistrate Judge Collings, but the parties were unable to reach agreement.

Pursuant to the Court's Order on the Motion for More Definite Statement, plaintiff filed an Amended Complaint and Jury Trial Demand ("Amended Complaint") on August 24, 2005 and asserted the following claims:

Count I:      Alleges racial discrimination in violation of M.G.L. chapter 151B

Count II:     Alleges racial discrimination in violation of M.G.L. chapter 27, §92A.

Count II*(sic)*: Alleges racial discrimination in violation of M.G.L. chapter 98 §11 *(sic)*.

Count IV:     Alleges racial discrimination under Title II of the Civil Rights Act of 1964, 42 U.S.C. §1981 *(sic)*.

Count V:      Alleges race discrimination under Title VII of the Civil Rights Act of 1964.

Fleet answered the Amended Complaint and denied plaintiff's claims.  For the reasons set forth below, summary judgment should be granted in Fleet's favor on all claims in plaintiff's Amended Complaint.

## III.    Statement of Material Facts as to which there exists no genuine issue to be tried

The material facts as to which no genuine issue is to be tried are set forth in the accompanying Defendant Bank of America's Rule 56.1 Statement of Material Facts as to Which There is no Genuine Issue to be Tried ("Statement of Facts").  As is explained therein, this Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor on summary judgment.  *Beasley v. Aramark Uniform and Career Apparel, Inc.,* __F. Supp. 2d __, 2006 WL 1216622, *2 (D. Mass. 2006) (citing *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993)).  Therefore Fleet does not dispute the facts set forth in the accompanying Statement of

3

Facts for the purposes of this summary judgment motion only.[2]  All evidence cited in the Statement of Facts is attached to the Affidavit of Carol E. Kamm.  The specific factual allegations in the Statement of Facts shall be referred to by their paragraph numbers as **"Facts, ¶ ."**

As is explained below and in the accompanying Statement of Facts, plaintiff is unable to present any evidence that anything that happened at the Medway branch was because of his race.  Summary judgment must enter in Fleet's behalf on all claims, because there is no genuine issue of fact to be tried on an essential element of all of plaintiff's claims, namely whether Fleet discriminated against plaintiff on the basis of his race.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).

## IV.     <u>Summary Judgment Standard</u>

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has affirmed that:

> Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

---

[2] Although Fleet must accept plaintiff's version of the facts for the purposes of summary judgment, many of the facts set forth in the Statement of Facts are strongly disputed by Fleet, and would be in dispute at trial or in opposition to any summary judgment motion filed by plaintiff.   In any event, Fleet believes that the facts it would dispute do not raise any genuine issues of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Evidence that is merely colorable or is not "significant[ly] probative" cannot deter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (quotation and citation omitted). As the Court noted, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and . . . it should be interpreted in a way that allows it to accomplish this purpose." *Celotex,* 477 U.S. at 323-34.

The First Circuit has stated that "[g]enuine issues of material fact are not the stuff of an opposing party's dreams. On issues where the nonmovant bears the burden of proof, he must present definite, competent evidence to rebut the motion. This evidence cannot be conjectural or problematic . . . . " *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (citations and quotations omitted). Plaintiff's obligation to produce enough proof to enable his case to get to a jury "cannot be satisfied by conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001); *id.* at 29 (affirming grant of summary judgment on §1983 claim, court noted that "[a]ccusations of bias are not self-elucidating," and plaintiff's allegation of bias were unsupported "rank conjecture" that could play no role in summary judgment calculus).

In this case, plaintiff has presented no evidence of any discriminatory intent, other than his own belief and conjecture. As a result, summary judgment must be granted in Fleet's favor on all counts in the Amended Complaint, as there is no genuine issue of fact

to be tried on an essential element of plaintiff's claims, namely whether he was discriminated against on the basis of his race.  *Mesnick*, 950 F.2d at 822.

**V.    Argument**

      ***A.    Summary judgment must be granted on Count I because M.G.L. chapter 151B does not provide a cause of action for discrimination in a place of public accommodation.***

Summary judgment must be granted on plaintiff's claims of racial discrimination in Count I, alleging a violation of M.G.L. chapter 151B.  Chapter 151B prohibits discrimination in employment and in housing, but contains no explicit prohibition on discrimination in places of public accommodation.  M.G.L. c. 151B, §4.  As a result, summary judment must be granted on Count I because chapter 151B does not provide an independent cause of action for discrimination in a place of public accommodation.

      ***B.    Summary judgment must be granted on Count II.***

          i.    Summary Judgment must be granted on Count II, because plaintiff is unable to demonstrate a causal connection between his race and the alleged denial of access to the Medway Fleet branch.

While chapter 151B does not itself provide an independent cause of action for discrimination in places of public accommodation, it does authorize a person alleging an unlawful practice under M.G.L. chapter 272, section 92A to file a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and to follow the procedures set forth in chapter 151B for pursuit of such claims.  *See* M.G.L. c. 151B, §§5, 9.  Count II of plaintiff's Amended Complaint asserts a claim under M.G.L. c. 272, §92A.

