UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | CIVIL ACTION NO.: 1:05-CV-10324 |
| JAY ODUNUKWE, ESQ., ) |  |
|      Plaintiff, ) |  |
| ) |  |
| v. ) |  |
| ) |  |
| FLEET BANK BOSTON, ) |  |
|      Defendant. ) |  |
| ) |  |

## PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The defendant's motion for summary judgment is meritless[1], mean-spirited, and frivolous in this racial profiling case. The motion flatly contradicts the findings of the Massachusetts Commission Against Discrimination based on work by its crack investigator Marzella B. Hightower. Those findings, as further endorsed by Jean A. Clanton, Supervisor, and Walter J. Sullivan, Jr., Investigating Commissioner, credited the claim of racial profiling discrimination. See Ex. 1.

## STATEMENT OF FACTS

The plaintiff and his sister, Joy I. Odunukwe, provide affidavits. They both are African-American professionals. Joy has a doctorate in pharmacy. Jay has a doctorate in law and is a highly regarded Boston attorney. See Affidavit of Joy Odunukwe, ¶ 1-4, and Jay Odunukwe, ¶ 1-3. Jay had been at the bank location where the incident occurred several times in the past and had

---

[1] There is nothing on this record suggesting a fabricating witness. Nevertheless, the center-piece of the defendant's argument involves a fabricating witness case. *Haney v. Fenway*, 28 MDLR 50 (2006). As a result, plaintiff also submits his sister's affidavit to counter this smear tactic. Under Rule 56(c) and the case law, the statements of the plaintiff are to be taken as true and they are entitled to every favorable inference. The case cited, of course, was not a Rule 56 case and is not a decision on a summary record.

been a Fleet customer for many years before moving to another bank. Id. at ¶ 5. Joy had issued a

check on her Fleet account to her brother, and had asked her brother to cash a check on her Fleet

account at the time of the incident. Op. Cite, at ¶ 5.

On May 14, 2002, the plaintiff went to the Medway Fleet bank located at 108 Main Street

in Medway Massachusetts to make a bank transaction. Aff. of Jay Odunukwe, ¶ 4.  When he

entered the bank at approximately 11:45am, the bank was open for business. Id. ¶ 4. He joined

the line of customers waiting to transact some business in the bank. Id. 6-7.When he got to a

teller window, he presented to the teller a check for $1,100 drawn on Fleet bank, made out in his

name and endorsed by him. He also presented a valid Massachusetts driver's license and a valid

American Express credit card to the teller. Aff. ¶ 7-9.

The teller took the check and his identification cards, looked at them and pushed them

back to him saying they are inadequate and that they will not cash his check. He asked her what

constitutes adequate identification and she said; a government issued identification with a picture

or a passport and a major credit card. He told her that his Massachusetts driver's license qualified

as a government issued identification and the American Express credit card is a major credit

card. Aff. ¶ 7-9. The teller then raising her voice told him that she will not accept his

identification cards and that he should leave. Aff. ¶ 10. Plaintiff told her that he will not leave

since he had valid and proper identification. She still refused to cash his check. Aff. ¶ 11. He

reached into his wallet and produced a third identification; his Suffolk University alumni

identification with his picture on it. The teller looked at it and said that it is not acceptable and

only good at Suffolk University. She then told him in a loud voice to leave and that he will not

be served. Aff. ¶ 12-13.Totally surprised and embarrassed, he requested to speak to the Manager.

Aff. ¶ 14. The manager came over to the teller's window, glanced at his check and his

identification cards, said something to the teller, then pushed the check and his Massachusetts driver's license, American Express credit card and Suffolk University identifications back to him and said that they are unacceptable. The manager told him that he would not be served and that should leave the bank. Aff. ¶ 15-16.

He asked the manager why his identification cards are unacceptable and she simply told him to leave. He informed her that he will not leave since he presented valid identification cards as required by law. He again requested to be served. Aff. ¶ 17-19. The manager then told him to leave the bank and that he will be forcibly evicted if he did not leave. He did not move. Aff. ¶ 18-19. While all this was taking place, there was a long line of customers in the bank. He felt totally humiliated, embarrassed, disgraced. He was made to feel totally worthless. Aff. ¶ 19, 32.