Summary judgment must be granted on plaintiff's claim under chapter 272, §92A, because plaintiff is unable to make out a prima facie case of discrimination.  As a

threshold matter, section 92A does not provide a basis for liability against Fleet. Section 92A defines a place of public accommodation and makes it a crime for certain specified persons acting on behalf of a place of public accommodation to advertise in a way intended to discriminate or actually discriminating against persons of, *inter alia,* race. The allegations in the captioned complaint do not concern allegedly discriminatory advertising, and thus this aspect of section 92A is inapplicable.

Fleet assumes that plaintiff intended to cite to Massachusetts General Laws chapter 272, section 98 as well as section 92A. Section 98 makes it a crime to discriminate on the basis of, *inter alia,* race against any person "relative to the admission of any person to, or his treatment in any place of public accommodation, resort or amusement, as defined in section ninety-two A, or whoever aids or incites such distinction, discrimination or restriction." M.G.L. c. 272, §98. Section 98 also makes it a civil right to be free from such discrimination. *Id.*

To the extent plaintiff intended section 98 to be the basis for his claim in Count II, summary judgment must be granted because plaintiff is unable to establish a prima facie case of discrimination under section 98. To establish a claim of race discrimination in violation of section 98 requires a showing that:

> 1) [plaintiff] is a member of protected class, 2) he/she was denied or restricted in access to a place of public accommodation, and 3) there is evidence from which it can be inferred that there is a causal connection between [plaintiff]'s protected class and the denial of access to the place of public accommodation.

*Haney v. Fenway Texaco et al*, 28 M.D.L.R. 50, 52 (2006)) (citations omitted)(copy attached hereto as Exhibit A).[3]  In the captioned case, plaintiff has satisfied the first prong of the prima facie case and, for the purposes of summary judgment only, Fleet will not dispute that he has satisfied the second prong.  Plaintiff is unable to satisfy the third prong of the prima facie case, however, as he has no evidence of a causal connection between his race and the alleged denial of access to the Medway Fleet branch.

Even viewing the facts in the light most favorable to plaintiff, plaintiff will have shown only that he presented sufficient forms of identification, was told by the teller and the branch manager that they could not cash his check, was told to leave the bank in a loud voice after he raised his voice, and was later told that he had to leave or would be forcibly evicted after he had been told several times that they could not cash his check. (**Facts, ¶¶1-11**).  Plaintiff acknowledges that Ms. Brennan invited him in to her office and made a phone call, and she has attested that she did this in order to assist him. (**Facts, ¶10**).   He also admits that neither Ms. McHardy nor Ms. Brennan mentioned his race or made any derogatory comments to him.  He has no evidence that similarly situated white customers were treated differently than him. (**Facts, ¶¶12-13**).  Plaintiff's claim rests solely on his belief that he was not allowed to cash his check because of his race.  "The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment."  *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) (citing *Local No. 48, United Bhd. Of Carpenters & Joiners*

---

[3] The Massachusetts appellate decisions relating to chapter 272 claims primarily concern the issue of what constitutes a place of public accommodation and do not appear to have addressed the requirements for proof of a claim under this chapter.  As the MCAD is charged with the initial investigation and enforcement of civil claims under chapter 272, Fleet has looked to MCAD decisions for the analysis to be employed in evaluating plaintiff's chapter 272 claim.

*v. United Bhd. Of Carpenters & Joiners,* 920 F.2d 1047 (1ˢᵗ Cir. 1990)(trial court granted summary judgment related to incident in which plaintiffs left restaurant after being told falsely that restaurant stove was broken, because no inference of racial animus existed sufficient to allow incident to proceed to trial).

Plaintiff is unable to produce any evidence that Ms. McHardy and Ms. Brennan refused to cash his check because of his race, nor is he able to present evidence from which a causal connection between the alleged denial of service and his race could reasonably be inferred.  As a result, he is unable to satisfy the third prong of his *prima facie* case under section 98, and summary judgment must be granted as a result. *Scott v. Macy's East, Inc.,* 2002 WL 31439745, *6, 8 (D. Mass. 2002)(Gertner, J.) (citing *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1ˢᵗ Cir. 1989), *overruled on other grounds in Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004))[4] (plaintiff's conviction that he was victim of racial profiling insufficient to raise inference of discriminatory intent under M.G.L. c. 272, §98, 42 U.S.C. §2000a, and 42 U.S.C. §1981, among other claims); *Jones v. City of Boston*, 738 F. Supp. 604, 606 (D. Mass. 1990)(McNaught, J.)(although court denied summary judgment against certain defendants based on use of the term "nigger," court granted summary judgment on behalf of defendant Alvarado because plaintiff made no showing that Alvarado "himself made racially derogatory remarks against plaintiff, nor is there any evidence that Alvarado's

---

[4] Based on Supreme Court precedent, the *Educadores* decision overruled the heightened pleading requirement for civil rights imposed in *Judge v. City of Lowell, infra,* and *Dartmouth Review v. Dartmouth College.*  The obligation of the party with the burden of proof not to rely on "bald assertions [and] unsupportable conclusions," and to produce significantly probative evidence of discrimination in opposition to a summary judgment motion on civil rights claims, is unaffected by the *Educadores* decision. *Educadores*, 367 F.3d at 67-68.