The manager then took the check and his identification cards and placed them on a vacant teller window and told him to step away from the teller window and that she will talk to him as soon as she finishes what she was doing. Aff. ¶ 21. He stepped away from the teller window and went to the side. A few moments later the manager called him into her office. Aff. ¶ 22. Inside her office, she went to her desk, sat down, picked up the phone and made a quick phone call and then dropped the phone. Aff. ¶ 23. She gave him back his check and identification cards and said that he will not be served and that he must leave the bank and should he refuse to leave that he will be forcibly removed. Id. 24. He again asked for an explanation to figure out what is going on and the manager simply stated that his identification cards were inadequate. Id. 25. He told her that what the bank had done to him is wrong, unfair and illegal. He told her that he was totally humiliated and disgraced in front of a lot of people for no reason. He told her that it is very obvious that he was the only black customer in the bank and that they have succeeded in

discriminating against him. He told her that he will file a complaint against the bank with Fleet

Bank Management for the discriminatory practice. Id. 25-27.

He then left the bank. He was totally distraught and in shock as he left the bank and

headed to his car. Upon regaining his composure, he drove to another Fleet Bank located in

Medfield Massachusetts about two miles away.  At the Medfield Fleet bank, he presented the

same Massachusetts driver's license, American Express credit card and check, only this time to

the Afro-American teller. The teller cashed his check after reviewing his identification cards. Id.

33-35. He was disgraced and humiliated; he was made to feel worthless. He felt completely

inadequate and useless. The treatment and humiliation he received at the Medway Fleet bank

caused him much pain, anguish and distress resulting in anxiety, weight loss and sleeplessness. It

was a life changing experience and it has a tremendous negative impact on his life.  Id. 35-44.

Plaintiff exhausted his administrative remedies and the MCAD entered a finding of

probable cause after exhaustive investigation to credit his claim of discrimination against the

defendant. See Ex. 1.


## LEGAL DISCUSSION OF THE MOTION FOR SUMMARY JUDGMENT

The defendant violated M.G. L. ch. 151B, M.G.L. ch. 27, §92A, and M.G.L. 98, § 11,

Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, et seq., and Title VII of the Civil

Rights Act and is liable for damages for emotional distress, interest, costs and attorney fees. With

respect to the state law claims, the plaintiff already was awarded a finding of probable cause

after the matter was litigated there and the bank was represented by counsel, and the state statute

is analogous to the federal claims.

The definition of "make and enforce contracts" in section 1981 extends the reach of the statute to situations beyond the four corners of a particular contract; the extension applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001) (explaining that, in a "commercial establishment" context, liability will attach when a plaintiff "receive[s] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.")

The defendant cannot distinguish the appellate authority of the plaintiff from the case. The plaintiff does not have to come forward with direct evidence of racial discrimination. The plaintiff may prove the unlawful intent with circumstantial evidence. The conclusion of discrimination must have "specific, nonconclusory factual support so that the plaintiff must summon evidence from which racial discrimination can be inferred." *Judge v. City of Lowell*, 160 F.3d 67, 75-77 (1st Cir. 1998). This is a very straight-forward example of such a violation. The bank is a commercial establishment. The plaintiff, who is of African Nigerian decent, received check cashing services in a markedly hostile manner and in a manner objectively reasonable to call discriminatory: there is no material fact in controversy that given that he was treated with race-based distrustfulness by the white bank employees in the first instance, and fairly and equitably by the Afro-American teller in the bank in the second instance when Plaintiff drove to another Fleet bank, located in Medfield Massachusetts, approximately two miles away, that this is racial misconduct. At the Medfield Fleet bank, he presented the same Massachusetts driver's license, American Express credit card and check to an Afro-American teller. The Afro-American teller cashed his check after reviewing his identification cards. Here, plaintiff received