motive in forcing [plaintiff] to leave the hotel was a pretext for a racially discriminatory purpose."). *See also Gutierrez v. MBTA*, 437 Mass. 396, 411 (2002)(holding trial judge did not err in refusing to instruct jury on a separate civil rights violation based on M.G.L. c. 272, §§92A and 98, because plaintiffs did not present evidence that defendants sought to exclude them from the subway station on the basis of race or any other prohibited basis). *Cf. Beasley v. Aramark Uniform and Career Apparel*, 2006 WL 1216622, *4 (D. Mass. 2006) (Gorton, J.) (comment that "your kind loves to sell drugs" insufficient to present jury question on claim of employment discrimination based on race).

> ii.    Summary Judgment must be granted on Count II , because Fleet is not liable for the acts of its employees under chapter 272, §98.

Summary judgment must be granted on Count II for the additional reason that Fleet cannot be held liable for the alleged criminal acts of its employees.  Section 98 states that "[w]hoever makes any distinction, discrimination or restriction on account of race. . . in any place of public accommodation" shall be criminally liable.  Fleet is not liable for any allegedly criminal acts of its employees, and therefore summary judgment must be granted on this count.  *Jones v. City of Boston*, 738 F. Supp. 604, 606 (D. Mass. 1990).  *See also Lopez v. Howth, Inc.*, 2002 WL 31677202 (Mass. Super. Oct. 23, 2002)(Lauriat, J.) (citing *Jones*, trial court dismissed section 98 claim), *aff'd*, 60 Mass. App. Ct. 1126 (2004) (unpublished opinion).

**C.    Summary judgment must be granted on Count III because M.G.L. c 98, §11 does not provide a cause of action for race discrimination.**

Plaintiff's third count asserts a claim under M.G.L. c. 98, §11, which governs tolerances and specifications for clinical thermometers.  This statute does not provide a cause of action for race discrimination, and therefore this claim must be dismissed.[5]

**D.    Summary Judgment must be granted on Count IV, alleging race discrimination under Title II, 42 U.S.C. §1981 (sic).**

Summary Judgment must be granted on Count IV of plaintiff's Amended Complaint, which asserts a claim under "Title II of the Civil Rights Act of 1964, 42 U.S.C. §§1981 *(sic).*" As a preliminary matter, plaintiff's citation to section 1981 as the codification of Title II is incorrect.  Title II was codified at 42 U.S.C. section 2000a *et seq.* and prohibits discrimination or segregation in places of public accommodation. Section 1981 has also been held to pertain to claims of discrimination in places of public accommodation.  As is argued below, regardless of whether Count IV is based on 42 U.S.C. section 1981 or 42 U.S.C. section 2000a, summary judgment should be granted on this claim.

    i.    <u>Plaintiff cannot assert a claim against Fleet under Title II, as Fleet is not a "place of public accommodation" as defined in section 2000a.</u>

Title II is inapplicable to this case because a bank is not one of the listed places of public accommodation as set forth in section 2000a.  The statute provides that the following establishments which serve the public are places of public accommodation if, among other things, their operations affect commerce:

---

[5] Fleet assumes that this is an erroneous citation but has received no response from plaintiff to its request for the correct citation for this count.  Fleet respectfully requests the right to provide further argument on this claim, if plaintiff's opposition provides the correct citation to the statute upon which he bases liability in Count III.

(1)  any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

(2)   any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

(3)   any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

(4)   any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically loated any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. §2000a(b).  Banks are not listed in any of the categories of establishments set forth above.  Therefore, a bank such as Fleet is not covered by this statute, and plaintiff's Title II claim fails.  *Wilson v. Harding*, 1999 WL 203458, *2 (D. Kan. 1999) (granting defendant's motion to dismiss because defendant bank and other defendants were not covered by statute).

  ii.  <u>Even if Title II is applicable, summary judgment must be granted on plaintiff's claim under either Title II or section 1981 because there is no genuine issue of fact to be tried on an essential element of his claim, namely whether he was discriminated against on the basis of his race.</u>

   Even if this Court finds that Fleet is a "place of public accommodation" under Title II, summary judgment must be granted on Count IV because there is no genuine issue of fact to be tried on an essential element of this claim, namely whether plaintiff was discriminated against on the basis of his race.

   While the First Circuit does not appear to have explained the analysis to be utilized in evaluating Title II claims, other courts have applied the same *prima facie* test

as applies to section 1981 claims.  *See, e.g., Eddy v. Waffle House, Inc.,* 335 F. Supp.2d 693, 701-702 (D.S.C. 2004)("It is well recognized that the same *prima facie* test as applies in §1981 cases applies to claims under §2000(a) *[sic].*") (quotation and citation omitted).  Fleet assumes that the First Circuit would employ the same analysis for section 1981 and section 2000a claims.

Section 1981 prohibits intentional discrimination based on race with respect to the right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property . . . ." 42 U.S.C. §1981(a).  Title II provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. §2000a(a).  In order to prevail on either of these claims, plaintiff must show that he was denied rights under these statutes because of his race.