services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

It is pellucidly clear that a merchant (the bank), acting out of racial animus, impeded a customer's (plaintiff's) ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001). Both the plaintiff and his sister have business relations with the bank, the plaintiff having used its ATM machine and been a customer, and the sister seeking cashing of checks by her brother. The complaint is predicated upon a federal statute that traces its origins to section 1 of the Civil Rights Act of 1866, 14 Stat. 27 (1866). This statute, now codified in 42 U.S.C. § 1981, prohibits both public and private racial discrimination in certain specified activities (including the making and enforcement of contracts). *Runyon v. McCrary*, 427 U.S. 160, 168-75 (1976). To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority (plaintiff is), (2) that the defendant discriminated against him on the basis of his race (he certainly was treated differently and very shabbily than the other people in the bank), and (3) that the discrimination implicated one or more of the activities enumerated in the statute. *Morris v. Dillard Dep't Stores, Inc.*,277 F.3d 743, 751 (5th Cir. 2001). There is sufficient nexus between the asserted discrimination and some contractual right or relationship for summary judgment.

The case law suggests the nature of the requisite nexus. The Supreme Court originally gave section 1981 a narrow focus, declaring that the statute "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989). But Congress widened the interpretive lens when it enacted the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071 (1991). Section 1981, as amended, reads in pertinent part:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . .* * *For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." That Act amended section 1981 by expanding the phrase "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The preeminent case is *Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir. 1996). There, two black customers were browsing innocently in a retail store. The assistant manager became suspicious and called the police. Id. at 412. The police arrived, hassled the two men (one of whom had completed his purchase and the other of whom had purchased nothing), found no evidence of wrongdoing, and departed (uttering racially derisive comments). Id. The customers sued, accusing the store of violating section 1981. The Seventh Circuit rejected the suit on the ground that the plaintiffs could not "point to specific facts showing that Office Max deprived them of any of the enumerated rights in § 1981 . . . specifically, the right to make and enforce a contract. They were denied neither admittance nor service, nor were they asked to leave the store." Id. at 414. Here, by contrast, the plaintiff was denied service and asked to leave the bank with which he conducted business. In *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1117-18 (10th Cir. 2001), cert. denied, 122 S. Ct. 1071 (2002), the Tenth Circuit ruled that a woman of African-American descent who allegedly had been ejected from a store on the basis of her race could not pursue a section 1981 claim because she had neither attempted nor planned to make any specific purchase (and, accordingly, could not prove any interference with a contractual relationship). Id. The court made plain that "the mere expectation of being treated

without discrimination while shopping" will not support a claim under section 1981. Id. at 1118.

In contrast, the court upheld a judgment for another African-American woman, ejected at the

same time, who was attempting to redeem a coupon that she had received incidental to a

previous purchase. Id. at 1103-05. The court concluded that the coupon was tantamount to an

option contract, and that the store could be held liable for its race-based denial of the right to

redeem it. Id. at 1104. The distinction drawn by the Tenth Circuit between the two plaintiffs

aptly illustrates the need for a contractual nexus in a suit premised on 42 U.S.C. § 1981. This

case is distinguishable from *Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) because the

plaintiff here has an ongoing commercial relationship with his bank with ATM use, cashing a

check drawn on this bank, and being a former customer, unlike the person passing through a

store in *Garrett*.

The plaintiff gets the benefit of every inference in this state of mind case, resting on

circumstantial evidence of discrimination for the 151B and Title VII counts[2]. The matter is

extremely straight-forward and trial-worthy as it involves state of mind issues when a bank

treated its Afro-American customer in highly different ways in two branches in the course of

the negotiation of a check. An African American is subjected to high scrutiny in one branch of a

bank and no scrutiny in the other branch of the bank. The plaintiff contends and the

Commission Against Discrimination in its FINDING OF PROBABLE CAUSE agreed that

something other than good banking was going on here and it was rank, actionable

discrimination. The job of the fact-finder will be to sort out the intentions and state of mind of

the parties, as is elementary in the law of these cases. There is no more skeptical judge than

Judge Selya and he has warned the courts against making state of mind calls on summary

judgment. See *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999). This is

---

[2] The defendant appears to be right in saying that the bank is excluded from Chapter 27 and 98 regulation.

not a stray comment case; rather, this case involves a course of conduct involving

discrimination. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st

Cir. 2005). Both the state agency and the court here have every good reason to let this case go

to trial.