The analysis below, relying on section 1981 precedent, applies equally in mandating judgment in Fleet's favor of any section 2000a claim asserted in Count IV. Plaintiff bears the burden of proof on the essential element of discriminatory intent at trial, and judgment on Fleet's behalf is required by his failure to make a sufficient showing on this issue.  *Celotex*, 477 U.S. at 322-23.

 To state a claim under section 1981, plaintiff must show:

(1) that he is a member of a racial minority, (2) that the defendant discriminated against him on the basis of his race, and (3) that the discrimination implicated one or more of the activities enumerated in the statute.

*Garrett v. Tandy Corp.*, 295 F.3d 94, 98 (1st Cir. 2002) (citing *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)).  Fleet expects plaintiff to argue that he was discriminated against in the right to make and enforce an alleged contract with Fleet to cash a check. *See* 42 U.S.C. §1981(b).

    Plaintiff satisfied the first element of this claim, namely that he is a member of a racial minority.  Plaintiff's claim founders, however, on the second essential element, that Fleet discriminated against him on the basis of his race.  As is explained above in the accompanying Statement of Facts, plaintiff is unable to make any sufficient showing of discriminatory intent.  "The conclusion of discrimination must have 'specific, nonconclusory factual' support...," and plaintiff has presented no such evidence in this case.  *Scott v. Macy's East, Inc.*, 2002 WL 31439745, *4-5 (D. Mass. Oct. 31, 2002)(Gertner, J.) (quoting *Judge v. City of Lowell*, 160 F.3d 67, 77 (1st Cir. 1998), *overruled on other grounds in Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004))[6] (in granting summary judgment on §1981 claim, court held that plaintiff's claim of a freeze placed on his credit card implicated a contract right, but that plaintiff had failed to present sufficient evidence of race discrimination when "sum total of evidence offered by [plaintiff is his] own conviction that he was a victim of racial profiling" and an inadmissible statement of an American Express representative).

    Even viewing the facts in the light most favorable to plaintiff, has shown only that the teller and the branch manager refused to cash his check when he presented sufficient identification and told him to leave the branch in a loud voice.  (**Facts, ¶¶1-11).**  He testified that no comments were made about his race by either the teller or the branch

---

    [6] See footnote 4 above.

manager, nor were any derogatory comments made to him. (**Facts**, **¶12**).  He has no

evidence of similarly situated white customers being treated differently than he was.

(*Id.,*§13).   None of his allegations directly show any discriminatory intent, nor do they

even raise a reasonable inference of racial animus.[7]  *See Overby v. Chase Manhattan*

*Bank & J.P. Morgan Chase*, 351 F. Supp.2d 219, 224 (S.D.N.Y. Jan. 3, 2005) (court

granted summary judgment on plaintiff's "make and enforce" contracts claim under

§1981, finding no evidence to support an inference that defendant had intent to

discriminate against plaintiff when defendant failed to suggest investment options to

plaintiff, as plaintiff produced no evidence that white customers were treated differently,

nor could discriminatory intent be inferred from fact that plaintiff was asked for

identification when depositing $19,000 check); *Wiggins v. Rhode Island*, 326 F. Supp.2d

297, 311 (D.R.I. 2004) (court held that plaintiff's "factual proffer" on issue of intent did

not raise any inference of racial animus in decision to stop, search, forcibly restrain, or

arrest plaintiff; evidence included false testimony by police officers, completion of

---

[7] An inference of discrimination is unwarranted in this case.  A branch manager
intent on discriminating against plaintiff would not have invited plaintiff into her office
and made phone calls in an effort to assist plaintiff in being able to cash his check.
(**Facts, ¶10**).  Plaintiff has admitted that the teller and the branch manager did not make
any comments about his race or other derogatory comments to him, and he has no idea
whether similarly situated white customers were treated differently.  Moreover, it would
be unreasonable to infer discrimination based upon alleged statements by the bank
manager to leave the premises or he would be removed.  As the First Circuit has noted,
private business owners have an absolute right to withdraw or revoke license given to
enter a business establishment.  *Alexis v. McDonald's Restaurants of Massachusetts, Inc.,*
67 F.3d 341, 351 (1st Cir. 1995).  In the absence of competent evidence that the bank
manager "sought to exclude  [plaintiff] on the basis of [his] race," Ms. Brennan would
have been acting "within her lawful authority" if she revoked any license given to
plaintiff to be on the premises.  *Id.*  The fact that plaintiff raised his voice and refused to
leave would have provided ample reason for a bank teller to tell him that he needed to
leave in a raised, firm voice, and for a bank manager to tell him that he needed to leave or
he would be removed.  There is simply nothing that connects any of the actions of Ms.
McHardy and Ms. Brennan to plaintiff's race.

reports and tickets with false information, not stopping for plaintiff after first alleged traffic infraction, and assorted other criticisms of officers). Plaintiff can point to no competent evidence that the actions of the teller and branch manager "stemmed from something other than a race-neutral reaction" to the encounter with plaintiff. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.*, 67 F.3d 341, 347 (1st Cir. 1995) (summary judgment on §1981 affirmed, as plaintiff presented no competent evidence that defendants intentionally discriminated against her on account of her race; court ruled that, "absent probative evidence that [the restaurant manager's] petulance stemmed from something other than a race-neutral reaction to the stressful encounter plainly evidenced in the summary judgment record, including [plaintiff's] persistence (however justified)," district court properly excluded conclusory lay opinions of discrimination). Plaintiff's lack of evidence on this essential element of his claim mandates summary judgment in Fleet's favor.