                                          Respectfully submitted,

                                          Jay Odunukwe, Esq.,
                                          By his attorney,


                                          /s/ Robert O. Berger
Date: June 14, 2006                       Robert O. Berger (BBO#: 038900)
                                          11 Beacon Street, Suite 1210
                                          Boston, MA 02108
                                          (617) 423-7575


                          **CERTIFICATE OF SERVICE**

       I hereby certify that a true and exact copy of the above document was served upon the

attorney of record for each other party by electronic transfer.


                                          /s/ Robert O. Berger
Date: June 14, 2006                       Robert O. Berger (BBO#: 038900)

# Exhibit 1

MCAD Investigation Fact Sheet

**COMMISSION AGAINST DISCRIMINATION**
**One Ashburton Place, Boston, MA 02108**
**(617) 994-6000 Fax: (617) 994-6024**
**INVESTIGAITON FACT SHEET**

| To: | Jay Odunukwe | From: | Mass Commission Against Discrimination |
| | 9 Fieldmont Street. | | One Ashburton Place, Room 601 |
| | Hyde Park, MA 02136 | | Boston, MA 02108 |

| Case: Jay Odunukwe v. FleetBank | Docket No: 021402452 |
| Investigator: Marzella B. Hightower | EEOC No: None |

Investigation Summary:

Whether the Complainant was discriminated against in a place of public accommodation in being denied service. On May 14, 2002, Complainant went to the Respondent's Medway Branch to cash a check for $1,100.00 (one thousand and one hundred dollars). Complainant was a non-customer with a check drawn on Fleet account held by the Complainant's relative. Complainant alleges he presented two (2) forms of identification, a driver's license and valid American Express credit card, but the Respondent rejected both forms of identifications; he then presented his Suffolk University identification card and was told that the student identification card was only good at the University and that it had expired. He believes he was denied because of his race/color (Black) in violation of M.G.L. 272, Section 98. The Respondent asserted Complainant failed to provide proper identification accordance to the Respondent's check cashing policy.

Investigation revealed:

Investigation revealed Respondent's policy states that two forms of acceptable identification, one of which a photo identification is required when the check is greater than $500.00 (five hundred dollars). Another is a major credit card, such as American Express. The investigation revealed that upon being denied by the teller, the Complainant requested to see the manager. The manager spoke to the Complainant in her office and made a telephone call to the customer of the account. The manager was unable to communicate with the account holder at home or work.

Investigation further revealed that the Complainant immediately went to another Fleet Bank located in Medfield and was able to cash the check with his Massachusetts driver's license and his American Express card with out incident.

Conclusion:

Based on the foregoing findings, one could form the reasonable belief that the Respondent discriminated against the Complainant by denying him services because of his race/color. Genuine issues of material fact are present which are reserved for public hearing. Therefore, a finds of probable cause is warranted.

Disposition:

Therefore, pursuant to Section 5 of Chapter 151B, of the Massachusetts General Laws, and in conformity with the foregoing Findings of Facts, I have this day found that probable cause exists for crediting the allegations of the subject complaint. Pursuant to said Section 5, the parties will be

- 2 -

afforded an opportunity to participate in a conciliation conference at the offices of the Commission.
If the [arties do not choose to participate, or if such conferences does not result in an informal
resolution of this matter, the case will be certified for public hearing and final disposition on this
matter will be rendered by the designated Hearing Commissioner.


Marzella B. Hightower          Jean A. Clanton    (мв)        Walter J. Sullivan, Jr.
Investigator                   Supervisor                     Investigating Commissioner

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | CIVIL ACTION NO.: 1:05-CV-10324 |
| JAY ODUNUKWE, ESQ., ) | |
|      Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| FLEET BANK BOSTON, ) | |
|      Defendant. ) | |

## PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

The defendant's motion for summary judgment is meritless[1], mean-spirited, and frivolous

in this racial profiling case. The motion flatly contradicts the findings of the Massachusetts

Commission Against Discrimination based on work by its crack investigator Marzella B.