"Disputes generally arise out of mutual misunderstanding, misinterpretation and overreaction, and without more, such disputes do not give rise to an inference of discrimination." *Alexis*, 67 F.3d at 347-48 (quoting and citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 18 (1st Cir. 1989), *overruled on other grounds in Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004))[8] (internal quotations and citations omitted). In this case, there is nothing more. "Given the absence of any meaningful evidence of discriminatory intent," Fleet's Motion for Summary Judgment must be granted for failure to satisfy this essential element of his claim. *Wiggin*, 326 F. Supp.2d at 311.

---

[8] See footnote 4, above.

16

###### E.      *Summary Judgment must be granted on Count V.*

Summary judgment must be granted on Count V, asserting a claim under Title VII of the Civil Rights Act of 1964, because Title VII is inapplicable to the factual allegations in the captioned complaint.

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Plaintiff was not an employee of Fleet, and therefore Title VII does not apply to this case. As a result, summary judgment must be granted on this claim.

### VI.    <u>Conclusion</u>

For the reasons set forth above, Fleet's Motion for Summary Judgment should be allowed, and all counts in plaintiff's Amended Complaint should be dismissed with prejudice.

BANK OF AMERICA, N.A.
By its attorneys,


_____/s/ Carol E. Kamm_____
Donn A. Randall, BBO# 631590
Carol E. Kamm, BBO # 559252
Bulkley, Richardson, and Gelinas LLP
One Post Office Squire, Suite 3700
Boston, Massachusetts 02109
Telephone:  (617) 368-250
Facsimile:  (617) 368-2525

Dated:  May 15, 2006

(doc. # 388525)

# EXHIBIT A:
# FLEET'S MEMORANDUM IN
# SUPPORT OF RENEWED MOTION
# FOR SUMMARY JUDGMENT

CITE AS 28 MDLR 50                                                                          DARLENE HANEY

Any party aggrieved by this final determination may contest the Commission's decision by filing a complaint in superior court seeking judicial review, together with a copy of the transcript of proceedings. Such action must be filed within thirty (30) days of receipt of this decision and must be filed in accordance with M.G.L. c.30A, c.151B, § 6, and the 1996 Standing Order on Judicial Review of Agency Actions. The filing of a petition pursuant to M.G.L. c.30A does not automatically stay enforcement of this order. Failure to file a petition in court within thirty (30) days of receipt of this order will constitute a waiver of the aggrieved party's right to appeal pursuant to M.G.L. c.151B, § 6.

SO ORDERED this 13th day of February, 2006.

\* \* \* \* \* \*

---

DARLENE HANEY

v.

FENWAY TEXACO and TEXACO, INC.

Docket No. 99-BPA-0463

*March 8, 2006*
*Betty E. Waxman, Hearing Officer*

---

*Tony V. Blaize, Esq., for Complainant*

*Erik J. Frick, Esq. for Respondent Fenway Texaco*

*Anne-Marie Gerber, Esq. and*
*Michael A. Fitzhugh, Esq. for Texaco, Inc.*

**P**ublic *Accommodation-Race Discrimination-Credibility of Complainant*—Hearing Officer Betty E. Waxman dismissed an appeal from an African-American woman who claimed she had been called a "fucking black nigger bitch" by a Boston gas-station attendant over a payment dispute. The Hearing Officer found Complainant to be an untrustworthy witness after noting numerous fabrications in her testimony in contrast to the sincere and credible manner in which Respondent's witnesses testified.

## DECISION OF THE HEARING OFFICER

### I. PROCEDURAL HISTORY

**O**n February 18, 1999, the Complainant, Darlene Haney, filed a complaint with the Massachusetts Commission Against Discrimination charging that she was a victim of discrimination based on race, color and sex in a place of public accommodation. Complainant alleges that Arshad Aimara, a gas station attendant at Fenway Texaco, called her a "fucking black nigger bitch" and threw her to the floor in connection with a dispute over the purchase of gas. Probable cause issued and the case was certified to public hearing on September 4, 2003.

During discovery, Complainant limited her claims of pain and suffering to the period between February 18, 1999 and December 2001. As a result, Respondents did not pursue discovery for the period following December 2001. Respondents moved *in limine* during the public hearing to exclude evidence related to alleged harm after December 2001. The motion was allowed.

A public hearing was conducted on November 3 and 12, 2004. Six joint exhibits were accepted into evidence. Complainant offered three additional exhibits and Respondent offered sixteen additional exhibits, all of which were accepted into evidence. Complainant testified on her own behalf. Ilias Gianakopoulos, the owner of Fenway Texaco, presented testimony on behalf of Respondents.