Hightower. Those findings, as further endorsed by Jean A. Clanton, Supervisor, and Walter J.

Sullivan, Jr., Investigating Commissioner, credited the claim of racial profiling discrimination.

See Ex. 1.

## STATEMENT OF FACTS

The plaintiff and his sister, Joy I. Odunukwe, provide affidavits. They both are African-

American professionals. Joy has a doctorate in pharmacy. Jay has a doctorate in law and is a

highly regarded Boston attorney. See Affidavit of Joy Odunukwe, ¶ 1-4, and Jay Odunukwe, ¶ 1-

3. Jay had been at the bank location where the incident occurred several times in the past and had

---

[1] There is nothing on this record suggesting a fabricating witness. Nevertheless, the center-piece of the defendant's argument involves a fabricating witness case. *Haney v. Fenway*, 28 MDLR 50 (2006). As a result, plaintiff also submits his sister's affidavit to counter this smear tactic.  Under Rule 56(c) and the case law, the statements of the plaintiff are to be taken as true and they are entitled to every favorable inference.  The case cited, of course, was not a Rule 56 case and is not a decision on a summary record.

been a Fleet customer for many years before moving to another bank. Id. at ¶ 5. Joy had issued a

check on her Fleet account to her brother, and had asked her brother to cash a check on her Fleet

account at the time of the incident. Op. Cite, at ¶ 5.

On May 14, 2002, the plaintiff went to the Medway Fleet bank located at 108 Main Street

in Medway Massachusetts to make a bank transaction. Aff. of Jay Odunukwe, ¶ 4.  When he

entered the bank at approximately 11:45am, the bank was open for business. Id. ¶ 4. He joined

the line of customers waiting to transact some business in the bank. Id. 6-7.When he got to a

teller window, he presented to the teller a check for $1,100 drawn on Fleet bank, made out in his

name and endorsed by him. He also presented a valid Massachusetts driver's license and a valid

American Express credit card to the teller. Aff. ¶ 7-9.

The teller took the check and his identification cards, looked at them and pushed them

back to him saying they are inadequate and that they will not cash his check. He asked her what

constitutes adequate identification and she said; a government issued identification with a picture

or a passport and a major credit card. He told her that his Massachusetts driver's license qualified

as a government issued identification and the American Express credit card is a major credit

card. Aff. ¶ 7-9. The teller then raising her voice told him that she will not accept his

identification cards and that he should leave. Aff. ¶ 10. Plaintiff told her that he will not leave

since he had valid and proper identification. She still refused to cash his check. Aff. ¶ 11. He

reached into his wallet and produced a third identification; his Suffolk University alumni

identification with his picture on it. The teller looked at it and said that it is not acceptable and

only good at Suffolk University. She then told him in a loud voice to leave and that he will not

be served. Aff. ¶ 12-13.Totally surprised and embarrassed, he requested to speak to the Manager.

Aff. ¶ 14. The manager came over to the teller's window, glanced at his check and his

identification cards, said something to the teller, then pushed the check and his Massachusetts driver's license, American Express credit card and Suffolk University identifications back to him and said that they are unacceptable. The manager told him that he would not be served and that should leave the bank. Aff. ¶ 15-16.

He asked the manager why his identification cards are unacceptable and she simply told him to leave. He informed her that he will not leave since he presented valid identification cards as required by law. He again requested to be served.  Aff. ¶ 17-19. The manager then told him to leave the bank and that he will be forcibly evicted if he did not leave. He did not move. Aff. ¶ 18-19. While all this was taking place, there was a long line of customers in the bank. He felt totally humiliated, embarrassed, disgraced. He was made to feel totally worthless. Aff. ¶ 19, 32.