During the hearing, affidavits pertaining to Respondent Fenway Texaco's unsuccessful efforts to contact Arshad Aimara were allowed into evidence. The affidavits were accepted to rebut the inference that Aimara's non-appearance was due to Respondents' concern that he would testify contrary to Respondents' position.

To the extent the parties' proposed findings are not in accord with or irrelevant to the findings herein, they are rejected. To the extent the testimony of various witnesses is not in accord with or irrelevant to my findings, it is rejected. Based on all the relevant, credible evidence and the reasonable inferences drawn therefrom, I make the following findings and conclusions.

### II. FINDINGS OF FACT

1. In 1999, Fenway Texaco was a gas station located at the corner of Boylston Street and Ipswich Street in Boston, Massachusetts. Ilias Gianakopoulos was the sole proprietor of Fenway Texaco. He paid rent to Texaco Inc. every month. He had the sole authority to hire and fire employees and supervised the daily operations of Fenway Texaco. He hired Arshad Aimara, the only Fenway Texaco employee who was working on January 10, 1999.

2. At all relevant times, Gianakopoulos instructed his employees not to confront customers in situations when they refused to pay for gas, but rather to write down their license plate numbers if possible.

3. In order to use a credit card to pay for fuel at Fenway Texaco, the credit card had to be swiped at the pump before the fuel was pumped. Once pumping commenced, a credit card had to be swiped through the credit card machine inside the Fenway Texaco office.

4. Gianakopoulos hired Aimara in 1998 to pump gas and to work in the convenience store that was part of the gas station. Aimara was referred by another employee. Aimara did not supervise anyone. He was paid by the hour and did not have check writing authority or any decision making authority. Aimara stopped working at Fenway Texaco in February or March 1999.

5. Gianakopoulos informed Aimara about the gas station's policy regarding non-paying customers as part of his interview and/or training.

6. Gianakopoulos never observed Aimara use force or racial or gender epithets, or yell at customers during the little more than one year that Aimara worked at Fenway Texaco.

7. On January 10, 1999, Gianakopoulos arrived at Fenway Texaco between 9:00 and 10:00 a.m. Aimara was already at work when Gianakopoulos arrived. At approximately 3:30 p.m., Complainant pulled into the gas station and asked Aimara to fill her car with gas. She was on her way to visit her husband at the Gardner Correctional Facility where he was incarcerated.

8. Aimara asked Complainant whether she wanted to pay with cash or credit card. Complainant said cash.

9. Aimara started filling up Complainant's car with gas and walked away from the pump.

10. Complainant subsequently decided to use her credit card to pay and blew her horn to get Aimara's attention.

11. According to the allegations in Complainant's complaint filed with the MCAD, Aimara returned to the car, took the card, and asked her why she didn't give him "the fucking card in the beginning." In response, Complainant said to Aimara, "Give me my card. I don't want to do business here." She got out of her car to remove the gas pump. Aimara then said, "Fuck you, you come to rob my gas." Complainant acknowledged in her complaint that she answered Aimara by saying, "Fuck you too." I credit these allegations.

12. Aimara walked inside the gas station with Complainant following him. The parties offer different accounts about what transpired next. According to Complainant, Aimara turned around and said, "you fucking black nigger bitch" while he pointed his finger in her face. She testified that she responded, "You can say what you want because this is America. As long as you don't put your hands on me, everything will be fine." Complainant contends that after she uttered these words, Aimara grabbed her in the chest area and threw her to the floor, tearing her bra strap and injuring her hand. I do not credit this version of the events.

13. According to Gianakopoulos, he noticed Complainant following Aimara into the convenience store as he stood behind the waist-high counter of the store. He estimates that Complainant was approximately four or five feet in front of the door to the convenience store when he noticed her. He heard Complainant demand her credit card back, saying that she was late to see her kids in the hospital. According to Gianakopoulos, Aimara continued to process the credit card transaction. Gianakopoulos testified that Complainant threw some plastic bottles from a shelf to the ground and then proceeded to stumble over the bottles and fall to the ground. I credit this testimony.

14. Gianakopoulos testified that he asked Aimara what had happened, and Aimara responded by saying that Complainant did not want to pay for the gas. According to Gianakopoulos, he took

the credit card from Aimara, gave it to Complainant, and told her, "Lady, here's your card. You don't have to pay, just go." Gianakopoulos testified that the credit card was not damaged and that Complainant did not pay for gas. I credit this testimony.

15. Complainant went outside and asked a cab driver if she could use his cell phone to call 911. The police came and took statements from Complainant and Aimara. The police officer filed a report stating that an argument took place between Complainant and Aimara concerning the method of paying for gas after Aimara finished pumping the gas. According to the police report, Aimara said, "Why didn't you tell me before that you were paying by credit?" The report states that Complainant charged Aimara with pushing her to the ground and that Complainant struck Aimara "about the face."

16. After leaving Fenway Texaco, Complainant visited her husband at the Gardner Correctional Facility. Complainant placed money into his prison canteen account. Complainant was subsequently charged in July 2001 and pled guilty in September 2002 to a felony of conspiring to steal public money in the form of social security benefits by cashing her husband's social security checks while he was in prison and depositing those funds into her husband's canteen account.