The manager then took the check and his identification cards and placed them on a vacant teller window and told him to step away from the teller window and that she will talk to him as soon as she finishes what she was doing. Aff. ¶ 21. He stepped away from the teller window and went to the side. A few moments later the manager called him into her office. Aff. ¶ 22.  Inside her office, she went to her desk, sat down, picked up the phone and made a quick phone call and then dropped the phone. Aff. ¶ 23. She gave him back his check and identification cards and said that he will not be served and that he must leave the bank and should he refuse to leave that he will be forcibly removed. Id. 24. He again asked for an explanation to figure out what is going on and the manager simply stated that his identification cards were inadequate. Id. 25.  He told her that what the bank had done to him is wrong, unfair and illegal. He told her that he was totally humiliated and disgraced in front of a lot of people for no reason. He told her that it is very obvious that he was the only black customer in the bank and that they have succeeded in

discriminating against him. He told her that he will file a complaint against the bank with Fleet Bank Management for the discriminatory practice. Id. 25-27.

He then left the bank. He was totally distraught and in shock as he left the bank and headed to his car. Upon regaining his composure, he drove to another Fleet Bank located in Medfield Massachusetts about two miles away.  At the Medfield Fleet bank, he presented the same Massachusetts driver's license, American Express credit card and check, only this time to the Afro-American teller. The teller cashed his check after reviewing his identification cards. Id. 33-35. He was disgraced and humiliated; he was made to feel worthless. He felt completely inadequate and useless. The treatment and humiliation he received at the Medway Fleet bank caused him much pain, anguish and distress resulting in anxiety, weight loss and sleeplessness. It was a life changing experience and it has a tremendous negative impact on his life.  Id. 35-44.

Plaintiff exhausted his administrative remedies and the MCAD entered a finding of probable cause after exhaustive investigation to credit his claim of discrimination against the defendant. See Ex. 1.


## **LEGAL DISCUSSION OF THE MOTION FOR SUMMARY JUDGMENT**

The defendant violated M.G. L. ch. 151B, M.G.L. ch. 27, §92A, and M.G.L. 98, § 11, Title II of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981, et seq., and Title VII of the Civil Rights Act and is liable for damages for emotional distress, interest, costs and attorney fees. With respect to the state law claims, the plaintiff already was awarded a finding of probable cause after the matter was litigated there and the bank was represented by counsel, and the state statute is analogous to the federal claims.

The definition of "make and enforce contracts" in section 1981 extends the reach of the statute to situations beyond the four corners of a particular contract; the extension applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001) (explaining that, in a "commercial establishment" context, liability will attach when a plaintiff "receive[s] services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.")

The defendant cannot distinguish the appellate authority of the plaintiff from the case. The plaintiff does not have to come forward with direct evidence of racial discrimination. The plaintiff may prove the unlawful intent with circumstantial evidence. The conclusion of discrimination must have "specific, nonconclusory factual support so that the plaintiff must summon evidence from which racial discrimination can be inferred." *Judge v. City of Lowell*, 160 F.3d 67, 75-77 (1st Cir. 1998). This is a very straight-forward example of such a violation. The bank is a commercial establishment. The plaintiff, who is of African Nigerian decent, received check cashing services in a markedly hostile manner and in a manner objectively reasonable to call discriminatory: there is no material fact in controversy that given that he was treated with race-based distrustfulness by the white bank employees in the first instance, and fairly and equitably by the Afro-American teller in the bank in the second instance when Plaintiff drove to another Fleet bank, located in Medfield Massachusetts, approximately two miles away, that this is racial misconduct. At the Medfield Fleet bank, he presented the same Massachusetts driver's license, American Express credit card and check to an Afro-American teller. The Afro-American teller cashed his check after reviewing his identification cards. Here, plaintiff received

services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

It is pellucidly clear that a merchant (the bank), acting out of racial animus, impeded a customer's (plaintiff's) ability to enter into, or enjoy the benefits of, a contractual relationship. See *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001). Both the plaintiff and his sister have business relations with the bank, the plaintiff having used its ATM machine and been a customer, and the sister seeking cashing of checks by her brother. The complaint is predicated upon a federal statute that traces its origins to section 1 of the Civil Rights Act of 1866, 14 Stat. 27 (1866). This statute, now codified in 42 U.S.C. § 1981, prohibits both public and private racial discrimination in certain specified activities (including the making and enforcement of contracts). *Runyon v. McCrary*, 427 U.S. 160, 168-75 (1976). To state a claim under this statute, a plaintiff must show (1) that he is a member of a racial minority (plaintiff is), (2) that the defendant discriminated against him on the basis of his race (he certainly was treated differently and very shabbily than the other people in the bank), and (3) that the discrimination implicated one or more of the activities enumerated in the statute. *Morris v. Dillard Dep't Stores, Inc.*,277 F.3d 743, 751 (5th Cir. 2001). There is sufficient nexus between the asserted discrimination and some contractual right or relationship for summary judgment.