17. Complainant went to Brigham & Women's Hospital following her visit to Gardner, complaining of pain in her right hand. An x-ray revealed that there was no fracture.[1] Complainant received prescriptions for Tylenol with Codeine and for Valium. She filled the prescription for Valium on January 12, 1999 and the prescription for Tylenol with Codeine on January 15, 1999.

18. At the time of the incident at Fenway Texaco, Complainant was not working at either the Justice Resource Institute or Casa Myrna Vasquez, despite her testimony at the public hearing that she was so employed. Complainant began to work at Casa Myrna Vasquez in February 2000 and worked there until March 2001, when she was terminated for unexcused absences. Complainant did not start her employment at the Justice Resource Institute until March 13, 2001 and was terminated for falsifying time records on or around January 2002.

19. On January 11, 1999, the day after the incident at Fenway Texaco, Complainant filed an application for a criminal complaint against Aimara, charging him with assault and battery and larceny. Complainant alleged in the application that Aimara grabbed her credit card, tore it up, pushed her, and threw her to the ground, injuring her right arm. Aimara filed a cross application for a criminal complaint against Complainant.

20. Aimara appeared at the first hearing on his application for a criminal complaint against Complainant. Complainant was also present. The Clerk Magistrate continued the matter. Aimara subsequently relocated to Detroit, Michigan. He traveled by bus from Detroit to Boston to attend the second hearing on his appli-

---

1. Complainant responded to an interrogatory request by stating that she suffered a hairline fracture of the right hand as a result of the incident. That answer was not accurate.

cation for a criminal complaint. Complainant did not appear at the second hearing, but her attorney did appear. The cross applications were continued and ultimately dismissed.

21. Counsel for Fenway Texaco attempted to contact Aimara in order to arrange for him to participate in the MCAD's public hearing but was unable to locate him.

III. CONCLUSIONS OF LAW

A prima facie case of race or sex discrimination in violation of G.L. c. 272, sec. 98 requires a showing that: 1) a person is a member of protected class, 2) he/she was denied or restricted in access to a place of public accommodation, and 3) there is evidence from which it can be inferred that there is a causal connection between the person's protected class and the denial of access to the place of public accommodation. *See Lumely* v. *Flynn,* 5 MDLR 1031 (1983); *Lewis* v. *McColgan,* 4 MDLR 1125 (1982). Complainant attempts to satisfy this burden by alleging that she is a Black female who was restricted in her attempt to purchase gas at Fenway Texaco, a place of public accommodation, by the hostile actions of employee Arshad Aimara. *See id.* I conclude that Complainant has failed to establish a prima facie case because she did not present credible testimony from which an inference of discrimination can be drawn.[2]

According to Complainant, she at first told Aimara that she wanted to pay for gas by cash but after Aimara started to fill her tank, she changed her mind and decided to pay by credit card. When she informed Aimara, he took her credit card and asked her why she didn't give him "the fucking card in the beginning." In response, Complainant said to Aimara, "Give me my card. I don't want to do business here." She got out of her car to remove the gas pump. Aimara then said, "Fuck you, you come to rob my gas." Complainant responded by saying, "Fuck you too." Aimara walked inside the gas station with Complainant following him.

As Complainant approached the door to the convenience store, she demanded her credit card back, but Aimara continued to process the credit card transaction. I find that Complainant threw some plastic bottles from a shelf to the ground and proceeded to stumble over the bottles and fall to the ground. According to the credible testimony of Gianakopoulos, he took the credit card from Aimara, gave it to Complainant, and told her, "Lady, here's your card. You don't have to pay, just go." The credit card was not damaged and Complainant left the station without paying for any gas.

I do not credit Complainant's allegations that Aimara called her a "fucking black nigger bitch." According to Complainant, she reacted to this grievous insult with the following response: "You can say what you want because this is America. As long as you don't put your hands on me, everything will be fine." Such a reaction is stilted and unconvincing. Moreover, the police report,

taken just moments later, does not mention any racial or gender epithets. I find it inconceivable that such language, had it been uttered by Aimara, would not have been conveyed to the police and been included in the police report.

I also decline to credit Complainant's allegation that Aimara grabbed her in the chest area, threw her to the floor, tore her bra strap, and injured her hand. It is difficult to imagine how Aimara could have grabbed her in the chest area, threw or pulled her to the ground, and tore her bra without damaging Complainant's sweater and t-shirt which covered Complainant's brassiere. I also find it incredible that Aimara would have assaulted a customer in plain view of his employer. Gianakopoulos, who witnessed this part of the interaction between Complainant and Aimara, testified credibly that he heard Complainant demand her credit card back and then saw Complainant throw some plastic bottles from a shelf to the ground, stumble over the bottles, and fall to the ground. He did not see Aimara attack Complainant. I find the account of the incident provided by Gianakopoulos to be more credible than the account provided by Complainant.

I also fail to credit Complainant's allegation that Aimara tore her credit card with his bare hands. Since the credit card was laminated in plastic, tearing it up would have been difficult to accomplish in a matter of seconds without a scissors. Moreover, the allegation that Aimara tore up the card is not included in the police report. Complainant's deposition testimony states that she did not see Aimara tear the card and, thus, contradicts her direct testimony at the public hearing.