The case law suggests the nature of the requisite nexus. The Supreme Court originally gave section 1981 a narrow focus, declaring that the statute "does not apply to conduct which occurs after the formation of a contract and which does not interfere with the right to enforce established contract obligations." *Patterson v. McLean Credit Union*, 491 U.S. 164, 171 (1989). But Congress widened the interpretive lens when it enacted the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071 (1991). Section 1981, as amended, reads in pertinent part:

"All persons within the jurisdiction of the United States shall have the same right in every State
and Territory to make and enforce contracts . . . .* * *For purposes of this section, the term
"make and enforce contracts" includes the making, performance, modification, and termination
of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the
contractual relationship." That Act amended section 1981 by expanding the phrase "make and
enforce contracts" to include "the making, performance, modification, and termination of
contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual
relationship." 42 U.S.C. § 1981(b). The preeminent case is *Morris v. Office Max, Inc.*, 89 F.3d
411 (7th Cir. 1996). There, two black customers were browsing innocently in a retail store. The
assistant manager became suspicious and called the police. Id. at 412. The police arrived, hassled
the two men (one of whom had completed his purchase and the other of whom had purchased
nothing), found no evidence of wrongdoing, and departed (uttering racially derisive comments).
Id. The customers sued, accusing the store of violating section 1981. The Seventh Circuit
rejected the suit on the ground that the plaintiffs could not "point to specific facts showing that
Office Max deprived them of any of the enumerated rights in § 1981 . . . specifically, the right to
make and enforce a contract. They were denied neither admittance nor service, nor were they
asked to leave the store." Id. at 414. Here, by contrast, the plaintiff was denied service and asked
to leave the bank with which he conducted business. In *Hampton v. Dillard Dep't Stores, Inc.*,
247 F.3d 1091, 1117-18 (10th Cir. 2001), cert. denied, 122 S. Ct. 1071 (2002), the Tenth Circuit
ruled that a woman of African-American descent who allegedly had been ejected from a store on
the basis of her race could not pursue a section 1981 claim because she had neither attempted nor
planned to make any specific purchase (and, accordingly, could not prove any interference with a
contractual relationship). Id. The court made plain that "the mere expectation of being treated

7

without discrimination while shopping" will not support a claim under section 1981. Id. at 1118. In contrast, the court upheld a judgment for another African-American woman, ejected at the same time, who was attempting to redeem a coupon that she had received incidental to a previous purchase. Id. at 1103-05. The court concluded that the coupon was tantamount to an option contract, and that the store could be held liable for its race-based denial of the right to redeem it. Id. at 1104. The distinction drawn by the Tenth Circuit between the two plaintiffs aptly illustrates the need for a contractual nexus in a suit premised on 42 U.S.C. § 1981. This case is distinguishable from *Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002) because the plaintiff here has an ongoing commercial relationship with his bank with ATM use, cashing a check drawn on this bank, and being a former customer, unlike the person passing through a store in *Garrett*.