Certain ancillary matters are crucial in evaluating the parties' credibility. First, Complainant alleged in her interrogatory answers that she suffered a hairline fracture of her right hand as a result of the incident. At the public hearing, she admitted that there was no such fracture. Second, Complainant was convicted of conspiring with her husband to fraudulently cash social security benefits around the same time she made the allegations against Aimara. Third, Complainant falsely claimed during the incident at Fenway Texaco that she was going to the hospital to visit her children. Fourth, Complainant testified that she sustained a loss of income in regard to two jobs, but the evidence reveals that she did not hold the jobs until years after the incident. These matters render Complainant an untrustworthy witness. Gianakopoulos, by contrast, testified in a sincere and credible manner that Aimara did not commit the acts of racial and gender harassment of which he is accused.

The fact that Aimara's actions did not violate G.L. c. 272, sec. 98 or Chapter 151B does not mean that his behavior was above reproach. I do believe that Aimara provoked Complainant by swearing at her after she changed her mind about using her credit card. The situation deteriorated into mutual swearing and antagonism. Nonetheless, there is no credible evidence that the interaction was motivated by Complainant's race or gender or that a

MCAD Administrative Law Decisions–2006

CITE AS 28 MDLR 53

racial epithet was uttered by Aimara. Accordingly, neither Fenway Texaco nor Texaco Inc. is liable for Aimara's actions under G.L. c. 272, sec. 98, because those actions did not constitute discrimination.[3]

IV. ORDER

For the reasons set forth in this decision, the Complaint is hereby dismissed.

This decision represents the final order of the Hearing Officer. Any party aggrieved by this Order may appeal this decision to the Full Commission. To do so, a party must file a Notice of Appeal of this decision with the Clerk of the Commission within ten (10) days after the receipt of this Order and a Petition for Review within thirty (30) days of receipt of this Order.

So ordered this 8th day of March, 2006.

\* \* \* \* \* \*

ANDREW HARRIS and SPENCE TATUM

v.

CITY OF WORCESTER POLICE DEPARTMENT

Docket Nos. 94-SEM-0589 and 94-SEM-0590

*March 8, 2006*
*Cynthia A. Tucker, Commissioner*
*Walter W. Sullivan, Commissioner*

**F**ull Commission Review–Race and Color Discrimination–Failure to Promote–Split Vote of Full Commission Affirms Dismissal of Case—Unable to reach accord on whether the City of Worcester had acted in an unlawful manner in failing to promote people of color, the Full Commission let stand the decision of Hearing Officer Edward R. Mitnick in favor of the Respondent.

### DECISION OF THE FULL COMMISSION

**T**his matter is before us following a remand decision of Hearing Officer Edward Mitnick, in favor of Respondent. In his decision of August 13, 2004, the Hearing Officer concluded that the Complainants had failed to establish that the City of Worcester had engaged in unlawful discrimination on the basis of race and color when it did not promote them to the position of sergeant in the police department during the period from 1993 to 1995.[1]

Specifically, the Hearing Officer determined that the City had produced sufficient credible evidence that its conduct was not motivated by discriminatory racial animus. The primary question on remand for which additional evidence was presented was: "Is there sufficient evidence to establish that the City's failure (following the expiration of the Consent Decree in 1991) to create an affirmative action plan and apply for a PAR 10 special certification for its promotions in 1993, 1994 and 1995 amounts to discriminatory animus against the hiring and promotion of racial and ethnic minorities," and if so, were the Complainants in

---

3. Fenway Texaco asserts that regardless of Aimara's conduct, it is not liable under Chapter 151B as the employer of Aimara because under G.L. c. 272, sec. 98, an employer may not be held liable for the acts of an employee. While an employer is not liable for the criminal act of its employee under c. 272, sec. 98, liability may be imputed to the employer under Chapter 151B for violations of c. 272, sec. 98 if the acts constitute discrimination in a place of public accommodation. It is not necessary to reach this question, however, because the evidence establishes that Aimara did not engage in discriminatory conduct violative of c. 272, sec. 98. Likewise, it is not necessary to resolve the issue of Texaco Inc.'s potential liability under agency principles.

1. The Decision of **August 13, 2004** [26 MDLR 203], was based on a remand ordered by the full commission in an order dated August 4, 2003. In his earlier decision dated **April 6, 2002**, the Hearing Officer had concluded that despite the Complainants having proved a prima facie case of disparate impact discrimination, the City had nonetheless established that its practice of strictly promoting candidates by order of rank on the civil service eligibility list constituted a lawful business necessity. 24 MDLR 122, 126-128 (2002).

Complainants appealed to the Full Commission. On August 14, 2003, the Full Commission remanded the case to the Hearing Officer to consider and review the claims under a disparate treatment analysis. 25 MDLR 261, 263 (2003). In accordance with the decision of the Full Commission, another Public Hearing was held before the Hearing Officer on January 6, 2004, in Springfield, MA, at which time the parties offered supplemental testimony and exhibits in evidence.