The plaintiff gets the benefit of every inference in this state of mind case, resting on circumstantial evidence of discrimination for the 151B and Title VII counts[2]. The matter is extremely straight-forward and trial-worthy as it involves state of mind issues when a bank treated its Afro-American customer in highly different ways in two branches in the course of the negotiation of a check. An African American is subjected to high scrutiny in one branch of a bank and no scrutiny in the other branch of the bank. The plaintiff contends and the Commission Against Discrimination in its FINDING OF PROBABLE CAUSE agreed that something other than good banking was going on here and it was rank, actionable discrimination. The job of the fact-finder will be to sort out the intentions and state of mind of the parties, as is elementary in the law of these cases. There is no more skeptical judge than Judge Selya and he has warned the courts against making state of mind calls on summary judgment. See *Fernandes v. Costa Brothers Masonry, Inc.,* 199 F.3d 572 (1st Cir. 1999). This is

---

[2] The defendant appears to be right in saying that the bank is excluded from Chapter 27 and 98 regulation.

not a stray comment case; rather, this case involves a course of conduct involving discrimination. *Mercado v. The Ritz Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41 (1st Cir. 2005). Both the state agency and the court here have every good reason to let this case go to trial.

Respectfully submitted,

Jay Odunukwe, Esq.,
By his attorney,

/s/ Robert O. Berger

Date: June 14, 2006          Robert O. Berger (BBO#: 038900)
         11 Beacon Street, Suite 1210
         Boston, MA 02108
         (617) 423-7575

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the above document was served upon the attorney of record for each other party by electronic transfer.

/s/ Robert O. Berger

Date: June 14, 2006          Robert O. Berger (BBO#: 038900)

9

# Exhibit 1

MCAD Investigation Fact Sheet

**COMMISSION AGAINST DISCRIMINATION**
**One Ashburton Place, Boston, MA  02108**
**(617) 994-6000 Fax: (617) 994-6024**
**INVESTIGAITON FACT SHEET**

| To: | Jay Odunukwe | From: | Mass Commission Against Discrimination |
| | 9 Fieldmont Street. | | One Ashburton Place, Room 601 |
| | Hyde Park, MA  02136 | | Boston, MA 02108 |

| Case:  Jay Odunukwe v. FleetBank | Docket No: 021402452 |
| Investigator: Marzella B. Hightower | EEOC No:  None |

Investigation Summary:

Whether the Complainant was discriminated against in a place of public accommodation in being denied service. On May 14, 2002, Complainant went to the Respondent's Medway Branch to cash a check for $1,100.00 (one thousand and one hundred dollars).  Complainant was a non-customer with a check drawn on Fleet account held by the Complainant's relative. Complainant alleges he presented two (2) forms of identification, a driver's license and valid American Express credit card, but the Respondent rejected both forms of identifications; he then presented his Suffolk University identification card and was told that the student identification card was only good at the University and that it had expired. He believes he was denied because of his race/color (Black) in violation of M.G.L. 272, Section 98.  The Respondent asserted Complainant failed to provide proper identification accordance to the Respondent's check cashing policy.

Investigation revealed:

Investigation revealed Respondent's policy states that two forms of acceptable identification, one of which a photo identification is required when the check is greater than $500.00 (five hundred dollars).  Another is a major credit card, such as American Express. The investigation revealed that upon being denied by the teller, the Complainant requested to see the manager. The manager spoke to the Complainant in her office and made a telephone call to the customer of the account. The manager was unable to communicate with the account holder at home or work.

Investigation further revealed that the Complainant immediately went to another Fleet Bank located in Medfield and was able to cash the check with his Massachusetts driver's license and his American Express card with out incident.

Conclusion:

Based on the foregoing findings, one could form the reasonable belief that the Respondent discriminated against the Complainant by denying him services because of his race/color. Genuine issues of material fact are present which are reserved for public hearing.  Therefore, a finds of probable cause is warranted.

Disposition:

Therefore, pursuant to Section 5 of Chapter 151B, of the Massachusetts General Laws, and in conformity with the foregoing Findings of Facts, I have this day found that probable cause exists for crediting the allegations of the subject complaint.  Pursuant to said Section 5, the parties will be

- 2 -

afforded an opportunity to participate in a conciliation conference at the offices of the Commission. If the [arties do not choose to participate, or if such conferences does not result in an informal resolution of this matter, the case will be certified for public hearing and final disposition on this matter will be rendered by the designated Hearing Commissioner.


Marzella B. Hightower
Investigator

Jean A. Clanton    (mB)
Supervisor

Walter J. Sullivan, Jr.
Investigating Commissioner