1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

JAY ODUNUKWE,                    ) C.A. No. 05-10324-NG

        PLAINTIFF              ) Courtroom No. 2

VS.                              )

FLEET BANK BOSTON,               ) 1 Courthouse Way

        DEFENDANT              ) Boston, MA  02210

EXCERPT

NOVEMBER 14, 2007

JURY TRIAL DAY 2

8:31 A.M.

BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE

Valerie A. O'Hara

Official Court Reporter

2

1    A P P E A R A N C E S:

2        Law Office of Robert O. Berger, III, by ROBERT O.
     BERGER, III, ESQ., 11 Beacon Street, Boston, Massachusetts
3    02108; for the Plaintiff;

4        Bulkley, Richardson & Gelinas LLP, by CAROL E. KAMM,
     ATTORNEY and DONN A. RANDALL, ESQ., One Post Office Square,
5    Suite 3700, Boston, Massachusetts  02109; for the Defendant.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    EXCERPT

2          OPENING STATEMENT BY MS. KAMM:

3          MS. KAMM:  Good morning, your Honor.  Good

4    morning, members of the jury.  This case is about two

5    employees at the Medway branch who did their job on May

6    14th, 2002.  We're here because the plaintiff claims that he

7    was discriminated against when these two employees did not

8    cash his check.  The evidence will show there was no

9    discrimination.

10         This case is about the types of identification

11   that the plaintiff presented when he was at the Medway

12   branch and then at the Medfield branch.  He claims he

13   produced an American Express card as a second form of

14   identification.  The bank employees will tell you he didn't.

15   It's about the efforts of these two employees, Mary Beth

16   Nance, the teller, and Jean Brennan, the manager made an

17   effort to try to cash his check, even though he didn't

18   present the proper identification under the check cashing

19   policy, and it's about the fact that two different branches

20   had two different policies in applying Fleet's check cashing

21   policy.

22         The first, the Medway strictly enforced the policy

23   and only made some exceptions when they had some independent

24   verification that the check could be cashed.  The second

25   branch, the Medfield, is more lenient about making

1    exceptions to this policy.  That's really what this case is

2    about.

3         My name is Carol Kamm, and with me at counsel

4    table is Donn Randall.  We represent Fleet Bank in this

5    matter.  Let me explain a couple of things that may be

6    confusing to you as you hear the evidence in this case.  The

7    first has to do with who the defendant is.  You've heard

8    that the events of this case occurred at branches of Fleet

9    National Bank, and you may know in 2005 Fleet merged with

10   Bank of America, so don't be confused when Fleet.  Fleet is

11   now Bank of America.

12        The second thing that may be confusing to you as

13   Mr. Berger said is that the plaintiff went to two different

14   branches in two different towns that had very similar names.

15   The first branch he went to was in Medway, Massachusetts.

16   That's where the check was not cashed.  The second branch he

17   went to was in Medfield, Massachusetts, and that's where the

18   check was cashed.

19        So, what happened on May 14th, 2002?  Well, you

20   will hear from a number of bank employees about what

21   happened that day.  The first employees you'll hear from

22   were working at the Medway branch.  You'll meet Mary Beth

23   Nance the teller, and she will tell you that she was not

24   normally working at the Medway branch.  She was what we

25   might call a floater.  She had a branch she normally worked

1    at, but she would fill in at other branches, and she

2    happened to be filling in at the Medway.  It was the only

3    time she did it, in fact.

4         She'll tell you that a person came up to the

5    teller window, it was approaching noon.  It was busy, there

6    was a line, and this person came up that wanted to cash a

7    check for more than $500.  Now, she'll explain that Fleet

8    had a check cashing policy, and this is the policy that set

9    out the types and the number of identification that had to

10   be produced when somebody wanted to cash a check, and it

11   varied depending upon whether the person was a Fleet

12   customer, whether it was somebody who was known to the bank,

13   to the branch, or whether it was a noncustomer.

14        Fleet customers, known customers had to produce

15   less I.D. than noncustomers, and it also varied depending

16   upon the amount of the check.  The higher value of the

17   check, the more I.D. had to be produced, and Ms. Nance will

18   tell you that when a noncustomer such as the plaintiff came

19   in and wanted to cash a check over $500, he had to produce

20   two forms of accepted I.D., and the policy lists the types

21   of identification that are accepted.

22        Now, she'll tell you that this person came to her

23   teller window, gave her a check, she found out he was not a

24   customer of the bank, and she asked him for identification.

25   He produced a driver's license.  Since it was a check over

1   $500, he needed two forms of identification, so she asked

2   him for more identification, and he produced a student I.D.

3        She'll tell you that the driver's license is an

4   accepted form of identification under the policy, but the

5   student ID is not, so she asked him if he had more

6   identification.  She asked him if he had a credit card.  She

7   asked him if he had a passport, he started pulling things

8   out of a wallet, she thinks he pulled out a health insurance

9   form, but he never produced another form of identification

10  that was accepted under the policy, so she told him he

11  couldn't cash the check.

12       He became loud and angry, talked to somebody else

13  behind the teller wall to see if he was a known customer,

14  but he was not a known customer, so she told him again she

15  could not cash his check, and he continued to be loud and

16  upset, and you'll hear from another employee at the branch

17  named Paula Curtis who observed him being loud and

18  disruptive and saw the branch manager come over and try to

19  help, and you'll hear from that branch manager, Jean

20  Brennan.

21       Now, Ms. Brennan will tell you that she went over

22  to Ms. Nance' window, and she looked at the identification

23  that the plaintiff produced.  She recalls that he had a

24  driver's license and he had another form of I.D.  She

25  doesn't remember any more what that other form of

1    identification was, but she knows it was not one that was

2    accepted under the policy, so she told him that he didn't

3    have the proper identification.

4           He continued to be loud and upset, and she asked

5    him to step out of the line, and then she spoke with him and

6    she offered to bring him into her office and to call the

7    person who had written the check, in bank language we call

8    it the maker of the check, and the maker of the check is

9    Joy Odunukwe who is a Fleet customer.  This is a check that

10   was written on a Fleet account.

11          Mrs. Brennan had the contact information for

12   Ms. Odunukwe in her computer system, so she told the

13   plaintiff that she would try to reach Ms. Odunukwe, and if

14   she could reach her and verify that she had given the check

15   to him, she'd cash it for him even though he only had one

16   form of I.D. and Ms. Brennan told him that her practice in

17   the Medway branch was to strictly enforce the check cashing

18   identification policy.  If a person came in and they didn't

19   have the proper I.D., unless she had some independent

20   verification that this check could be cashed, she didn't

21   authorize the authorizing of the check, it didn't matter

22   what the race of the person was.

23          But in this case she was willing to make an

24   exception if she could contact the maker of the check, and

25   you'll hear that Mr. Odunukwe and Mrs. Brennan went into her

1    office and that she made some phone calls.  She tried to

2    call Mrs. Odunukwe at her work, wasn't there.  She tried to

3    call Mrs. Odunukwe, no answer.  She told Mr. Odunukwe, the

4    plaintiff, that she could not cash his check.  Still angry

5    and upset, he left the branch, and as you heard, he drove a

6    short distance, probably less than ten minutes to the second

7    branch in Medfield, Mass.

8            And you'll hear from the employees that were

9    involved in his check cashing transaction there.  The first

10   person you'll hear from is Orfalina El-Alam, and she was

11   very new to banking, she was a teller in training at that

12   point.  She had no authority to cash that check, it was

13   above her authority level, so somebody else had to approve

14   that transaction, and you'll hear from that person.

15           Her name is Linda Tissot, and Ms. Tissot will tell

16   you that she is and was at that time a teller at the

17   Medfield branch, and she came over to Ms. El-Alam's teller

18   window, and she looked at the identification that the

19   plaintiff presented.  She recalls it only being a driver's

20   license.  She looked at the driver's license.  She knows

21   Hyde Park because so she started asking him questions, do

22   you know where Solaris Road is, do you know where this

23   restaurant is, do you know where this deli is?  He answered

24   politely, he told her where the deli was.  She asked him

25   what he was doing in the area.  He told her that he had

1    business in the area, and she said okay, I'll cash this

2    check for you this one time, but in the future you need to

3    bring in two forms of identification, and she authorized the

4    transaction.

5         Now, Ms. El-Alam processed this transaction, and

6    you will see the check that was deposited.  Under the check

7    cashing policy, the identification that is used has to be

8    recorded on the check.  If a driver's license is used, the

9    license number has to be written on the front of the check.

10   If a credit card is used, at that time the credit card type

11   and expiration date had to be noted on the front of the

12   check.

13        The credit card number was not noted on the check.

14   That was to be noted what's called the flex turn journal

15   tape.  It's like a running trail, it's the paper that we

16   used to have in calculators.  It's a running record of all

17   the transactions that this teller took.  She was supposed to

18   write the credit card number on that flex tape.  You will

19   see that check, and on this check is the only information is

20   a driver's license, and you'll see here there's no credit

21   card information recorded on the check, there's no credit

22   card information recorded on the tape.

23        Now, as you hear the evidence in this case, there

24   are three questions to consider.  First, other than the

25   plaintiff's testimony, is there any evidence that he

1    presented an American Express card to anyone at the Medway

2    branch or the Medfield branch?  2, why would Mary Beth Nance

3    have asked him for more identification?

4            Why would she have tried to find out if he was a

5    known customer, and why would Jean Brennan, the branch

6    manager, had brought him into her office and made phone

7    calls on his behalf if either of them were intending not to

8    cash his check because of his race, and, 3, is there any

9    evidence that Mary Beth Nance or Jean Brennan did not cash

10   his check because of his race?  The bank believes the answer

11   to that question will be no, and at the close of the

12   evidence in this case, the bank will ask you to return a

13   verdict in its favor.  Thank you.

14           MR. BERGER:  Your Honor, may I ask a question at

15   sidebar?

16           THE COURT:  Okay.

17           MR. BERGER:  I made a request that the witnesses

18   who are from the bank be sequestered.

19           THE COURT:  Not a problem.

20           THE COURT:  What's your evidentiary issue?

21           MR. RANDALL:  Well, the teller tape.  Let me get a

22   copy.

23           THE COURT:  Do you want Jay Odunukwe to be --

24           MR. RANDALL:  We ask that, yes.

25           THE COURT:  So if they're going to be severed.

1          MR. BERGER:  Joy as well.

2          MR. RANDALL:  This is a copy of the document that

3     we wish.

4          THE COURT:  Is there an objection?

5          MR. BERGER:  Yes, there is, your Honor.

6          THE COURT:  What's the objection?

7          MR. BERGER:  The best evidence rule.  There are

8     interdelineations, alterations and deletions in the text of

9     the document.  We need to get the original, it's classic.

10         MR. RANDALL:  We have the Massachusetts

11    authentication statute, and the basis for admitting this is

12    set forth in the affidavit and in the authentication

13    statute.

14         MR. BERGER:  The statute doesn't resolve the

15    issues that I've raised, namely that there is a box.

16         THE COURT:  I understand.  The interdelineations

17    are irrelevant to this.

18         MR. RANDALL:  Mrs. Brennan will testify that in

19    fact she placed that star on the original of the tape.

20         THE COURT:  Okay.  I'll allow it.

21         MR. RANDALL:  Thank you, your Honor.

22         MR. BERGER:  Objection noted.

23         (SIDEBAR CONFERENCE WAS CONCLUDED)

24         MR. BERGER:  Jay Odunukwe.

25         THE COURT:  There's been a request that the

1    witnesses be sequestered which means that one witness

2    doesn't hear the question of the other.  Go on,

3    Mr. Berger.

4                MR. BERGER:  Jay Odunukwe, please.

5                THE COURT:  Okay.

6                              - - - -

7                (A recess was taken.)

8                MS. KAMM:  The parties have stipulated the

9    admission of Exhibits 1 through 9 with the exception of

10   Exhibit No. 6.  The defendant is moving to strike Exhibit

11   No. 6.

12               MR. BERGER:  We object because we assented to the

13   it.

14               THE CLERK:  All rise for the jury.

15               THE COURT:  You can be seated.  Proceed,

16   Mr. Berger.

17               MR. BERGER:  The next witness is Pamela Martin,

18   your Honor.

19               PAMELA MARTIN, having been duly sworn by the

20   Clerk, testified as follows:

21                         DIRECT EXAMINATION

22   BY MR. BERGER:

23   Q.  Good morning.

24   A.  Good morning.

25   Q.  Please state your name.

1    A.  Pamela Martin.

2    Q.  And what is your position?

3    A.  I'm currently a teller manager.

4    Q.  For whom?

5    A.  Bank of America in Foxborough, Mass.

6    Q.  I draw your attention to May, 2002.  What was your

7    position?

8    A.  A teller manager.

9    Q.  Now, on May 14th, 2002, did you authorize a teller in

10   the Medfield branch to cash a check for a non-Fleet customer

11   named Jay Odunukwe?

12   A.  I don't recall.

13   Q.  Do you recall signing an affidavit under the penalties

14   of perjury on the 18th of June, 2005?

15   A.  I do.

16   Q.  If you reviewed the document, could it refresh your

17   recollection?

18   A.  It may.

19   Q.  Could you take a look at paragraph 2 of your affidavit

20   from this proceeding.  Could you read paragraph 2 in its

21   entirety.

22   A.  "On May 14th, 2002, I authorized -- "

23   Q.  No, to yourself, pardon me.  Have you read paragraph

24   2?

25   A.  I did.

1    Q.   Does it refresh your recollection?

2    A.   It does not.

3    Q.   Now, did you recall on May 14th, 2002, being the

4    supervisor at the Medfield branch of Fleet National Bank?

5    A.   I did.

6    Q.   And do you recall whether all the customers who had

7    checks cashed that day showed driver's license and other

8    forms of identification prior to the negotiation of the

9    checks?

10           MR. RANDALL:   Objection, your Honor.

11           THE COURT:   Sustained.

12   Q.   Did you in your affidavit signed on the 18th of June,

13   2005 in this case state "The customer showed me a

14   Massachusetts driver's license and another form of

15   identification"?

16           MR. RANDALL:   Objection.

17   A.   That's what the affidavit says.

18   Q.   Did you read the affidavit before it was signed?

19   A.   I did.

20   Q.   And is this your signature on the second page of the

21   affidavit?

22   A.   It is.

23   Q.   Now, could you take a look at this document and tell the

24   jury where on the check there is a writing indicating the

25   other form of identification that you referenced in your own

1    affidavit?

2    A.  It's not on the check.

3    Q.  Thank you.  Now, did you also indicate in the affidavit

4    that you just read paragraph 2, "I believe the non-Fleet

5    customer in these transactions was the plaintiff in this

6    case, Jay Odunukwe?"  Did you put that in your affidavit?

7    A.  That's what I just read, yes.

8    Q.  Yes.  Now, did you supervise anyone when you were

9    working for the Medfield Bank of America branch?

10   A.  I supervised I believe six tellers.

11   Q.  Did you supervise any of the tellers who are here today

12   to testify?

13   A.  Yes.

14   Q.  Did you supervise Orfalina El-Alam, and I'm probably

15   butchering it, and I apologize?

16   A.  I did.

17   Q.  Did you supervise her in connection with the transaction

18   in which the customer showed a Massachusetts driver's

19   license and another form of identification and the person

20   was Jay Odunukwe?

21   A.  I don't recall.

22   Q.  You don't recall.  Did you at any time in your

23   supervision punish her for negotiating any checks without

24   proper identification?

25          MR. RANDALL:  Objection, your Honor.

1          THE COURT:  Overruled.

2     A.  I don't recall because she would always need

3     supervision.

4     Q.  Did you ever talk to her short of punishment, did you

5     ever talk to her about any instances in which she negotiated

6     a check without the proper forms of identification?

7     A.  No.  She always followed the rules.

8     Q.  She always followed the rules?

9     A.  To the best of my knowledge.

10    Q.  Now,  --

11          MR. BERGER:  No further questions, your Honor.

12          THE COURT:  Thank you.

13                    CROSS-EXAMINATION

14    BY MR. RANDALL:

15    Q.  Good morning, Ms. Martin.

16    A.  Good morning.

17    Q.  Could you please introduce yourself to the jury and tell

18    them a little bit about yourself?

19    A.  My name is Pamela Martin, I've lived in Massachusetts

20    all my life.  I now reside in East Taunton with my husband

21    and my 20-month old daughter.  I try to spend as much

22    quality time with my family as possible, and my daughter is

23    my pride and joy.

24    Q.  Thank you.  You testified you were a teller supervisor

25    at the Medfield branch in May of 2002?

1    A.  Yes, for the last five and a half years.

2    Q.  You also testified you have no independent recollection

3    of Mr. Odunukwe or cashing his check; is that correct?

4    A.  That is correct.

5    Q.  Do you have any recollection of approving a check for

6    cash or deposit from Mr. Odunukwe?

7    A.  I do not.

8    Q.  Do you have any recollection of a transaction at all?

9    A.  I just remember a conversation with the Medway office

10   that occurred either that day or a couple days later about

11   the incident.

12   Q.  And what did you say in that conversation?

13   A.  I was told that the person tried to cash a check there

14   in Medway and the check was not cashed in Medway, they came

15   to Medfield, and we did cash the check.

16   Q.  And why did you cash the check?

17   A.  Because we made an exception.

18   Q.  And did you have authority to make exceptions in May of

19   2002?

20   A.  I did.

21   Q.  And what was the limit of your authority?

22   A.  I believe it was 50,000.

23          MR. RANDALL:  I have no further questions, your

24   Honor.

25          THE COURT:  Thank you.

```
 1                      REDIRECT EXAMINATION
 2   BY MR. BERGER:
 3   Q.  Now, did you earlier testify that you signed under the
 4   penalties of perjury on the 18th of June an affidavit which
 5   appears in this action?
 6   A.  Yes.
 7   Q.  Did you have recollection of the facts then when you
 8   prepared this affidavit?
 9   A.  I believe I did, yes.
10   Q.  Then in connection with that time then, and I'm
11   comparing it to now, has your recollection changed whether
12   "the customer showed me a Massachusetts driver's license and
13   another form of identification?"  Has your recollection
14   changed between now and the 18th of June, 2005, when you
15   signed an affidavit under the pains and penalties of perjury
16   in this document which was filed in the United States
17   District Court?
18   A.  What's the question?
19   Q.  Have you changed, has your memory changed?
20   A.  It has.
21   Q.  It has.  What's your new memory?
22   A.  The only recollection I have is having a conversation
23   with the Medway office concerning the incident.
24   Q.  Has there been something that's happened to you mentally
25   or physically since you signed this affidavit on June 18th,
```

1   2005?

2   A.  I believe just having a child and, you know, I can't

3   remember what I need at the grocery store if I don't have a

4   list.

5   Q.  I understand.  I have four daughters.  Have you gone

6   through any neurological or psychological conditions that

7   have altered your memory?

8        MR. RANDALL:  Objection, your Honor.

9        THE COURT:  Overruled.  Overruled.  I think her

10  first answer was complete.  Being a mother alters your

11  memory.

12       MR. BERGER:  I appreciate that.  Four daughters, I

13  get the concept.

14  A.  No, I have not.

15  Q.  So the fact of the matter is that when you signed this

16  affidavit on the 18th of June, 2005, which was closer in

17  time to May 14th, 2002 than now, obviously, your

18  recollection was that the customer showed you a driver's

19  license and another form of identification; isn't that

20  correct?

21  A.  Correct.

22  Q.  Thank you.

23       MR. BERGER:  No further questions, your Honor.

24       THE COURT:  One more round.  Anything further?

25       MR. RANDALL:  Nothing further, your Honor.

```
1          THE COURT:  Thank you very much.  Next witness.

2          MR. BERGER:  Mary McHardy, Mary Beth McHardy

3    Nance.

4          MARY BETH McHARDY NANCE, having been duly sworn by

5    the Clerk, testified as follows:

6                       DIRECT EXAMINATION

7    BY MR. BERGER:

8    Q.  Please state your name.

9    A.  Mary Beth Nance.

10   Q.  And could you please tell us where you reside.

11   A.  I reside in Jacksonville, Florida.

12   Q.  And how did you come today?

13   A.  By airplane.

14   Q.  How get to the court here today?

15   A.  By taxi.

16   Q.  Okay.  How did you get from Florida to Boston?

17          THE COURT:  She walked.

18   Q.  Long walk?

19          THE COURT:  Right.

20   A.  A very scary, bumpy airplane ride.

21   Q.  Who paid for the plane ticket?

22   A.  I'm not certain.

23   Q.  The bank didn't pay it, you have no idea?

24   A.  I'm not sure.

25   Q.  I draw your attention to May, 2002.  Did you work as a
```

1    teller at Fleet's Medway branch?

2    A.  Yes.

3    Q.  And do you recall Mr. Odunukwe?

4    A.  No, I don't.

5    Q.  Do you recall a customer who seemed extremely irate who

6    called you a bitch and accused you of being a racist?

7    A.  Yes, I sure do.

8    Q.  Okay.  Who was that?

9    A.  I know it to be Mr. Odunukwe, but that's not -- the

10   memory of the person is not in my mind, the memory of the

11   situation is.

12   Q.  All right.  Well, I don't understand that distinction.

13   Could you explain to us what you mean.

14   A.  I'd be happy to.  I remember being insulted, and I

15   remember the infraction, but I don't remember the

16   individual.

17   Q.  Okay.  At the time of the interaction, did you have

18   anybody else with you who heard him say that he called you a

19   bitch?

20   A.  There were other tellers in my area that saw the

21   scene.

22   Q.  I ask something different, ma'am.  It's very important.

23   A.  I wouldn't know what someone else heard.

24          MR. BERGER:  Your Honor, could I get a yes or no

25   instruction, please?

1    Q.  Did you have any teller beside you, near you or any

2    other person beside or near you that you know to have heard

3    him call you a bitch?  Yes or no.

4            MR. RANDALL:  Objection, your Honor.

5            THE COURT:  Sustained.

6    Q.  Did anybody that you know hear him because they told you

7    or sympathized with you hear him at the time call you a

8    bitch?

9            MR. RANDALL:  Objection.

10           THE COURT:  Sustained.

11   Q.  Did you report that he called you a bitch to the

12   police?

13           THE COURT:  To the police?

14           MR. BERGER:  To the police.

15   A.  No.

16   Q.  Did you report that he called you a bitch to anybody

17   official outside of the bank?

18   A.  I'm sorry, but I don't understand the question.

19   Q.  Okay.  Did you make a report about him calling you a

20   bitch to any public agency?

21   A.  Are you asking me if I made a complaint of some kind?

22   Q.  Correct.

23   A.  No.

24   Q.  How about about his accusation in which he called you a

25   racist, as you allege?

1   A.  No.

2   Q.  Did you report that to any agency or police officer?

3   A.  No.

4        THE COURT:  Did you report any of these matters to

5   anyone in the bank?

6   Q.  Well, isn't it true that a Medway --

7        THE COURT:  Excuse me, she's answering my

8   question.  Did you report it to anybody?

9        THE WITNESS:  I mean, there was just the

10   conversation with Jean, she knew the issue, but, no, I

11   didn't personally make a grievance or anything.

12        THE COURT:  Okay, go on.

13   Q.  Wasn't it true that at the same time you called and he

14   called you a bitch there was a Medway police officer who you

15   know who happened to be in the branch that day and was near

16   you and observed the interaction and remained in the branch

17   until Mr. Odunukwe left?

18        MR. RANDALL:  Objection.

19        THE COURT:  Overruled.  You mean there was an

20   officer there?

21        THE WITNESS:  I didn't know the officer, I was

22   told that there was an off-duty officer there.  I didn't

23   know him.  I didn't know anyone from Medway.

24   Q.  Did you prepare an affidavit in this case that was filed

25   in the docket No. 02-BPA 0252 at the Massachusetts

1   Commission Against Discrimination under the penalties of

2   perjury?

3           MS. KAMM:  Objection, your Honor.  May we be

4   heard?

5           THE COURT:  Yes.

6           ( THE FOLLOWING OCCURRED AT SIDEBAR:)

7           MS. KAMM:  Your Honor, this is an attempt to

8   reference the obscenity.

9           MR. BERGER:  No, it isn't.

10          THE COURT:  Can I see the statement?

11          MR. BERGER:  It's public record.

12          THE COURT:  Whether it's a public record, it's not

13  a question of relevance in the case.

14          MR. BERGER:  Understood.  It's a prior case, she

15  knew the man, he was right there.

16          THE COURT:  Okay, you can have them.

17          MS. KAMM:  I know that Medway police officer

18  happened to be present, that's all she testified.

19          MR. BERGER:  It's inconsistent.  She didn't say

20  she knew the man.

21          THE COURT:  You can show her this portion.

22          MS. KAMM:  Can we have it done on the record?

23  This is filed with the MCAD.

24          THE COURT:  He referred to it in his opening

25  without objection.

1          ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

2     Q.   I'd like you to read only this paragraph of the

3     statement that was signed by you under the penalties of

4     perjury.

5     A.   Aloud or to myself?

6     Q.   To yourself, please.

7     A.   Okay.

8     Q.   Have you had an opportunity to do that?

9     A.   Yes.

10    Q.   Okay.  Does this refresh your recollection about whether

11    you knew that a Medway police officer who happened to be in

12    the branch that day was there?

13    A.   Again --

14    Q.   Yes or no.  Does it refresh your recollection?

15    A.   Yes.  The way you're saying it though, but, yes.

16    Q.   Okay.  Do you want to take a look at the document

17    again?

18    A.   No, that's fine.  Thank you.

19    Q.   So you knew that a Medway police officer who happened to

20    be in the branch that day observed the interaction and

21    remained in the branch until Mr. Odunukwe left; is that your

22    full statement at that time?

23    A.   Yes, I came to know that after, yes.

24    Q.   Thank you.  Now, who was your supervisor when you were a

25    teller in May, 2000?

1   A.   Ruth Ferrera.

2   Q.   And I take it you're certain that you have no

3   recollection of the particular aspects as you've testified

4   earlier of your banking transaction with Mr. Odunukwe; is

5   that a correct summary of your testimony?

6            MS. KAMM:  Objection.

7            THE COURT:  Overruled.

8   A.   That's not my testimony.

9   Q.   Okay.  How many pieces of identification did he present

10  to you?

11  A.   He presented his driver's -- well, he presented various

12  forms of identification but only one that I could accept.

13  Q.   I see.  Did he give his Suffolk identification to you?

14  A.   A Suffolk?  What is that?

15  Q.   A Suffolk University identification?

16  A.   There was a student I.D., yes.

17  Q.   And did he give you a credit card?

18  A.   No.

19  Q.   Did he give you a driver's license?

20  A.   Yes.

21  Q.   And you had only requested two forms of identification?

22  Yes or no.

23  A.   Yes.

24  Q.   Thank you.

25            MR. BERGER:  No further questions, your Honor.

```
 1              THE COURT:  Counsel.
 2                          CROSS-EXAMINATION
 3   BY MS. KAMM:
 4              THE COURT:  Good morning.
 5   Q.  Good morning, Ms. Nance.
 6   A.  Good morning.
 7   Q.  Let's back up and have you introduce yourself to the
 8   jury and tell them a little bit about yourself.
 9   A.  I'm Mary Beth Nance and I'm from Jacksonville, Florida,
10   I live now, I've lived there just under three years.
11   Q.  Who do you work for?
12   A.  I work for Bank of America.
13   Q.  How long have you worked for Bank of America in
14   Florida?
15   A.  Since I moved there but a little less than the time,
16   about two and a half years.
17   Q.  What do you do when you're working?
18   A.  I try to enjoy the beach as much as I can and my
19   husband, we don't have any children yet, just try to
20   relax.
21   Q.  At some point did you live in Massachusetts?
22   A.  Yes, I did.
23   Q.  And at some point did you work for Fleet?
24   A.  Yes, I did.
25   Q.  When was that?
```

1    A.   I began working for Fleet in September of 2001.

2    Q.   And what was your position in 2001?

3    A.   I started as a part-time teller and moved up to a lead

4    teller, and towards the end of 2001, beginning of 2002, I

5    was promoted to a floating position where I was trained to

6    be a customer service associate as well as a teller that

7    traveled to various branches.

8    Q.   Were you stationed in one branch?

9    A.   My home base was out of Stoughton, Massachusetts.

10   Q.   But then you would go to other branches when they needed

11   some people to fill in?

12   A.   Yes.

13   Q.   Is either what they call the platform in customer

14   service?

15   A.   Yes.

16   Q.   Now, you've testified that you don't remember

17   Mr. Odunukwe himself, he does not look familiar to you,

18   correct?

19   A.   No, he doesn't, I'm sorry to say.

20   Q.   But you have a strong memory of the interaction?

21   A.   Yes, I do.

22   Q.   Were you in Medway on a regular basis filling in?

23   A.   No, I was there on one occasion.

24   Q.   Just this one occasion?

25   A.   Yes.

1    Q.   Is that one of the reasons that this incident sticks out

2    in your mind?

3    A.   One of, yes.

4    Q.   Now, you testified that he presented a driver's license

5    and a student identification?

6    A.   Yes.

7    Q.   Did you ask him if he was a customer of the bank?

8    A.   Yes, I did.

9    Q.   And what did he say?

10   A.   He was not.

11   Q.   So, under the check cashing policy, how many forms of

12   identification did he need to produce?

13   A.   It depended on the amount of the check.

14   Q.   Do you recall what the amount of his check was?

15   A.   I recall that it was over $500 but not the specific

16   amount.

17   Q.   So, if you're a noncustomer and you want to cash a check

18   over $500, how many I.Ds do you need to show?

19   A.   Two I.D.s from a specific list.

20   Q.   And is that list in the check cashing policy?

21   A.   Yes, it is.

22        MS. KAMM:  May I approach?

23        THE COURT:  Yes.

24   Q.   I'd like to show you a document that's marked as

25   Exhibit 7.

1    A.  Okay.

2    Q.  And ask you if that document lists the forms of

3    identification that are accepted.

4    A.  Yes.

5         MS. KAMM:  Your Honor, may I attempt to use the

6    computer?

7         THE COURT:  Yes.  Ladies and gentlemen, ladies

8    rather, you all have screens.  This is a high tech

9    courtroom.

10   Q.  Now, first Ms. Nance, let me ask you to take a look at

11   Exhibit 7 and tell the jury if you recognize it.  You can

12   flip manually through the pages, if you'd like.

13   A.  Okay, thank you.

14   Q.  Page 4, 5, 6 and page 7.  Do you recognize this

15   document?

16   A.  I do.

17   Q.  What is it?

18   A.  It's a chapter from what we called our BOPLUM, our

19   operations procedure manual and this is about the check

20   cashing policy.

21   Q.  As far as you know, was this the check cashing policy

22   that was in effect in May of 2002?

23   A.  Yes.

24   Q.  Now, directing your attention to page 4, page 4 lists

25   the approved forms of identification, correct?

1    A.  Yes, it does.

2    Q.  Now, is a driver's license listed as an approved form of

3    identification?

4    A.  Yes, it is.

5    Q.  Is a student I.D. listed as an approved form of

6    identification?

7    A.  No, it is not.

8    Q.  Would any expired identification be an approved form of

9    identification under this policy?

10   A.  No.

11   Q.  Now, you said that Mr. Odunukwe, the plaintiff, showed

12   you a driver's license and a student identification?

13   A.  Yes.

14   Q.  One was approved, one was not, correct?

15   A.  Yes.

16   Q.  Did you ask him for any more identification?

17   A.  Yes.

18   Q.  What did you ask him for?

19   A.  I would have gone over the list with him.  The most

20   common is a credit card.

21   Q.  Do you recall asking him if he had a credit card?

22   A.  Yes.

23   Q.  Do you recall asking him that he had any other form of

24   identification?

25   A.  Yes.

1  Q.  What did you ask him for?

2  A.  A credit card, or and I would have gone through the

3  list, but typically the other form would be either a

4  passport, military I.D. or the other common form was like a

5  state I.D. card.

6  Q.  Did he show you any other identification?

7  A.  He went through his wallet, but, no.

8  Q.  Did he show you anything from his wallet?

9  A.  No, he flipped through, but, no, there was nothing else

10  I could take.

11  Q.  Nothing else you could take.  Then what happened?

12  A.  He got loud and irate at that point.

13  Q.  You told him he couldn't cash the check?

14  A.  Yes, I did.

15  Q.  After he became loud and irrate, what did you do?

16  A.  I deferred to one of the other tellers that was in that

17  banking center, I stepped away to make sure that maybe he

18  was a known person or that some exception could be made and

19  was denied that request.

20  Q.  Now, since this was not your regular branch, did you

21  have the authority to make an exception to the check cashing

22  policy?

23  A.  No.

24  Q.  So, you found out that he was not a known customer, then

25  what did you do?

1    A.   I denied the request to cash the check.

2    Q.   You told him you couldn't cash it?

3    A.   Right.

4    Q.   What happened at that point?

5    A.   Well, he was loud and yelled at me.

6    Q.   What did he say?

7    A.   He did call me a name and used profanity and insulted me

8    at that point.

9    Q.   How did he insult you?

10   A.   He called me a racist and he called me a bitch, pardon

11   me.

12   Q.   What did you do?

13   A.   Honestly, I kind of froze, nervous by the interaction,

14   and the manager came over at that point.

15   Q.   Had anything like that ever happened to you before?

16   A.   No.

17   Q.   Anything like that ever happen to you since?

18   A.   No.

19   Q.   So you just testified that the manager at that point

20   came over?

21   A.   Yes.

22   Q.   Okay.  And what happened when the manager came over?

23   A.   There was an interaction, they conversed a little bit,

24   and they moved off to her office area away from me.

25   Q.   Did Mr. Odunukwe say anything else as far as you

1    recall?

2    A.  I do recall that he asked to speak with the man in

3    charge.

4    Q.  When did that happen?

5    A.  When he was still at my window as Jean was coming

6    over.

7    Q.  Anything else that you can recall?

8    A.  To a point the other ladies normally worked there told

9    me that there was a police officer there, but, you know, not

10   to be worried or anything, but that's all I remember.

11   Q.  Were you worried?

12   A.  More so insulted and alarmed that someone would talk to

13   me that way, yeah.

14   Q.  Did you have any further interaction with

15   Mr. Odunukwe?

16   A.  No.

17           MS. KAMM:  I have no further questions, thank you.

18                    REDIRECT EXAMINATION

19   BY MR. BERGER:

20   Q.  Under the regulations, does the bank manager have almost

21   unlimited authority to approve the negotiation of a check?

22   A.  May I refer to the policy?

23   Q.  Sure.

24   A.  Thank you.  Under certain circumstances, yes.

25   Q.  So, if a manager in the manager's disdiscretion wanted

1    to, the manager could okay a check upon the production of

2    any forms of identification including a driver's license

3    and/or a student identification; is that correct?  In other

4    words, these bullet lists of things could be overridden by

5    the manager; is that true?

6    A.  Given, yes, given these.

7    Q.  Okay.

8    A.  Yes.

9    Q.  Now, when this matter escalated, did either of -- strike

10   that.  As this matter escalated in your view, did you have

11   any, you know, collateral damage?  Did you feel sick?  Did

12   you get sick?  Did you go to a doctor?  Did any of those

13   things happen?

14              MS. KAMM:  Objection.

15              THE COURT:  Sustained.

16   Q.  And you earlier testified that there was a police

17   officer there whom you know?

18   A.  I didn't know him.  I think that's where I'm nervous in

19   saying yes to you.  Then I didn't know him.

20   Q.  He was a police officer in uniform?

21   A.  I don't recall.  I remember the girl next to me saying

22   that's a police officer over there.

23   Q.  And when she, the girl said that to you, what was her

24   name, I don't want to use the --

25   A.  It was another teller, I only worked there on the

1    occasion, I didn't learn everybody, I'm sorry.

2    Q.  But the point is she didn't tell you to report that to

3    the police, did she?

4          MS. KAMM:  Objection.

5    A.  No.

6    Q.  And you didn't feel any obligation to report the

7    incident to anybody, any agency, the government or the

8    police officer, did you?

9    A.  No, I never reported anything.

10          MR. BERGER:  No further questions.

11          THE COURT:  Thank you.  Anything further?

12          MS. KAMM:  I have one further.

13                    RECROSS-EXAMINATION

14    BY MS. KAMM:

15    Q.  Ms. Nance, in your experience, in order to make an

16    exception to the check cashing policy, what did you

17    require?

18    A.  That it be someone I personally knew.

19    Q.  And if you didn't know the person, under what

20    circumstances would you make an exception to the check

21    cashing policy?

22    A.  I personally didn't ever make an exception in my time

23    with Fleet.  I worked in an area that I, you know, in

24    different branches.  I didn't ever know people so, you know,

25    I didn't -- basically an exception was you see you have the

1    same person come to you week after week cashing their

2    payroll check, and they properly present identification, one

3    day they forget it, something of that nature.  It isn't

4    meant to be, you know, abused or used in any other way.

5    Q.  So, as far as you understood, exceptions to the policy

6    are not a customary thing?

7    A.  No.  No, they weren't.

8    Q.  And in your experience, when branch managers have

9    authorized exceptions to the policy, have they required

10   generally some additional information in order to confirm

11   that the check should be cashed?

12   A.  Yes.  Sometimes they would call the maker to make sure

13   it was legitimate.

14   Q.  Tell the jury who the maker is?

15   A.  The maker is the person that actually wrote the check

16   out to the person trying to cash it.

17   Q.  So, that's a way that whoever the authorized person was

18   usually the branch manager, yes?

19   A.  Yes.

20   Q.  Would confirm that this check could be cashed when there

21   was insufficient identification under the policy?

22   A.  Exactly.

23   Q.  Are there any other circumstances that you recall in

24   which you'd make an exception to the check cashing policy?

25   A.  No.  Oh, actually one.  If they're exchanging it for

1   something like a cashier's check payable to them instead,

2   that's another way.

3   Q.  Those are the limited circumstances in which

4   exceptionses are being made?

5   A.  Yes.

6           MS. KAMM:  Thank you.  I have nothing further.

7           MR. BERGER:  A few, your Honor.

8           THE COURT:  No, that's it.  Only twice.  Thank you

9   very much.  Next witness.

10          THE WITNESS:  Thank you.

11          THE COURT:  Next witness.

12          MR. BERGER:  Jean Brennan.

13          JEAN BRENNAN, having been duly sworn by the Clerk,

14  testified as follows:

15                      DIRECT EXAMINATION

16  BY MR. BERGER:

17  Q.  Please state your name.

18  A.  Jean Brennan.

19  Q.  And were you the branch manager for the Bank of America

20  branch located at Medway, Massachusetts?

21  A.  Yes, I was.

22  Q.  And were you the branch manager for this branch in May,

23  2002?

24  A.  Yes, I was.

25  Q.  And was it a branch then of Fleet National Bank?

1    A.  Yes, it was.

2    Q.  Is it now a branch of the Bank of America?

3    A.  Yes, it is.

4    Q.  So you now get your paycheck from Bank of America?

5    A.  I'm retired.

6    Q.  You get your pension check from Bank of America?

7    A.  Yes.

8    Q.  And you have been involved in the banking industry for

9    25 years; is that correct?

10   A.  Twenty-six plus years.

11   Q.  And a manager of a bank has the authority to make

12   exceptions in the check-writing policy for the use of

13   identification; isn't that correct?

14   A.  That's correct.

15   Q.  Yes or no answer.

16   A.  Yes.

17   Q.  So the regulations themselves indicate that if a manager

18   authorizes a transaction, there can be nonconforming

19   documents so long as the banking manager authorizes it; is

20   that correct?

21   A.  I went by the banking regulations that were laid out in

22   the policy for me to follow.

23   Q.  Okay.  What were the banking regulations with regard to

24   exceptions?

25   A.  With regard to exceptions, I didn't do exceptions to

1    policy.

2    Q.  I understand.  The bank manager has the authority to do

3    so; is that correct?

4    A.  That's correct, but I didn't do it.

5    Q.  All right.  You didn't do it, but if a bank manager at

6    another branch, for example, were to find an exception, that

7    bank manager can authorize the negotiation of a check, can't

8    he or she?

9    A.  Yes, they could.

10   Q.  Now, I draw your attention to May 14th, 2002.  Were you

11   working as a teller?

12   A.  Yes, I was.

13   Q.  And was that because of the absence of several

14   tellers?

15   A.  That's correct.

16   Q.  Did you hear a customer speaking loudly to Mary Beth

17   McHardy?

18   A.  I did.

19   Q.  That was her name then; is that right?

20   A.  Yes, that's correct.

21   Q.  And her name is Mary Beth Nance now?

22   A.  I don't know what her last name is at the present

23   time.

24   Q.  But she's been sitting outside with you and this person

25   was the person who was just called into this proceeding; is

1    that correct?

2    A.  That's correct.

3    Q.  Okay.  And did you hear the customer raise his voice at

4    all?

5    A.  The customer was very loud and disruptive in the

6    office.

7    Q.  And how was he loud and disruptive?

8    A.  He was in his language, he was -- it appeared that he

9    was drawing attention to himself by being disruptive.

10   Q.  Did you see a police officer in the teller line where

11   you were located?

12   A.  Yes.

13   Q.  Did you notify him of this situation at that time?

14   A.  No, no.

15   Q.  Did you ever notify him of the situation?

16   A.  No.

17   Q.  Did Ms. McHardy, that was her name at that time, raise

18   her voice at the customer?

19   A.  No.

20   Q.  Did she receive two forms of identification from the

21   customer?

22   A.  Yes.

23   Q.  And having received two forms of identification, you

24   were authorized to under the regulations to negotiate the

25   check?  Yes or no.

1    A.  No, because one of the identifications was invalid.  It

2    was an expired identification.

3    Q.  I understand.  But there were three, there were three

4    pieces of identification?

5    A.  That's incorrect.

6    Q.  That's incorrect.  Well, didn't you have the right under

7    the regulations to have an exception under these

8    circumstances?

9    A.  Yes, and I took the customer into my office and tried to

10   call the maker of the check.

11   Q.  All right.  So you were going within the regulations to

12   make an exception for the check?

13   A.  That's correct.

14   Q.  Okay.  Now, Mr. Odunukwe asked you whether you were the

15   person who was the manager; did he not?

16   A.  Yes, he did.

17   Q.  And did you tell him that you were the manager and that

18   you could assist him?

19   A.  That's correct.

20   Q.  Did you raise your voice at him?

21   A.  No.

22   Q.  Did you hear him raise his voice at Ms. McHardy?

23   A.  Yes.

24   Q.  Did you ever raise your voice at him?

25   A.  No.

1    Q.  Tell us, did you call his sister on the telephone in

2    your office?

3    A.  I did.  I wasn't sure who I was calling, I was calling

4    the maker of the check.  I wasn't sure of the

5    relationship.

6    Q.  All right.  Was the name the same, Odunukwe?

7    A.  That's correct.

8    Q.  And at what time during the day did you make the call to

9    this person?

10   A.  It was in the morning.

11   Q.  Was it in the early morning or the late morning?

12   A.  Let's see, I don't recall.

13   Q.  All right.  Did you get anybody on the other end of the

14   line?

15   A.  Yes.

16   Q.  Who did you get on the other end of the line?

17   A.  I don't know who it was, but it was a hospital and they

18   told me that she wasn't working or something with the

19   medical profession, they told me she wasn't working for the

20   day.

21   Q.  Did she say she was a pharmacist?

22   A.  No, she did not.

23   Q.  Did she say that she had a doctorate degree?

24   A.  No.

25   Q.  So how was the hostility towards you manifested?

```
 1              MR. RANDALL:  Objection, your Honor.
 2              MR. BERGER:  It was her word.
 3    A.   There is no hostility.
 4    Q.   I thought you said that she manifested hostility?
 5    A.   No.
 6              MR. RANDALL:  Objection, your Honor.
 7              MR. BERGER:  I don't know, that's what I heard.
 8              THE COURT:  Whatever.
 9              MR. RANDALL:  She said she worked in a hospital.
10              MR. BERGER:  Excuse me.
11              THE COURT:  There was a misunderstanding.
12    Q.   A hospital?
13    A.   Something in the medical profession so I don't know
14    where.
15    Q.   Okay.  What did she say to you and what did you say to
16    her?
17    A.   When you're referring to she, who are you referring to?
18    Q.   Well, let's get back.  The person on the other end of
19    the telephone, was it a man or a woman?
20    A.   It was a woman.
21    Q.   And how long did you speak?
22    A.   Momentarily.
23    Q.   And what she say and what did you say?
24    A.   I asked, I gave her the name that was on the check if
25    she was working that day, she said no, and I hung up the
```

1    phone.

2    Q.  You let her only say no to you; is that your

3    testimony?

4    A.  That's correct.

5    Q.  Did you ask her anything about the check itself?

6    A.  No.

7    Q.  Did you ask her anything about her name?

8    A.  No.

9    Q.  So, you instantly hung up on her; is that fair to say?

10   A.  That would be fair to say.

11   Q.  Is it fair to say that you didn't have an opportunity to

12   verify that she had given him the check?

13   A.  Well, the person on the end of the phone said the person

14   was not working that day.

15   Q.  If I can just repeat the question, your Honor.  Did you

16   ask the person whether she had given Mr. Odunukwe the check?

17   A.  No.

18   Q.  Did you make a number of phone calls to this person?

19   A.  I made one other phone call to a home number that was on

20   the system at the time.

21   Q.  How many phone calls did you make?

22   A.  Two.

23   Q.  And did you make these phone calls and did you talk to

24   anybody for verification of the check?

25   A.  No.

1    Q.  Did you discuss verification in either of these phone

2    calls?

3    A.  No.

4    Q.  Did you tell Mr. Odunukwe you were sorry but you were

5    unable to cash the check?

6    A.  That's correct.

7    Q.  Did you explain to him why?

8    A.  Because he didn't have proper identification.

9    Q.  But proper identification could have been confirmed if

10   you had verified the maker of the check; is that correct?

11   A.  If I had talked to the maker of the check, I would have

12   cashed the check.

13   Q.  I see.  But you didn't determine whether the person you

14   talked to was the maker of the check?  Yes or no, please.

15   Yes or no answer.

16           MR. RANDALL:  Objection.

17           THE COURT:  Overruled.

18   A.  No.

19   Q.  Thank you.  Now, you do know that later in that day

20   Mr. Odunukwe's check was negotiated; is that correct?

21   A.  That's correct.

22   Q.  And that was negotiated at a different branch of the

23   bank?

24   A.  That's correct.

25   Q.  Did you raise your voice to Mr. Odunukwe?

1   A.  No.

2   Q.  Did you feel intimidated by Mr. Odunukwe?

3   A.  No.

4   Q.  Is Mr. Odunukwe in the courtroom today?

5   A.  He could be.

6   Q.  Could you identify him for the record.

7   A.  No.

8   Q.  Did Mr. Odunukwe tell you that he was humiliated?

9   A.  No.

10  Q.  Did he tell you he felt disgraced?

11  A.  No.

12  Q.  Did he tell you that he felt disgraced in front of a lot

13  of people for no reason?

14  A.  No.

15  Q.  Did he tell you that he was a recent member of the Bar

16  of Massachusetts?

17  A.  No.

18  Q.  Did he tell you that he was the only black customer in

19  the bank?

20  A.  No.

21  Q.  Did he tell you that he had been discriminated

22  against?

23  A.  No.

24  Q.  Did he tell you he was going to file a complaint with

25  Fleet management?

48

1    A.  He told me he was going to file a complaint.

2    Q.  Just so it's clear from your testimony, if you had

3    gotten verification, you could have negotiated the check; is

4    that correct?

5    A.  That's correct.

6            MR. BERGER:  No further questions.

7                        CROSS-EXAMINATION

8    BY MR. RANDALL:

9    Q.  Good afternoon, Mrs. Brennan.

10   A.  Hi.

11   Q.  Would you please introduce yourself to the jury, tell

12   them a little bit yourself.

13   A.  I'm Jean Brennan, I've been in banking for 26 plus

14   years.  I'm retired from the bank and I'm a grandparent who

15   likes to spend a lot of time with her grandchildren when I

16   have the opportunity, and it's wonderful being retired.

17   Q.  Where do you live?

18   A.  I live in Mendon, Massachusetts.

19   Q.  What was the last job you had?

20   A.  Was Bank of America in management.

21   Q.  And where were you a manager?

22   A.  In the Medway office of Bank of America.

23   Q.  And I think you testified that you worked for 26 years

24   in the banking industry?

25   A.  That's correct.

1    Q.  And for how long were you a branch manager?

2    A.  For 12 plus years.

3    Q.  And what was the -- what level did you start off in the

4    banking industry?

5    A.  I started off as a teller.

6    Q.  And what was your next, the next level after that?

7    A.  It's been, let's see, with the banking business like a

8    lot of other businesses, we end up to merge, and I worked

9    for quite a few merges, so I've been called many things,

10   many different names, and today I don't even know if I would

11   be called a banking manager because the terminology changes

12   as the times change.

13   Q.  And could you please tell the jury what the basic duties

14   of a branch manager are.

15   A.  The basic duties of a branch manager is to open and

16   close the branch in the morning, to make sure the branch is

17   properly staffed, to make sure that the people that are

18   managing are safe, the environment is safe around them, also

19   not only for my employees but also for my customers that

20   might be coming into the branch and to make any decisions if

21   there is a disagreement or something in the office, my job

22   is to make a decision on that at that particular time.

23   Q.  Now, did Fleet Bank provide you with any training to

24   become a branch manager?

25   A.  Yes.  There's always continuous training even when we

1    went from one bank to the other, there was always training

2    done.

3    Q.  And what kind of training was it?

4    A.  It's training in all aspects of operations and schooling

5    in operations or also how to treat customers.  Customer

6    service with every bank that I've ever worked for is a

7    priority.

8    Q.  And what kind of training did you have about how to

9    treat customers?

10   A.  You always treat customers in a very professional

11   manner.  You don't end up judging a person by their

12   appearance or anything about them, the only judgments you

13   can make are on the transactions that you're doing.

14   Q.  Now, you know that this case involves a claim by

15   Mr. Odunukwe that the branch didn't cash his check; is that

16   right?

17   A.  That's correct.

18   Q.  And was there a special procedure that the bank had for

19   cashing checks?

20   A.  Yes, there's a policy and procedure for check cashing

21   for customers and noncustomers.

22   Q.  And I'm going to show you what's been marked as

23   Exhibit 7, I believe.  If you could look at that document in

24   front of you.

25   A.  Okay.  Yes, this was a policy for cashing checks.

1    Q.  Okay.  And can you tell us whether that was the policy

2    that was effective in May of 2002?

3    A.  Yes, it was.

4    Q.  And how do you know that?

5    A.  Because of the date that's on here.  You can -- because

6    everything is dated.

7    Q.  What's the date on there?

8    A.  I've seen it.

9    Q.  If you look at the last page of the document.

10   A.  1-25-2002.

11   Q.  So that was the effective starting 1-25-2002?

12   A.  That's correct.

13   Q.  And as you sit here today, you believe that that's the

14   policy that was in effect in May of 2002?

15   A.  That's correct.

16   Q.  And why do you have this policy?

17   A.  It's guideline to prevent losses by the bank because if

18   the bank ends up receiving a lot of losses, it only makes

19   your fees and my fees go higher.

20   Q.  And how could a bank suffer a loss?

21   A.  The bank can suffer a loss from what we call controlable

22   losses and noncontrolable losses.  A controlable loss is

23   something that you would do against policy, and that would

24   be used against me as a manager that when it comes time for

25   my reviews at the end of the year, my manager would put down

1    the number of controlable losses that I had had during the

2    year, and it would affect my pay raises and anything that

3    happened to me, and it could also affect whether I would be

4    working or not if I had a number of losses that were

5    uncontrollable, I could lose my job for it.

6    Q.   And did Fleet have a policy that told you about

7    complying with the procedures of the bank?

8    A.   Yes, they did.

9    Q.   I'm going to show you what's been marked as Exhibit 8.

10   A.   Thank you.

11   Q.   Can you tell us what this policy is?

12   A.   This is the policy that we're given as a guideline.

13   Q.   And what does this policy tell you?

14   A.   It tells me the procedure that I would go through as a

15   branch manager or that my manager would go through with me

16   whether I would be following procedure or not.

17   Q.   And if you look at the second page, do you see that?

18   A.   Yes.

19   Q.   And what does the second page tell you?

20   A.   It gives me the different steps that I would go through

21   before I was terminated.

22   Q.   And are these the types of things that could happen to

23   you if you suffered losses at your branch?

24   A.   Yes, it is.

25   Q.   And I notice on the front page of the document it talks

1    about tellers.

2    A.  Right.

3    Q.  Did this policy apply to tellers?

4    A.  Yes, it does.

5    Q.  And are the tellers subject to the same discipline

6    actions that you were if there were losses?

7    A.  They are.

8    Q.  Now, you've testified about an incident that took place

9    on May 12th, 2002, and you testified that you worked at the

10   branch, you were working at the branch that day, and you've

11   testified that you remember a customer who caused a

12   disruption in the branch; is that correct?

13   A.  That's correct.

14   Q.  And you had this customer I believe we've identified

15   Mr. Odunukwe even though you have no independent

16   recollection of who he is?

17   A.  Correct.

18   Q.  And I think there was some confusion about the telephone

19   calls.  Could you tell the jury why you had Mr. Odunukwe

20   come into your branch, into your office?

21   A.  Okay.  I was behind the teller line because I ways

22   short-handed with help that particular day.  The teller was

23   trying to assist him with his transaction.  He was being

24   very disruptive, and because he was being so disruptive, I

25   stepped away from behind the teller line because I wanted to

1   give the customer a little more privacy than discussing what

2   we were going to do right behind the teller line, so I

3   stepped from behind the teller line, I invited the customer

4   to come into my office, and at that particular time, I

5   explained to him what I was going to do.  I said, "I'm going

6   to call the maker of the check provided the maker of the

7   check gives me permission to cash the check, we will cash it

8   with the one piece of identification that he had produced,

9   which was a legal I.D.  Because one piece of identification

10  was an expired student identification, which is not

11  acceptable I.D., the other piece was a Mass. driver's

12  license, so with that I could cash the check provided I

13  talked to the maker, so I called the -- I went on the

14  system.

15  Q.   Okay.  Can you tell the jury what you mean when you say

16  I went on the system.

17  A.   What it is, when you have an account with the bank, you

18  can go on the system with the account number, you can pull

19  up the person's name and also the place of work and their

20  home phone numbers.  It gives a lot of personal -- well,

21  personal information that the bank needs to do in order for

22  us to assist our customers, so I went on the computer system

23  and I pulled up the phone number for the place of work

24  because since it was during the day, I assumed this person

25  would be working.

1          So I called, I asked to speak to the person whose

2   name was on the check.  I was told that person was not

3   working that day.  After they said that they were not

4   working that day, then I proceeded to pull the phone number

5   off the system for the home phone number, so from the home

6   phone number I ended up calling the home phone number, and I

7   received no answer, so then I was unable to cash the check

8   because I didn't have the information that I felt

9   comfortable with in order to cash his check.

10  Q.  So you never spoke with the maker of the check in this

11  instance?

12  A.  No, I did not.

13  Q.  You just talked to somebody at work?

14  A.  That's correct.

15          THE COURT:  Are you finished with this witness?

16          MR. BERGER:  Not quite, your Honor.  I have one or

17  two other things.  It will be brief.

18          THE COURT:  I'd like to break for a meeting.  I

19  have a meeting that I have to go to.  We can break for

20  lunch.  How much longer, how many more witnesses do we have

21  here?

22          MR. BERGER:  Two more.

23          MR. RANDALL:  Two more, I believe, your Honor.

24          THE COURT:  Is there anyone on the jury who cannot

25  stay this afternoon in case we'll be finished?  Can everyone

```
1    stay?

2              ALL JURORS:  Yes.

3              THE COURT:  Everyone said yes.  We will take a

4    break now and resume at 2:00.

5              MR. BERGER:  Your Honor, may I approach the bench?

6              THE COURT:  Wait just a second.  We'll step at

7    sidebar.

8              ( THE FOLLOWING OCCURRED AT SIDEBAR:)

9              THE COURT:  Your two witnesses cannot come back on

10   Monday?

11             MS. KAMM:  They can.  They're very, very brief.

12             MR. RANDALL:  Both of them, the travel witnesses

13   will be finished, Mrs. Brennan is the last traveling

14   witnesses, but these two witnesses are brief.

15             THE COURT:  Can you call to see if you can start?

16             MR. BERGER:  I can be back by three, I think, I

17   just have to go back.  I flagged about the timing issue.

18             MS. KAMM:  I wouldn't expect our examination of

19   either of these witnesses to be long.

20             MR. RANDALL:  Mrs. Brennan is our last big

21   witness.  The other simply are 10 or 15 minutes.

22             THE COURT:  I would rather finish here, give it to

23   the jury.  The question is whether we can call the Judge and

24   see if he can continue it to four?

25             MR. BERGER:  I can try, but, unfortunately, I'm
```

1    dealing with a huge law firm, but you know what, I don't

2    know.  I can give it a shot if you want to.

3          THE COURT:  Why don't we call the Judge and see,

4    tell them we're nearly finished with this case and see if

5    that proceeding, he can be there at four o'clock.  Okay,

6    then we'll continue at 2:00 here.  If you don't hear from

7    Adam, if you can wait a bit, then the jury will come back

8    and we'll just tell them to wait until 2:30.

9          MR. BERGER:  If I may be back by 2:30?  It's not a

10   complicated thing.  It's just a timing thing, I'll run over

11   to Cambridge.

12         THE COURT:  All right.  We'll continue at 2:30.

13         MR. BERGER:  Then if I get into a jam, I'll call

14   you.

15         ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

16         THE COURT:  Just one second.  Ladies and

17   gentlemen, we want to deal with scheduling, and we want to

18   deal with scheduling of the counsel and of the Court and

19   take you into account as well.  What we'd like to do then is

20   we'll break for lunch until 2:30.  Again, the goal here

21   would be to finish this case today and give it to you for

22   your deliberation, that's why I'm pushing everyone.  Please

23   go to lunch on your own.  Don't talk to anyone about this

24   case.  If you run into the lawyers or the witnesses, you

25   know, you got your issues and move on.  People understand

1    that there's a different pattern of behavior that occurs

2    when you are jurors in a case, and so we'll come back at

3    2:30, finish the evidence, and we'll give the case to you

4    for your deliberations.  Okay.  All rise for the jury.

5                 (Jurors exited the courtroom.)

6                 THE COURT:  We'll see you at 2:30.

7                 (A recess was taken.)

8                 THE CLERK:  All rise for the jury.

9                 THE COURT:  People were concerned about

10   scheduling.  I anticipate that the evidence will be

11   concluded in 45 minutes, then the lawyers will do their

12   closing statements, and I'll instruct you.  At that point

13   you get the case for your deliberation.  Your schedule is

14   your own.  I can control the Court, you control

15   deliberations.  If any of you, if you can't stay past five

16   because of childcare problems or whatever, then you let us

17   know, and we will abide by that.  You may have to come back

18   tomorrow morning to continue your deliberations.  That part

19   of the case is entirely yours.  If you wish to stay, you

20   know, we'll truck in pizza, we'll all stay, and we'll wait

21   for you so it's really up to you.  Put the witness on the

22   stand.  Proceed.

23   BY MR. RANDALL:

24   Q.  Thank you.  Hi, Ms. Brennan, welcome back.

25   A.  Hi.

1    Q.  And we were talking when you stopped testifying about

2    the internal policy or procedure at the bank about losses,

3    and we're going to move on and look at the incident that

4    happened in the Medway branch on May 14th and what happened

5    when you told Mr. Odunukwe that you could not cash the check

6    for him.

7    A.  He was upset and he was very loud, and after a period of

8    time when I told him I couldn't cash the check, he finally

9    resigned himself, even though he was being disruptive that I

10   was not going to cash the check, so he left my office.

11   Q.  Do you know what Mr. Odunukwe did after he left your

12   office?

13   A.  Yes.

14   Q.  And how do you know what Mr. Odunukwe did after he left

15   your office?

16   A.  After he left my office, he went to another branch, and

17   I only know this because he gave me a telephone call, and he

18   told me that he had cashed the check in another branch and I

19   had not seen the end of him.

20   Q.  And what did you do after you received that telephone

21   call?

22   A.  After I received that telephone call, I called my

23   manager, Richard Driscoll.  I told him what had occurred in

24   the office that day.  He told me that.

25   Q.  I don't want you to testify about what Mr. Driscoll told

1    you.

2    A.  Okay.

3    Q.  So you reported that to Mr. Driscoll?

4    A.  That's correct.

5    Q.  Did you talk to anybody else about this transaction?

6    A.  Not that particular day, no.

7    Q.  Did you talk to anybody else after that particular day

8    about this transaction?

9    A.  Yes, I did.

10   Q.  And who did you talk to?

11   A.  I don't recall who I talked to, but I did call the

12   Medfield office where the transaction had taken place, and I

13   asked them to send me the tape of the transaction.

14   Q.  And could you tell the jury what the tape of the

15   transaction is?

16   A.  The tape of a transaction, what it does for me or for

17   anyone looking at the tape, it gives you a lot of

18   information of what has happened because you could make

19   notations on this tape.  It also tells you the time that the

20   transaction occurred.  It tells you the teller that was

21   involved, the person's account that you're cashing the check

22   on, and that's the type of information that is on the

23   tape.

24   Q.  And what did you do with the teller tape when you got

25   it?

1    A.  When I got the teller tape, I looked at the tape, and I

2    marked the transaction that had occurred in the Medfield

3    office, and I examined the tape to see what type of

4    information was on the tape.

5    Q.  And I'm going to show you what's been marked as

6    Exhibit 9.

7    A.  Thank you.

8    Q.  A miracle of modern technology, I hope.

9          MR. BERGER:  Your Honor, just in terms of modern

10   technology, I would request that only the entire document be

11   displayed.

12         THE COURT:  The jury will have the entire

13   document.  This is only for the purposes of directing their

14   attention, and when you do your examination, you can direct

15   their attention to something.

16         MR. BERGER:  Very well, thank you, your Honor.

17         THE COURT:  Go on.

18   Q.  Mrs. Brennan, do you recognize this document?

19   A.  Yes, I do.

20   Q.  What is this document?

21   A.  This is a copy of the teller tape that I received from

22   the Medfield office.

23   Q.  And I note that there are some handwritten notations and

24   marks on this tape.  Do you see that?

25   A.  There is a star there and I placed that star there.

1    Q.  Did you place that star there on the original teller

2    tape that you got from the Medfield office?

3    A.  Yes, I did.

4    Q.  When you got the teller tape from the Medfield branch,

5    were there any other markings on it?

6    A.  No, there was not.

7    Q.  Was there a notation of any credit card information?

8    A.  There was no credit card information on the tape.

9    Q.  Looking at this teller tape, what can you tell us about

10   this transaction?

11   A.  I can tell from the teller tape that there was not a

12   credit card taken for this transaction because we were not

13   allowed to write a credit card on the check itself because

14   this protected the customer from getting information because

15   of privacy laws.  What we need to do is to notate on the

16   tape that a credit card was presented for check cashing

17   purposes, and we would write the number of the credit card

18   on the tape at the time the transaction occurred.

19   Q.  And what was the dollar amount of this transaction?

20   A.  It was $1100.

21   Q.  And do you recall how much the check that Mr. Odunukwe

22   gave you was for?

23   A.  It was for $1100.

24   Q.  And if you look at here, do you see next to the star

25   there's the word "supervisor"?

1    A.   Right.

2    Q.   And what does that mean?

3    A.   That would indicate to me that a supervisor had probably

4    overridden this transaction because their number would come

5    up, the person who was cashing it would, their teller number

6    would come up.  It doesn't have a person's name again to

7    protect their identity, but everybody is assigned a number

8    in the computer system so this would have been the person

9    who would have again permission or who cashed the check.

10   Q.   And do you recognize that supervisor number there?

11   A.   No, I do not.

12   Q.   Now, Ms. Brennan, did Mr. Odunukwe ever show you an

13   American Express card?

14   A.   No.

15   Q.   Did he present any identification that was acceptable to

16   the bank other than a driver's license?

17   A.   No.

18   Q.   If he had shown you an American Express card along with

19   his driver's license, what would you have done?

20   A.   I would have cashed his check.

21   Q.   Did you ever mention his race to him when he was in your

22   branch?

23   A.   No.

24   Q.   Did you ever say anything derogatory to him while he was

25   in your branch?

1    A.  No.

2            MR. RANDALL:  I have no further questions for this

3    witness.

4            THE COURT:  Counsel.

5                    REDIRECT EXAMINATION

6    BY MR. BERGER:

7    Q.  In the document that's before you that's on the screen,

8    does it indicate that on March, May 14th, 2002, Pamela

9    Martin was presented with two different forms of

10   identification?

11   A.  Right now I have nothing on my screen.

12   Q.  Oh, I apologize.

13           MR. RANDALL:  I handed it to you, I'm sorry.

14   Q.  I can't tell from here.  Is that readable to you?

15   A.  Yes, it is, thank you.

16   Q.  I'll repeat the question.  Could you glance at that

17   document and tell us whether that document reflects Pamela

18   Martin accepting two forms of identification?

19   A.  According to this tape, it doesn't show me anything

20   about the identification that was accepted.

21   Q.  The Bank of America branch located in Medfield had as

22   its teller Pamela Martin, is that not correct?

23   A.  I don't know who the teller was in the Medfield

24   office.

25   Q.  And when you talked to someone from the Medfield office,

1    the supervisor who I guess authorized the override, where is

2    that person's name on the document that's in front of you?

3    A.   There's no names on the document in front of me.

4    Q.   Okay.  But you can see that the supervisor did authorize

5    the override?

6    A.   I see a supervisor number.

7    Q.   Okay.  And what does that supervisor number tell you

8    about the override?

9    A.   It just tells me that this is the person who gave

10   permission to cash the check.

11   Q.   Okay.  Now, let me go through some of the items that you

12   mentioned in your earlier discussion.  You had said that

13   Mr. Odunukwe was disruptive.  Could you tell us what you

14   heard him say to you?

15   A.   I didn't hear him say anything.  It was nothing that I

16   heard that I can remember that was addressed to me.  I just

17   know he was very disruptive in my office.

18   Q.   So, simply put, you didn't hear anything that he said to

19   you?

20   A.   Correct.

21   Q.   And when this disruption occurred  -- well, let's back

22   up for a minute.  Did he talk to you while you were at the

23   teller window beside the woman who was known as McHardy at

24   the time?

25   A.   No.

1  Q.  Okay.  So he didn't talk to you but he was in a

2  conversation with McHardy?

3  A.  Correct.

4  Q.  Okay.  And how soon after he was talking to Ms. McHardy

5  did you join in the discussion?

6  A.  When I stepped outside the teller line to ask him to

7  come into my office.

8  Q.  All right.  Now, there was a police officer in the line

9  that you were then serving as teller; is that true?

10  A.  That's correct.

11  Q.  Did you report to the police officer Mr. Odunukwe's

12  disruptive behavior?

13  A.  No, I did not.

14  Q.  And did you have -- did you report it to any other

15  person the disruptive behavior that you described in

16  connection with this matter, any other person outside of the

17  bank?

18  A.  No, I did not.

19  Q.  But the officer was there to observe the disruptive can

20  conduct because he was in the line where you were which was

21  right beside Ms. McHardy; is that not true?

22  A.  Yes.

23  Q.  Okay.  And he took no steps to stop Mr. Odunukwe from

24  his conduct that you've described as disruptive?

25  A.  That's correct.

1   Q.  But he had the opportunity to observe it, did he not?

2   A.  That's correct.

3   Q.  And did he have the opportunity to hear any words that

4   he might have spoken if he spoke in a normal voice or a

5   raised voice?

6           MR. RANDALL:  Objection, your Honor.

7           THE COURT:  This is cumulative.  The question has

8   been asked.  You've gotten your answer.  You should move

9   on.

10  Q.  Now, did you file a routine report regarding this

11  incident with Fleet Bank?

12  A.  No, I did not.

13  Q.  Did you in the ordinary course file a routine report

14  regarding an incident when there's disruptive conduct in a

15  bank?

16  A.  This type of transaction could happen every day.  If you

17  tell someone no, sometimes they get very loud and they leave

18  the office and you never hear from them again, so I would be

19  filing reports continuously if I filed a report every time

20  there was a customer that was upset.

21  Q.  Now, you had used the term every day.  What do you mean

22  by every day?

23  A.  It wasn't an every day occurance, it could be something

24  that happened maybe every two weeks, every week, there was

25  no system.

1   Q.  Okay.  But this disruptiveness of Mr. Odunukwe was so

2   every day that you didn't file a routine report regarding

3   the incident with Fleet Bank?

4              MR. RANDALL:  Objection, your Honor.

5              THE COURT:  Overruled.

6   A.  That's correct.

7   Q.  Now, when Mr. Odunukwe left, did you talk to the police

8   officer about him?

9   A.  No, I did not.

10  Q.  When Mr. Odunukwe left, did you take any action against

11  him in the Court system or the administrative system?

12  A.  No, I did not.

13  Q.  Now, on this Exhibit No. 9, it doesn't show -- why don't

14  we walk it through, all right.  What it means, what is 37

15  plus .12, what does that indicate?

16  A.  I don't see where you are.

17  Q.  On the top of the document, it says 37.12 plus 66683

18  plus 8?

19  A.  It appears that maybe the teller might have -- she could

20  have been adding back money from a previous transaction

21  because every teller does things differently.  Sometimes

22  they would add money back that they were giving to a

23  customer to make sure that they were giving the proper

24  dollar amount back so that they would have a paper trail.

25  Q.  Okay.  Then the next set of entries is the cash check

1    amount of $1100; is that correct?

2    A.  That's correct.

3    Q.  And the cash output, what does that term mean?

4    A.  That means the dollar amount that was given to the

5    customer.

6    Q.  And then the next entry is the supervisor?

7    A.  Let's see, the dollar amount was given to the customer,

8    the next entry it looks like after the cash out was that

9    maybe the teller was adding the cash that was given to the

10   customer again.

11   Q.  All right.  Now, you had -- can this document tell you

12   whether the teller had two forms of -- her name is Martin,

13   Pamela Martin.  Does this document tell you whether

14   Pamela Martin had two pieces of identification?

15           MR. RANDALL:  Objection, your Honor.

16           THE COURT:  It's a yes or no answer.  Does it tell

17   you that?

18           THE WITNESS:  No.

19   Q.  Thank you.

20           THE COURT:  Anything further?

21           MR. BERGER:  Just one minor point.

22   Q.  Above -- I'm pushing it down a little here, and I just

23   would like you to explain one thing.  There are some

24   documents that seem not to be clear on this.  Do you know

25   what those things are that are below use bin No. 3 and

1    accepted on line 12-20?

2    A.  Under use bin it looks like there's probably an account

3    number right under use bin No. 3.

4    Q.  Yes.

5    A.  And it looks like there's an account number there is

6    what it appears to be.

7    Q.  And does it involve this transaction?

8    A.  This is another transaction that occurred it looks like

9    after.

10   Q.  And the final question I have about this document is

11   that the checkmark that's on this is the checkmark that you

12   put on it?

13   A.  The star I put on.  I do not recall putting the

14   checkmark, the line that's off to the side there.

15   Q.  Right, yes.

16   A.  I don't recall putting that on.

17   Q.  So somebody else must have?

18   A.  Correct.

19   Q.  Okay.  Then can you recall right now who supervisor

20   23212 is?

21   A.  No, I do not know who that is.

22   Q.  Okay.  Now, is 23212 likely to be the person who

23   permitted the override?

24   A.  Yes.

25            MR. BERGER:  Thank you, no further questions, your

1   Honor.

2              THE COURT:  Nothing further?

3              MR. RANDALL:  Nothing further, your Honor.

4              THE COURT:  Thank you very much.  Next witness.

5              MR. BERGER:  Pamela Curtis.

6              THE COURT:  All right.

7              MR. RANDALL:  Paula Curtis.

8              MR. BERGER:  Pardon.

9              PAMELA CURTIS, having been duly sworn by the

10  Clerk, testified as follows:

11                        DIRECT EXAMINATION

12  BY MR. BERGER:

13  Q.  Good afternoon.

14  A.  Good afternoon.

15  Q.  What is your name, please?

16  A.  My name is Paula Curtis.

17  Q.  And where do you reside?

18  A.  I reside in Medway, Massachusetts.

19  Q.  And are you -- were you employed in May, 2002 at Fleet's

20  Medway branch?

21  A.  Yes, I was.

22  Q.  And what was your position?

23  A.  I was a personal banker.

24  Q.  And in May, 2002, did you have any involvement at all

25  with the gentleman who is seated there, Mr. Odunukwe?

1    A.  No, I did not.

2    Q.  Have you seen him before or interacted with him in any

3    way before?

4    A.  Not personally, no.

5    Q.  And how long have you been employed at the bank?

6    A.  Six years.

7    Q.  And I take it at no time were you involved in any of the

8    activities that occurred on March 14th, 2002 at either of

9    the two branches of what was then Fleet Bank regarding

10   Mr. Odunukwe?

11   A.  Not personally, no.

12         MR. BERGER:  Thank you.

13                    CROSS-EXAMINATION

14   BY MS. KAMM:

15   Q.  Good afternoon, Ms. Curtis?

16   A.  Good afternoon.

17   Q.  Let's back up a little and have you introduce yourself

18   to the jurors, tell them something about yourself, please.

19   A.  I live in Medway, I worked for Fleet for about six

20   years, Bank of America now for about six years, I've been in

21   Medway for about 28 years, I have three children, and I'm

22   involved in church and sports.

23   Q.  Now, how did you come to apply for a position at

24   Fleet?

25   A.  I have known --

1          MR. BERGER:  Objection, your Honor.

2          THE COURT:  Relevance of this, just background,

3    the same background that the plaintiff has brought out on

4    any witness.  You can have it.

5          MS. KAMM:  No -- may we approach?

6          THE COURT:  No, go on.

7          MR. BERGER:  I'll withdraw it.

8          THE COURT:  Go on.

9    A.  I'm sorry, can you repeat?

10   Q.  How did you come to apply for a position at Fleet?

11   A.  I've known Jean for many years, I was a customer of the

12   bank.

13   Q.  Jean Brennan?

14   A.  Jean Brennan, and we happened to bump up into each other

15   at a drugstore one afternoon, and she was looking for help,

16   and I was looking for a job, and she asked if I was

17   interested in the job, and she asked me to come back with

18   her to the bank that afternoon and get an application, and I

19   filled it out that night and returned it the next morning.

20   Q.  How did you know Jean before this?

21   A.  From being customers of the bank and also my ex-husband

22   played volleyball with her on a yearly basis.  He had played

23   for about 25 years on the same league as Jean Brennan, and

24   we became friends that way and were at her house several

25   times and at different parties and functions together.

1    Q.   What race is ex-husband?

2    A.   My ex-husband is African-American.

3    Q.   What is your racial background?

4    A.   My racial background is African-American, Irish and

5    American Indian.

6    Q.   Now, were you working at the Medway branch on

7    May 14th?

8    A.   Yes, I was.

9    Q.   What was your position?

10   A.   Personal banker.

11   Q.   So, where were you in relation to the teller window?

12   A.   There's two doors, front and the back, I am at the last

13   desk after you come in the front, tellers are on the right

14   and the personal bankers are on the left.  There's a desk

15   right as you walk in the door, there's one in the middle,

16   and mine is the third desk from the front door.

17   Q.   So you're facing the tellers?

18   A.   Yes.

19   Q.   And then the two entrances are on either side of you and

20   the tellers?

21   A.   Yes.

22   Q.   Now, did you observe the plaintiff in the branch on

23   May 14th, 2002?

24   A.   Yes, I did.

25   Q.   What did you observe?

1    A.  I had a customer at the time at my desk, so I wasn't

2    involved in the transaction at all, but I did notice when

3    there was a commotion over on the teller side, I looked up

4    to see what was going on, and having a customer, I couldn't

5    do anything.  Jean came out and went to the teller window

6    herself.

7    Q.  Would you describe the --

8    A.  It was just loud talking, a little bit louder than

9    normal, most people are almost at a whisper in a bank, and

10   it was getting a little louder so we happened to note, and I

11   looked up again and took notice what was going on.

12   Q.  When you looked up, who was the one or who were the ones

13   that were talking louder?

14   A.  The teller was behind the desk, and the gentleman was at

15   the window, and Jean had come over to the window to help

16   after.

17   Q.  And who was talking loud?

18   A.  The gentleman right here.

19   Q.  You testified that Jean Brennan came over and spoke with

20   you.  What do you recall after that?

21   A.  She took him into the office and they sat down in the

22   office, and she made -- I saw her windows right next to me,

23   so I could see her making some phone calls.  I could not

24   hear the conversation.

25   Q.  Was the door shut?

1    A.  Yes.

2    Q.  How long were they in the office together?

3    A.  I don't -- had to be about 10 minutes, 10 or 15

4    minutes.

5    Q.  And then what happened?

6    A.  And then Mr. Odunukwe left and Jean walked out of her

7    office afterwards.

8    Q.  Did anything happen after he left?

9    A.  She came over and talked to me about what had happened

10   so that I would be aware in case she was out of the office

11   and anything had to be answered in the meantime.

12   Q.  What did she tell you?

13   A.  She told me that Mr. Odunukwe came up and wanted to cash

14   a check but he didn't have the correct I.D.s to have a check

15   cashed.

16   Q.  Did she tell you what I.D.s he did have?

17   A.  She said he had a driver's license, a Massachusetts

18   driver's license and I believe it was a student I.D.

19   Q.  Did she say anything else?

20   A.  Well, she said the reason why she couldn't cash it it

21   was against company policy, and that was it.

22   Q.  Now, at any point in your employment at the Medway

23   branch, had you acted as a teller?

24   A.  Yes.

25   Q.  And had you had occasion to make exceptions to the check

1    cashing policy?

2    A.  Not as a teller.  I'd have to get authorization from the

3    manager.

4    Q.  So, if a customer came in, if a person came in and

5    wanted to cash a check and didn't have the identification

6    required under the policy, is it your testimony that you

7    would have to ask the branch manager?

8    A.  Yes, it is.

9    Q.  And did you ever have to ask Jean Brennan for

10   authorization to cash a check with less than the required?

11   A.  Yes, I did.

12   Q.  And in your experience, what was Jean's response?

13   If they didn't have the correct forms of identification,

14   then she would say no, that she couldn't.  If she could call

15   the customer, the maker of the check, the person who wrote

16   the check, to verify that they gave the check to the person

17   trying to cash it, then she would do it, but otherwise she

18   would not cash the check

19   Q.  Did you ever observe Jean Brennan act differently toward

20   a white person who wanted to cash a check with less than the

21   required I.D. than a person of minority who wanted to cash a

22   check?

23   A.  Never.

24   Q.  Have you ever seen Jean Brennan treat white customers

25   differently than minority customer?

1  A.  I have never seen that.

2        MS. KAMM:  Thank you, I have nothing further.

3        THE COURT:  Mr. Berger.

4                  REDIRECT EXAMINATION

5  BY MR. BERGER:

6  Q.  You used the term "commotion" to describe Mr. Odunukwe.

7  Did he make a commotion that was addressed by a police

8  officer?

9  A.  Not that I know of.  I had a customer at the time.

10  Q.  Well, you noticed Mr. Odunukwe.  Did you also notice a

11  police officer at the at the same time in the same line in

12  front of Ms. McHardy?

13  A.  No.  I believe there was one in the area or close by,

14  but I had a customer in front of me so I really wasn't

15  involved.

16  Q.  Now, again, did you file a report regarding

17  Mr. Odunukwe's commotion with Fleet Bank?

18  A.  Did I file a motion?

19  Q.  Let me try it again.  Did you file a routine report

20  regarding the incident of Mr. Odunukwe's alleged commotion

21  with Fleet Bank?  Did you file a report?

22  A.  About raising his voice a little, no, I didn't, I don't

23  believe I did.

24  Q.  So you're saying raising the voice a little was the

25  commotion?

1    A.  Yes.

2    Q.  So it didn't arise beyond the so-called every day kinds

3    of things that happen in the bank; is that one of the

4    reasons you didn't file a report?

5                MS. KAMM:  Objection.

6                THE COURT:  Overruled.  Go on.  You can have the

7    question.

8    A.  Can you repeat that question?

9                THE COURT:  Why didn't you file a report?

10               THE WITNESS:  About the commotion?

11               THE COURT:  About the commotion.

12               THE WITNESS:  Well, we have people not regularly

13   but from time to time we have people to come in who are

14   upset because we can't cash a check because they don't have

15   the proper forms of identification, so we wouldn't file on

16   every one of those.

17   Q.  Now, how long were you a teller?

18   A.  I was a teller for not very long, I was just actually a

19   fill-in teller.  I didn't have a permanent position on the

20   teller side, it was just when somebody was on vacation or

21   out sick, I would go over and fill in.

22   Q.  And as a teller, if you get approval from the manager,

23   you get a waiver of all the identification regulations, the

24   seven pages of them; is that right?  You have the power to

25   waive any of those?

1    A.  I don't, no.  She would have the power to waive.

2    Q.  Let me rephrase it.

3    A.  Okay.

4    Q.  You've got a situation where you don't have

5    identification --

6    A.  Okay.

7    Q.  -- that you want that's perfect or this or that, you can

8    go to the manager?

9    A.  Yes.

10   Q.  And the manager can exempt or waive the obligations

11   about the identification; isn't that correct?

12   A.  Yes.

13   Q.  Okay.

14          MR. BERGER:  No further questions.

15          THE COURT:  Last round.  Anything further?

16          MS. KAMM:  No, I have nothing further.

17          THE COURT:  Thank you very much.  Next witness.

18          MR. BERGER:  Ms. Tissot.

19          THE COURT:  Okay.

20          MR. BERGER:  Your Honor, while there's a break in

21   the action, there was an issue that's come open.

22          THE COURT:  Go to sidebar.  Make sure someone is

23   getting the witness.

24          MR. BERGER:  Your Honor, seven exhibits were

25   assented to and filed.  Now, my Sister wants to draw out an

```
 1    assent that was in the filing that's in the court.

 2              THE COURT:  Which one is it?

 3              MR. BERGER:  No. 6, and I feel completely

 4    sandbagged by it.

 5              THE COURT:  Can I see it?

 6              MS. KAMM:  There's been no testimony about it.

 7              MR. BERGER:  It's like 2:33.

 8              MS. KAMM:  There's been no testimony about it at

 9    all.

10              MR. BERGER:  There has been testimony.

11              THE COURT:  What's the relevance of it?

12              MR. BERGER:  The relevance of it is that he tried

13    to process it in the ordinary course and he told them he

14    did, and one of the witnesses disputed it and this would

15    clarify it for the jury.

16              THE COURT:  They can come in.  It's not going to

17    make a difference.

18              MR. BERGER:  Thank you, your Honor.

19              (SIDEBAR CONFERENCE WAS CONCLUDED)

20              LINDA TISSOT, having been duly sworn by the Clerk,

21    testified as follows:

22                        DIRECT EXAMINATION

23    BY MR. BERGER:

24    Q.  Please state your name.

25    A.  Linda Tissot.
```

1    Q.  Could you spell your name for the record.

2    A.  Sure.  L-i-n-d-a.

3    Q.  The last name?

4    A.  T-i-s-s-o-t.

5    Q.  And if I say Tissot, like the watch.  Were you employed

6    by what was Fleet Bank in 2002?

7    A.  I was.

8    Q.  And what was your position?

9    A.  A teller.

10   Q.  And in May, 2002, were you present when Mr. Odunukwe was

11   present in your I want to say store but your bank?

12   A.  I was.

13   Q.  And did you prepare a report about him to Fleet Bank

14   after he was in the bank?

15   A.  I did not.

16   Q.  And if there were a serious disruption by someone, you

17   would be required to prepare a report for Fleet Bank,

18   wouldn't you?

19   A.  Probably.

20   Q.  So you were working as a teller on May 14th, 2002,

21   Mr. Odunukwe was there, and do you recall whether a police

22   officer was there?

23   A.  No.

24   Q.  And do you recall which tellers were serving at that

25   time?

1   A.  I know of one besides myself.

2   Q.  Okay.  Now, when you were there, you, as a result of

3   anything that Mr. Odunukwe did, you didn't prepare a report

4   and you didn't report him to the police or take any action

5   against him; is that correct?

6   A.  That's correct.

7   Q.  Okay.

8        MR. BERGER:  No further questions, your Honor.

9                CROSS-EXAMINATION

10  BY MS. KAMM:

11  Q.  Good afternoon, Ms. Tissot.

12  A.  Good afternoon.

13  Q.  Let's start by introducing you to the jury, tell them a

14  little bit about yourself.

15  A.  I'm a teller for Bank of America.

16  Q.  Now let me just interrupt here.  Which branch are you a

17  teller at?

18  A.  In Medfield, Massachusetts.

19  Q.  And how long have you been a teller there?

20  A.  It will be nine months in March of 2000, I'm sorry, nine

21  years, nine years.

22  Q.  They've gone fast?

23  A.  More than you know, in March of 2008.

24  Q.  Have you always been a teller at the Medfield branch?

25  A.  Yes.

1    Q.   And when you're not a teller, what do you do?

2    A.   I have a family, take care of a family, my house,

3    daughter.

4    Q.   Now, you said that you recalled Mr. Odunukwe coming into

5    the Medfield branch?

6    A.   That's correct.

7    Q.   And tell us what you recall about him coming into the

8    Medfield branch.

9    A.   On that day, I was at my station, and I was asked by my

10   supervisor, Pam.

11   Q.   Pam Martin?

12   A.   Pam Martin to go help a fellow teller Lina.

13   Q.   Is that Orfalina?

14   A.   Orfalina.

15   Q.   We'll call her Lina.

16   A.   Okay.  And she was a fairly new teller at the time, and

17   I have supervisory override more than Lina had, so I was

18   asked to go help Lina out with the transaction.

19   Q.   So you went over to her teller window?

20   A.   I did.

21   Q.   Then what happened?

22   A.   She told me that her customer did not have two forms of

23   legitimate identification and he wanted to cash a check out

24   and the check was over her limit.

25   Q.   Do you recall how much the check was?

1    A.   I do.

2    Q.   How much was it?

3    A.   It was over $1,000.

4    Q.   So she needed somebody else to authorize the

5    transaction?

6    A.   That's correct.

7    Q.   So what did you do when you went to her window?

8    A.   I spoke to her customer.

9    Q.   What did you say to him?

10   A.   Had a brief conversation with him.

11   Q.   Did you see any identification?

12   A.   Yes, I did.

13   Q.   What identification did you see?

14   A.   He had a Massachusetts driver's license.

15   Q.   So what conversation did you have with Mr. Odunukwe?

16   A.   I noticed on the driver's license that he was from Hyde

17   Park, and I asked him what brought him out this way, and he

18   said I have business up the road, and I noticed again Hyde

19   Park on his license plate, and since my Godmother is from

20   Hyde Park, I asked him if he knew where a deli called Tutto

21   Italiano was, and he nodded yes, and then I asked him if he

22   knew where Mariachio's Delicatessen was, and he nodded yes,

23   then I asked him if he knew where Solaris Road was, and he

24   said he did, it was on River Street.

25   Q.   Solaris Road was or --

1    A.   Solaris Road, Tutto Italiano and Mariachio's

2    Delicatessen are off of River Street.

3    Q.   Then what happened?

4    A.   He smiled.

5    Q.   Was polite to you?

6    A.   Yes, he was very polite.

7    Q.   Then what happened?

8    A.   I said I'm going to cash your check out today.  If you

9    want to come and cash your checks out further for this

10   amount, you need proper identification.  He nodded, I

11   overrode the transaction and went back to my teller

12   station.

13   Q.   So you made an exception to the cash checking

14   identification policy?

15   A.   I did.

16   Q.   Where did you -- how did you record your

17   authorization?

18   A.   My override on Lina's teller station, I typed in my

19   password, and that's it.

20        MS. KAMM:   Your Honor, may we turn the camera on?

21   Q.   Ms. Tissot, I want to direct your attention to a

22   document that's been marked as Exhibit 9, and tell us what

23   it is, please.

24   A.   This is a document that came out of the Fleet flex trans

25   system.  On Lina's machine, actually every teller's machine

1    had this tape that came out, and I see supervisor 23212

2    overriding a transaction for $1,100.  That is my supervisor

3    authorization.

4    Q.  So this is a transaction that you authorized, correct?

5    A.  I did.

6    Q.  And you overrode -- she required somebody's

7    authorization for this, and you overrode the system and

8    authorized the transaction?

9    A.  That's correct.

10   Q.  Now, Ms. Tissot, did the Medfield branch in May of 2002

11   strictly enforce the check cashing identification policy,

12   that is to say were two forms of accepted I.D. always

13   required?

14   A.  No.

15   Q.  What was the practice at the Medfield branch?

16   A.  We were going through managers.

17   Q.  What do you mean by that?  Did you not have a lot of

18   guidance?

19   A.  That's true.

20   Q.  So, is it fair to say that you were making decisions as

21   you went along about whether a particular transaction should

22   be transacted, in other words, whether an exception should

23   be made to the check cashing policy?

24   A.  I had that authorization.

25   Q.  And when you were authorizing exceptions to the check

1  cashing policy, did you always require two forms of accepted

2  of I.D.?

3  A.  Did I always, no.

4  Q.  So, it's fair to say that the Medfield branch was pretty

5  lenient about requiring two accepted forms of I.D. when

6  cashing checks?

7  A.  That is true.

8  Q.  Okay.  One last thing, I'm looking for Exhibit 7.

9        THE COURT:  What is it?

10       MS. KAMM:  It is the check cashing policy.

11  Q.  Ms. Tissot, I'd like to show you a document that's been

12  marked Exhibit 7, a page of that document.  Does this look

13  familiar to you?

14  A.  Yes.

15  Q.  What is it?

16  A.  It's a Massachusetts, one of the state's Massachusetts

17  policy in cashing a check.

18  Q.  All right.  And on this page, which is page 4 of a

19  policy, in Massachusetts if a credit card is used as a form

20  of identification, how must that credit card be recorded?

21  A.  The credit card number and the type of credit card it is

22  would be handwritten by the teller on a flex tran tape so

23  that document stays internal.

24  Q.  Is anything reported under the policy on the check

25  itself?

1    A.   The expiration date and the type of credit card it is.

2    Q.   Thank you very much.  I have nothing further.

3              THE COURT:  Mr. Berger.

4              MR. BERGER:  Thank you.

5                        REDIRECT EXAMINATION

6    BY MR. BERGER:

7    Q.   When you're scanning that document, does it indicate the

8    document that you're looking at right now, all of these

9    things can possibly be exempted by the manager at the bank;

10   isn't that true?

11   A.   That's correct.

12   Q.   Okay.  To simplify, it would be incorrect if Pamela

13   Martin indicated that on May 14th, 2002, she authorized the

14   teller in the Medfield branch to cash a check, it was you

15   who authorized the teller; isn't that correct?

16             MS. KAMM:  Objection, your Honor.

17             MR. BERGER:  It's the testimony of Pamela

18   Martin.

19             MS. KAMM:  That was not her testimony.

20             THE COURT:  The objection is sustained.  The

21   testimony is the things out of the people's mouths and the

22   exhibits.  There's nothing else that's testimony.

23             MR. BERGER:  Understood, withdrawn.  It's getting

24   late.

25   Q.   Now, Pam Martin and you were working together, the

1    teller is showing you I think two pieces of identification?

2    A.  Teller showed me one form of identification.

3    Q.  Okay.  And was that the driver's license?

4    A.  That's correct.

5    Q.  Okay.  And the the driver's license, you're sure there

6    wasn't another form of identification?

7    A.  I did not see one.

8    Q.  You did not see one, all right.  Now, based on what you

9    saw, you did your supervisory override; is that correct?

10   A.  That's correct.

11   Q.  Okay.  And the -- you went to the teller and you

12   essentially agreed that Mr. Odunukwe was polite.  Is there

13   any reason the same exception couldn't have been applied at

14   the other bank?

15           MS. KAMM:  Objection.

16           THE COURT:  Sustained.

17   Q.  Well, can any managing manager in a bank -- I guess you

18   went through a lot of managers -- authorize the negotiation

19   of a check?

20   A.  Could you repeat that question, I'm sorry.

21   Q.  All right.  So you're saying that in 2002, I wonder

22   there was a turnover of a lot of managers; is that

23   correct?

24   A.  Yes, that's correct.

25   Q.  And any of those managers could have authorized an

1    exception; is that not correct --

2              MS. KAMM:  Objection, your Honor.

3    Q.  -- Under the guidelines, the practices?

4              THE COURT:  I'm going to sustain the objection

5    because it's cumulative.

6              MR. BERGER:  All right.

7    Q.  Well, in this instance you override, you were capable of

8    overriding any exception that you could have concerning

9    under the practices and procedures; is that right?

10   A.  I personally, yes, up to my limit.

11   Q.  All right.  And just finally what did you mean when you

12   said Mr. Odunukwe was polite to you?

13   A.  He smiled.  He looked at me, he appeared very

14   gentlemenly to me.

15   Q.  Did he know all those places in Hyde Park?

16   A.  Yes, he did.

17   Q.  Thank you.

18   A.  You're welcome.

19             THE COURT:  Anything further?

20             MS. KAMM:  Nothing further.

21             THE COURT:  Thank you very much.

22             THE WITNESS:  It's my pleasure.

23             THE COURT:  Anything further, Mr. Berger.

24             MR. BERGER:  Nothing, your Honor.

25             THE COURT:  Anything further from the defendant?

1          MR. RANDALL:  Your Honor, at the close of the

2     plaintiff's case, we would like to make the usual motion.

3          THE COURT:  All right.  I'm going to reserve that.

4     Do you have any witnesses?

5          MR. RANDALL:  No, your Honor, we have no further

6     witnesses.

7          THE COURT:  So it is both at the close of the

8     Plaintiff's case and the close of the defendant's case.

9     We're going to take a five minute break.  We are five

10    minutes ahead of my latest schedule.  Five minutes to talk

11    to the lawyers, then although have argument and charge, then

12    on your break think about how late you wish to stay today.

13    All rise for the jury.

14          (Jurors exited the courtroom.)

15          THE COURT:  The plaintiff has rested, the

16    defendant has rested.  The plaintiffs filed a motion at the

17    conclusion of the plaintiffs case which to some degree

18    requires me, put me in the same position as I was in on the

19    motion for summary judgment, which is there is

20    Mr. Odunukwe's statement, then there's a mountain of

21    evidence on the other side.

22          I appreciate that, but my problem is I have

23    Mr. Odunukwe's statement and any determination of summary

24    judgment or any determination of a directed verdict requires

25    that I say, well, I don't believe him that he had an

1    American Express card at the first branch because of this

2    mountain of evidence.  You're not allowed to do that.

3         MR. RANDALL:  Your Honor, I think that the motions

4    address the lack of any evidence that anybody exhibited any

5    racial animous toward Mr. Odunukwe.  In his own testimony,

6    he said that nobody made any comments to him about his race,

7    and nobody said anything derogatory to him, and that was

8    consistent with the testimony of the other witnesses, and

9    the statutes under which he's filed his suit require that

10   there be both a racial animous and a nexus between what he

11   wanted to do and what he was not able to do.

12        THE COURT:  I understand, but although sweeping

13   across the country is this requirement that people can't win

14   discrimination cases unless somebody says, oh, you're a

15   person of color, I don't believe that.  If the facts were as

16   he suggested, and as I said, there's a mountain of evidence

17   suggesting they were not, but if the facts are as they

18   suggested, then there would have been no reason not to have

19   cashed his check, and the inference would have been, they

20   would be entitled to an inference because he was a person of

21   color, so we've gone too far down the road because of my

22   scrupulous adherence to these rules.  I think the motion is

23   denied both after the plaintiff's case and after the

24   defendant's case.  Now we go to the charge.

25        MR. RANDALL:  Would like us to file it for the

1    record?

2              THE COURT:  Yes, file it, by all means.

3              MR. BERGER:  Can I have a copy of it?

4              MS. KAMM:  Would you like us to file it

5    electronically?

6              THE COURT:  Yes, please.  In this courtroom

7    nothing gets filed without unless it's sealed.  You can be

8    seated, Mr. Berger.

9              MR. BERGER:  Your Honor, can I turn off this TV

10   thing?  I don't really know how.

11             THE COURT:  My clerk --

12             MR. BERGER:  I was rude to him, I owe him an

13   apology, and I want to apologize because I was caught in

14   traffic, and I thought everybody was going to go nuts on me,

15   and nobody did.  He comes near me after I was a grouch.

16   Sorry.

17             THE COURT:  That's right.

18             MR. BERGER:  It isn't.

19             THE COURT:  I think I'm going to give very simple

20   instructions.  The public accommodation, the Mass. Public

21   accommodation statute requires three elements, four

22   elements, rather, that the plaintiff is a member of a

23   protected class, he was denied or restricted in access to a

24   place of public accommodation, and there's evidence from

25   which it can be inferred there's a causal connection between

1    plaintiff's protected class and the denial of access.

2         Everyone agrees that Mr. Odunukwe was a member of

3    a protected class.  I will then simply instruct the jury as

4    to causation, legitimate nondiscriminatory reasons, I will

5    add business judgment issues and that evidence of

6    discrimination can come in as a matter of circumstantial

7    evidence.

8         The requirements for the Section 1981 are very

9    similar.  It is as a member of a protected class, again,

10   that's conceded, he sought to enter into a contractual

11   relationship with the defendant, he met the defendant's

12   ordinary requirements to pay for and to receive goods and

13   services, and he was denied an opportunity to contract for

14   goods and services that was otherwise afforded to white

15   customers, and it would have to be because of intentional

16   discrimination.

17         MR. BERGER:  That's where I may have an issue.

18         THE COURT:  Wait just a second, and it's very

19   similar, then again the structure is very similar, the bank

20   produces evidence of its reasons, it's the burden of

21   production.  The plaintiff still has to prove whether those

22   were the reasons that were the true reasons for the actions

23   as opposed to a pretext for race discrimination, business

24   judgment and the circumstantial evidence of discrimination

25   bears on both of them.  I will give instructions on damages,

1    on emotional disstress and nominal damages.  I will not give

2    instructions on punitive damages.

3           MR. BERGER:  I have a number of objections,

4    nothing that's going to take much time.  I think we're

5    instead under Christian vs. Wal-Mart Stores, 252 F.3d.

6    862-872 in the Sixth Circuit wherein a commercial context

7    liability would attach simply when a plaintiff receives

8    services in a markedly hostile manner, in a manner which a

9    reasonable person would find objectively discriminatory.  As

10   a result I think that the or I believe that the law

11   indicates that the business judgment issues and the

12   deliberate discrimination would be not what is at issue.

13          THE COURT:  There's no evidence that he received

14   services in a markedly hostile manner.  The evidence here is

15   either that he received the services or that he didn't.

16   There's no issue about the way, so I reject that.  Anything

17   else?

18          MR. BERGER:  I think the evidence is otherwise,

19   I'm just making a record.

20          THE COURT:  I understand.

21          MR. BERGER:  The other point is under

22   Morris vs. Diller Department Stores, 277 F.3d. 743 at 751,

23   the prima facie case under Section 1981 is that he is a

24   member of a racial minority, that the defendant

25   discriminated against him on the basis of his race, but this

1    is the one important point that the discrimination

2    implicated one or more of the activities enumerated in the

3    statute, and that's the civil rights statute about making

4    and enforcing statute.

5           THE COURT:  I see that, making and enforcing.

6           MR. BERGER:  That was my concern.

7           THE COURT:  It's very interesting, I don't

8    instruct on prima facie case, prima case is for me to

9    decide.  You have language in the defendant's version that

10   say if you find by a fair preponderance of the evidence that

11   the, where is this, if you find by a fair preponderance of

12   the evidence that he was -- I don't have it right in front

13   of me -- if you find by a fair preponderance of the evidence

14   that there was legitimate reasons for not cashing the check,

15   then you must decide that the plaintiff has proved to you

16   that the bank's rules were the real reasons.

17          If you found by a fair preponderance by the

18   evidence, then that's the rule.  What you're doing is you're

19   allying the prima facie case and ultimate proof.  In other

20   words, what the bank has to do is come forward with

21   legitimate, with reasons.  They have to be legitimate

22   nondiscriminatory reasons.  The burden then remains on the

23   plaintiff to prove that those were not the reasons for the

24   actions but discrimination was.  That's really all it is and

25   all this other language is incredibly confusing.  I am

1    saying that to the Court of Appeals.

2          MS. KAMM:  We didn't intend making it confusing,

3    but I think it's fair to the jury whether he's made a prima

4    facie case because I don't believe he's ever shown that he

5    was refused service.

6          THE COURT:  That may be so, then that's one of the

7    elements they have to find.  In other words, they come back

8    with no liability having concluded he didn't make a prima

9    facie case or having concluded no fair preponderance of the

10   evidence.  It's really winding up at the same point.  We

11   take very simple situations and make them needlesly

12   complicated, so I don't think -- I mean, I think you

13   essentially it doesn't make any sense to say to them has he

14   made a prima facie case, has he made a final case, I mean,

15   his answer is have they proved his claim?  If he hasn't

16   proved his claim, they ought to say so.

17         MS. KAMM:  Will there be a special verdict form,

18   your Honor?

19         THE COURT:  Yours again seemed more complicated.

20   This is the verdict form that I have come up with because I

21   couldn't figure out why it mattered.

22         MR. BERGER:  I don't have a problem with that, but

23   I do have something else.

24         THE COURT:  All right.  Just a second.  In other

25   words, your first question was that there's evidence from

1    which it can be inferred that there's a causal connection

2    between class and the denial of access to the place of

3    public accommodation.  That's the liability question.

4    That's the whole ball of wax.

5         MS. KAMM:  That's part of the prima facie case.

6         THE COURT:  But what I'm saying it's really not a

7    meaningful distinction, we're asking them because if there

8    is -- you're asking jurors, lay people to first decide is

9    there enough evidence to get to them, then you're asking is

10   there enough evidence to succeed?  It seems to me the

11   evidence at this point, is there enough evidence to succeed?

12        MS. KAMM:  The concern, your Honor, is that the

13   verdict slip doesn't ask the jurors to look at the reasons

14   that we're given.  I think I understand you're saying that

15   in the jury instructions they're going to be instructed to

16   look at the reasons that were given and whether they're

17   credible.  Our preference would be to have that in the

18   verdict slip itself.

19        THE COURT:  I think it's a simple enough case that

20   it isn't necessary.  Mr. Berger, what's your problem?

21        MR. BERGER:  The timing issue of which I just want

22   to get it clear what we're going to be doing because what

23   really worries me now is I know you've been accommodating,

24   everybody has been accommodating, it's ten of four, if we go

25   charging through this jury may be inclined to decide in 15

1    seconds so that they can get home by five  I think we've

2    reached a tipping point where it's unrealistic to ask lay

3    people --

4            THE COURT: I have a full day of hearings tomorrow.

5    The case took one day to go in.

6            MR. BERGER:  Right.

7            THE COURT:  We've said to them, and I'll give them

8    my usual instruction which has produced more hung juries

9    than anyone else.  Fair to say, Ms. Molloy?

10            THE CLERK:  Yes, fair to say.

11            THE COURT:  That is that I'd like them to be the

12   kind of jury that they would like to have if they were

13   sitting in the shoes of either side, and then we let them

14   know that they can come back tomorrow morning and

15   deliberate, but what I'd like to do is they're going to

16   deliberate then, in other words, I'd like to get our part of

17   it over, then they can deliberate while I have another

18   hearing.  I begin to feel like a dentist sometimes, are you

19   the root canal, or are you the --

20            MR. BERGER:  Having just arrived back from

21   Middlesex Probate Court, I am the dentist.  Let me just say,

22   I understand.  Let me put an objection on the record going

23   this way I think is perilous.

24            THE COURT:  There may be some people who have a

25   problem staying past five.  Why don't we take a five-minute

1    recess, and then she will check, and that may answer the

2    question because if you can't stay it's another question, I

3    can make you stay, I'm not going to make them stay.

4                (A recess was taken.)

5                THE CLERK:  All rise for the jury.

6                THE COURT:  You can be seated.  At this point this

7    is the closing arguments.  This is when they can argue to

8    you.  They couldn't argue before.  Now, as I instruct you,

9    lawyers' arguments are not evidence.  The only evidence is

10   what you heard on the stand and the exhibits, but the

11   lawyers certainly try to guide you as to the inferences that

12   you should draw, so you should pay attention to what they're

13   saying, but recognize that it's their version of the facts,

14   if different than your memory, your memory controls.

15               So with that, counsel, begin.

16               MS. KAMM:  Members of the jury, good afternoon.

17   On behalf of the bank and on behalf of the witnesses that

18   you've heard from today, I wanted to thank you for all the

19   attention that you've paid to the evidence.  I know it's

20   been a long day, it's been a long day for all of us, but we

21   appreciate the commitment and the attention that you've

22   paid.  The system works because you're here, and we thank

23   you.

24               Now, as you know, this is a case about race

25   discrimination.  The plaintiff has brought this case and the

1   judge is going to instruct you in a minute about what his

2   burden is, but he has to prove to you that he was

3   discriminated against on the basis of his race.  You have

4   Jean Brennan and Mary Beth Nance did not cash his check.

5        The Judge is going to tell you what his burden is,

6   but let me give you a sort of visual idea of what it means

7   to prove your case.  The Judge will tell you he has to prove

8   his case by a preponderance of the evidence.  Now, what does

9   that mean?  It means that when you look at all of the

10  evidence, it's more likely than not that you believe him

11  more than the bank.

12       We like to use the scale of justice analysis.  If

13  you've got the bank's evidence here, you've got the

14  plaintiff's evidence here, and you're weighing it; as you

15  weigh it, where does it tip?  Which side do you believe

16  more?  Do you believe the bank, because if it's equal, the

17  plaintiff doesn't win?  You have to believe his side is more

18  likely to be right than the bank's.

19       Now, what does he have to prove?  He has to prove

20  that Mary Beth Nance and Jean Brennan refused to serve him

21  because of his race.  You have to decide if he's proved this

22  to you.  I'd like to go back to the three questions that I

23  posed in my opening.  Other than his testimony, is there any

24  evidence that he presented an American Express card at

25  either branch?  You've heard from him, he testified.  You

1    heard from bank employees, Mary Beth Nance never saw it.

2    She saw a driver's license and a student I.D.  Jean Brennan

3    didn't see it, Linda Tissot from the Medfield branch didn't

4    see it, none of the bank employees ever saw an American

5    Express card.  There's no American Express card noted on the

6    check, there's no credit card noted on the journal tape.

7    Other than the plaintiff's testimony, there's no evidence in

8    this case that he ever actually presented an American

9    Express card, and they all testified that he didn't have two

10    accepted forms of I.D. as required by the policy.

11          Now, to the second question, why did Mary Beth

12    Nance and Jean Brennan try to help him if they intended all

13    along not to cash his check because of his race?  You saw

14    Mary Beth Nance and you heard her testify he presented some

15    evidence, he needed more, she asked him if he had any more

16    I.D.s, and he came forward with a student I.D.  She asked

17    him if he had any more because it wasn't an accepted I.D.,

18    and he never presented to her two accepted forms of I.D.

19          She tried to find out from another teller if he

20    was a known customer so she could cash his check with the

21    I.D. that he presented.  She made efforts to try to cash his

22    check.  She made efforts to try to get enough identification

23    so that she could go ahead and process it.  She told you she

24    did not have the authority to make an exception to the check

25    cashing policy, but she tried to get enough identification

1  so she could cash his check.  Why would she have done that

2  if she never intended to cash his check?

3          You also heard from Jean Brennan.  Now, Jean

4  Brennan told you she doesn't make exceptions to the check

5  cashing policy unless she gets some independent verification

6  that she can go ahead and cash the check, but she told you

7  she tried to make an exception of the check.  You heard from

8  Mr. Odunukwe she made phone calls.

9          It's for you to decide whether you believed him

10  that he didn't know who she was calling when his sister

11  testified that he came in, did Fleet call you?  She tried to

12  make phone calls, two phones calls to Joy Odunukwe and she

13  couldn't reach her.  She testified if she had been able to

14  reach Joy Odunukwe, she would have cashed the check.

15          Why would Jean Brennan have gone through the

16  trouble of bringing Mr. Odunukwe into her office if she

17  never intended to cash his check?  Why would she have made

18  the phone calls if she wasn't going to cash his check?  Did

19  both of those people decide independently whether they would

20  going to discriminate against this person and not accept his

21  identification?  You have to believe they both made this

22  determination separately, whatever his identification was

23  they were not going to accept it, or is it more reasonable

24  to decide that they looked at the identification that he

25  presented and they each independently decided that it didn't

1    meet the check cashing policy, that he didn't present two

2    acceptable forms of identification.

3         Now, the third question, is there any evidence of

4    discrimination?  Is there any evidence that Mary Beth Nance

5    and Jean Brennan decided not to cash his check because of

6    his race?  The plaintiff testified they made no derogatory

7    comments, they made no references to his race, there are no

8    references in this case whatsoever to his race.  There's no

9    evidence that the Medway branch did anything different with

10   respect to his transaction than any other transaction.  In

11   fact, you heard from Paula Curtis, an African-American

12   employee of the branch, who's hired by Jean Brennan that she

13   has never seen Jean Brennan ever treat any minority customer

14   differently from a white customer.

15        You're the ones that decide.  You're the ones that

16   have to evaluate the credibility of the witnesses.  It's for

17   you to decide whether there's any evidence in this case of

18   discrimination.  I believe there's none.  With regard to

19   Mr. Odunukwe's testimony on damages, I'll only say it's up

20   to you to decide in your collective wisdom whether his claim

21   for emotion distress is reasonable, whether any of it is

22   causally related to this brief encounter, whether it's

23   reasonable to assume that this was a life-changing

24   experience from the brief encounter that he had in the

25   Medway branch.

1          You may decide that his emotional distress was

2    caused by his own conduct at the Medway branch, but he has

3    to provide competent evidence of his emotional distress.

4    There's no evidence of counseling, there's no evidence of

5    medical records.  He has to prove to you that he suffered

6    emotional distress, it's reasonable and it's related to this

7    minor incident.

8          The plaintiff is the one that has the ultimate

9    burden to show you that these two individuals, employees of

10   the branch at Medway trying to do their job discriminated

11   against him because of his race when they didn't cash his

12   check.  The bank believes there is no such evidence of

13   discrimination that could possibly support this accusation,

14   and on behalf of the bank and on behalf these employees, I

15   ask you to return a verdict in the bank's favor.  Thank you.

16          THE COURT:  Mr. Berger.

17          MR. BERGER:  Thank you.  Thank you for sitting

18   with us.  This case is in a sense classic "he said, she

19   said" case, right, with one big exception, Joy Odunukwe.  In

20   order for the bank to win, you have to disregard everything

21   that Joy Odunukwe said.  Did she seem like an incredible

22   person, an incredible interest in this case with her job?

23   No.

24          Does she seem like the kind of person who would be

25   telling you wild stories where she's a pharmacist that she's

1    gone through the American dream story?  She said it very

2    simply, she never got a call to verify the check.  If she

3    had gotten the call, she would have verified the check, and

4    this never would have happened, so there's a lot of

5    contested facts which I'll go into, but there's one thing

6    that's totally uncontested, and that's Joy Odunukwe's

7    testimony.

8         Everything the bank is saying amounts to, well,

9    Joy Odunukwe is a liar, she's no liar.  The second thing I'd

10   point out to you is Exhibit 7, which is a bank letter on

11   June 12th, 2002.  In the letter, Stephanie Goldan, Fleet

12   Solution Group says on behalf of Fleet Bank, "We apologize

13   for any frustration or inconvenience this matter may have

14   caused you."  That will be one of the things that's going to

15   the jury room with you.

16        Now, let's find out what he said and what she

17   said.  What he said that was uncontradicted is that he was

18   hassled a lot, it was a very hostile place, that he had got

19   hassled.  Now, those of us who are parents and those of us

20   who read the newspapers know what a confidence game is.  You

21   know what a confidence game is, a confidence game, and it

22   happens a lot with children, Johnny said Joey did this, Joey

23   said Johnny did this, Joey, Johnny, Joey, Johnny until you

24   get confused.  Smoke and mirrors.  Those of us who have

25   enjoyed the pleasures of parenthood know that it's a

1    confidence game.

2    Now, let's play along with the confidence game.

3    Their confidence game was that he was disorderly,

4    disruptive; do you remember that?  If he was so disorderly

5    and disruptive, they didn't report it to the policeman who

6    was right there, right?  The policeman didn't observe any of

7    it obviously, or if he would have arrested him, but every

8    single one of those witnesses agree -- I think you'll

9    recall -- that they didn't even file a report with the bank,

10   in fact, one of them said it was an every day occurance.  So

11   I would say to you in terms of the confidence game that's

12   come through today, it's not a very convincing one.

13   Now, let's then focus on Mr. Odunukwe and this

14   incident and what the law is protecting him from.  Obviously

15   he is a minority person.  He's both an African-American and

16   African and he has protections under the law.  His testimony

17   was very clear, very lucid and very simple.  When you get

18   away from the confidence game about all these complications,

19   all these smoke and mirrors, all the stuff we deal with in

20   our common life as parents, you are left with a very

21   childish set of accusations that do not rebut the bottom

22   line.

23   The bottom line is that he was the customer.  He

24   was in there looking for services, and he got a royal

25   hassle.  Now, the hassle could have been because of

1    something he did, but if it was what he was doing, nobody

2    took any actions against him, so let's look at what

3    happened.  They got into a situation where there was an

4    issue about identification.

5           Now, that issue about identification blew up into

6    a brew ha-ha and the fact that there was a brew ha-ha and a

7    lot of hostility, as the Judge will do in instructing you,

8    creates inferences of discrimination.  There are no smoking

9    guns in life, sometimes they are, but what we use is

10   inferences, and I will submit to you that this whole

11   confidence game that you've been listening to is an

12   inference of not dealing with the hostility that he

13   experienced.  He goes to the bank, he's puts through three

14   pieces of identification.

15          Now, ladies and gentlemen of the jury, ladies,

16   sorry, ladies of the jury, this is 100 percent jury of

17   women, and ladies isn't the best term, but the point is that

18   have you ever in your experience gone through anything like

19   this?  Of course not.  Three pieces of identification, and

20   those three pieces of identification in this confidence game

21   mean they don't make any sense.

22          He comes up with a credit card, a driver's license

23   and a Suffolk I.D., therefore, he should have been served.

24   He wasn't.  Now, what happens 10 minutes later?  This is

25   really interesting.  Remember how in the confidence game, it

1    was how rude and outrageous and everything he was.  In 10

2    minutes, he becomes a perfect gentleman.  He's absolutely

3    polite when he goes to the next branch.  Something is off

4    with the confidence game served up by the bank.

5          And, incidentally, just because you have more

6    people telling a story, that doesn't make more people's

7    story true, it just means that the many people who have

8    arrived here are from one institution with its story, but

9    Mr. Odunukwe is coming to you to ask you to see whether any

10   of this is logical.

11         He was an attorney, he was a fresh attorney, some

12   may say an idealistic attorney.  He tried to deal with the

13   people who were there, the first person, the second person,

14   you know, about they said he asked for the man in charge.

15         Is that consistent with his relationship with his

16   sister with 20 people in a family?  I mean, if you come from

17   a family with 20 children, I believe that's the number.

18   Excuse me, is it 10, 11?  You're not somebody who says I

19   want the man in charge, that doesn't make any sense, but, in

20   this case he goes and he tries to iron this problem out, and

21   he's thrown out, and the way they did it, there's no

22   evidence to dispute it, the way they did it made him

23   distraught and in shock when he walked away, then he goes to

24   the other location, and he's humilated and subjected to

25   ridicule.

1          Now, do you remember the shocking comment of the

2    person who's outside of the "he said and the she said", what

3    Joy said?  She said her brother said, "Now I know what it's

4    like to be treated like an American black."  Those are very

5    haunting words, and I think one should consider that very,

6    very carefully.  What we have also is a situation in which

7    every point ad nauseam of the confidence game is rebutted in

8    detail by Mr, odunukwe but the bank would say, oh, no, he's

9    lying, he's exaggerating and all that.  Stick with Joy and

10   what Joy is saying or by implication is saying about the

11   whole situation.

12         Now, damages.  In life, law, you take the person

13   who comes to court as you find him, and it is probably

14   self-evident that Mr. Odunukwe is a very proud person who's

15   gone through a life-changing experience, and this

16   life-changing experience has had a chilling negative effect

17   on him, and, you know, it aggravated, this is the term I'm

18   sure it's some of you in medical know it, aggravated a

19   pre-existing condition, it aggravating a pre-existing

20   condition, and that's the ulcer, and as the medical people

21   know that if you have a condition, it can be aggravated by

22   other things, and that's the way life is.

23         Now, do you think that it's not extraordinary that

24   a man who founded internationalstudent.net, then the Harvcom

25   Group, you remember the Harvcom Group for prevention and

1  awareness in West Africa would come in from Jubilee

2  Christian Church, would come in and lie to you?  Those are

3  his character personality types, and if you consider who he

4  is, then you might consider the way Joy is and get a

5  composite picture in your mind of whether this shocking

6  event took place.

7          Now, as you know, none of the bank people took any

8  steps, but Mr. Odunukwe certainly did.  He took the steps of

9  following through and writing the bank, and the bank

10 apologized, so what do we have in here?  I think that the

11 evidence is very clear that he was treated in a markedly

12 hostile manner.  There's nothing that says that he wasn't,

13 that he's just getting in this confidence game, he was bad

14 and he was good.  No, he would have gotten some report and

15 that the conduct was subjectively discriminatory.

16         Well, objectively discriminatory is a concept that

17 bears a little bit of analysis.  Objective discrimination,

18 discrimination is something that we don't have control over.

19 We don't have control over what our race is.  We don't have

20 control over our physical disabilities, we don't have

21 control over our mental disabilities, Lord knows, that's

22 what we're talking about in this case, a condition he has no

23 control over caused him to be targeted and mistreated and

24 essentially treated manifestly different from other people,

25 and you have all kinds of information here to sort out, but

1    essentially Joy Odunukwe is the key person, but he was

2    singled out, and he was targeted and he was mistreated, and

3    I appreciate you taking the time to listen, you have some

4    evidence to sort out, but you ought to take most close

5    attention in our view to sort out all the stories to the

6    letter of Fleet in which it apologies, which is Exhibit 7,

7    and the testimony which was absolutely chilling of Joy

8    Odunukwe, it's as though Jay now knows what the horror is

9    coming from a place like Nigeria, there's something

10   extremely embarrassing, humiliating, and the Court -- I'll

11   stop there.

12           THE COURT:  Thank you.  Ladies and gentlemen, I

13   have very brief instructions for you.  Maryellen, can you

14   put the verdict slip on the camera.  When you go into the

15   jury room, this will be the verdict slip that you will have.

16   It has the -- I love this machine.  See, there are two

17   counts, one under the Massachusetts Public Accomodations law

18   and the other under the Federal Civil Rights Act, and I'll

19   explain them in a minute, and if you conclude that there is

20   liability, if you've answered yes to either Count 1 or 2 or

21   both, then and only then do you get to the question of

22   damages.

23           Let me describe to you first my general

24   instructions.  This is a civil case, not a criminal case,

25   and in this case, the burden is on the plaintiff,

1    Mr. Odunukwe, to prove every essential element of the claim

2    by a preponderance of the evidence.

3         If any element of the claim should fail to meet

4    that test, proof by a preponderance of the evidence, you

5    should find for Bank of America as to that claim.  To

6    establish a fact by a preponderance of the evidence means to

7    prove that something is more likely so than not so.  So,

8    what that means is if the evidence tilts in favor of the

9    bank, then the plaintiff obviously hasn't met his case, his

10   burden.  If the evidence could go either way, the plaintiff

11   has also not met his burden of proof.  It's only if the

12   evidence tilts in favor of the plaintiff that he has met his

13   burden of proving to you that the fact is more probable than

14   not.

15        At the same time preponderance of the evidence

16   does not mean proof to such a high degree of certainty as

17   you see on CSI, which is proof beyond a reasonable doubt.

18   We're talking about a fair preponderance of the evidence, so

19   it's a different standard.  I watch that show, too.  In

20   determining whether or not any fact has been proved by a

21   preponderance of the evidence, you may consider the

22   testimony of all the witnesses regardless of who may have

23   called them, it doesn't matter, and all of the exhibits

24   submitted into evidence regardless of who may have submitted

25   them.

1          Now, I'll get to the particular claims in a

2    moment, but in evaluating all of this, you have to first

3    consider the witnesses and evaluate their credibility.  You

4    are essentially the sole determiners of the facts.  I give

5    you the outline of the law, but you find the facts.  You may

6    not like the law that I give you, but that's not your job,

7    that's my job.

8          So, in evaluating the credibility of witnesses,

9    what credibility means really is just believabilty, and, so,

10   for example, you consider things like did the witness have

11   an interest in the outcome?  Did the witness have a

12   relationship to one of the parties in the case?  Was the

13   witness' testimony believable?  Did it hang together?  Was

14   it consistent?  Was it contradicted by other evidence?  Did

15   it make sense?  That is essentially what your common sense

16   tells you about the believabilty of witnesses.

17         In addition, there are two kinds of evidence, and

18   in a case involving intent, and this is a case involving

19   intent, a claim of intent to discriminate, there is direct

20   evidence and circumstantial evidence.

21         Direct evidence, since we've been talking about

22   being mothers, here's how I describe direct evidence.  I do

23   so in a way that trashes my sons.  They don't know.  I have

24   two sons, one very responsible, the older one, and one less

25   responsible, the younger one.  Assume I have a cookie jar in

1    my kitchen filled with cookies.  My oldest son Steven says

2    to me, Mom, I'm in the kitchen and I saw Peter eat all the

3    cookies in the cookie jar.

4         At that point my older son is essentially

5    testifying -- that's what happens when you have a mother who

6    is a Judge, you testify -- and I have to evaluate whether or

7    not he saw what he said he saw, whether he had an interest

8    in the outcome, these are the credibility decisions, versus

9    a situation in which he says to me, I'm in the kitchen, I

10   was in the kitchen at 10:00, the cookie jar was filled, and

11   then 10:15 I came back, and it was empty, and the only other

12   person in the house was Peter.  In the second case, I still

13   have to evaluate the credibility of the witness, but I'm

14   also being asked to draw an inference, a fair and rational

15   inference from the facts I believe that in fact Peter has

16   eaten all the cookies.

17        So, an inference is essentially a small step in

18   reasoning that is informed by what you find to be true to

19   determine what is not directly proved by that testimony but

20   is a fair inference from that testimony.  That is

21   circumstantial evidence.  In doing all of this, you have to

22   bear in mind that you have sworn to be fair and impartial

23   jurors, and what that essentially means in a nutshell that

24   you want to give both sides in this case the kind of jury

25   you would want to have if you were sitting in their shoes.

1          That's what it means to be fair and impartial, how

2     would you want the jury to be if you were sitting in the

3     shoes of either side.  There have been -- you'll get all the

4     exhibits, as I said, you'll actually physically have them,

5     not on a screen.

6          Let me now address the counts that are on the

7     screen in front of you.  There are two counts here.  One is

8     under the state law, which is a state public accommodation

9     statute which prohibits discrimination on the basis of race

10     in the admission of any person at a place of public

11     accommodation.

12          That's what we call the Massachusetts public

13     accommodation statute.  The second count deals with a claim

14     under a federal statute, Section 1981, which prohibits

15     discrimination on the basis of race in the making or

16     enforcing of contracts, and I'll describe both of them to

17     you.  To prove his case under either of these statutues, the

18     plaintiff, Mr. Odunukwe, must prove to you by a

19     preponderance of the evidence that the actions of the

20     defendant were motivated by a racially discriminatory

21     purpose, that intentional and purposeful discrimination was

22     what caused his treatment.

23          There are two critical aspects in both causes of

24     action, intentional discrimination and cause, and I'll

25     define them for you in a moment, and as to both, the

1    plaintiff has the burden of proof.  In deciding whether the

2    defendant intentionally discriminated on the basis of race,

3    you must consider all the evidence in this case, direct and

4    circumstantial evidence.

5         Now, let me address -- I can actually change the

6    color if anybody is interested.

7         MR. BERGER:  Please.

8         THE COURT:  All right.  Your taxpayer dollars,

9    ladies and gentlemen.  One of the claims in the plaintiff's

10   complaint asserts a claim under the public accommodation

11   statute.  That statute prohibits discrimination on the basis

12   of race in the admission of any person or in his treatment

13   in any place of public accommodation.  The Fleet Medway

14   branch is a place of public accommodation as it is open to

15   the general public, and this is where the plaintiff claims

16   he was treated in a discriminatory.

17        In order to prove a claim of discrimination under

18   the State Public Accommodation Statute, the plaintiff must

19   prove to you by a preponderance of the evidence that he was

20   a member of a protected class, and let me tell you both the

21   plaintiff and defendant agree that Mr. Odunukwe was a member

22   of a protected class, that he was denied or restricted in

23   access at this place of public accommodation and that

24   there's evidence from which it can be inferred that there is

25   a causal connection between the plaintiff's race and the

1    denial of access to the place of public accommodation, and

2    on your screen it says, "Has the plaintiff, Jay Odunukwe,

3    proven by a preponderance of the evidence both that he was

4    denied a restricted access in a place of public

5    accommodation and that he was denied access because of his

6    race or national origin?"

7          As part of deciding the question of causal

8    connection and the question of race discrimination, you must

9    decide whether the Bank of America has presented credible

10   evidence of a legitimate reason which is the basis for not

11   cashing Mr. Odunukwe's check.

12         If you find that they did, that they presented to

13   you a credible, we call it a legitimate nondiscriminatory

14   reason for not cashing the check, then you must decide

15   whether the plaintiff has proved to you by a preponderance

16   of the evidence that the reasons advanced by the bank were

17   not the real reasons for the defendant's actions, that

18   rather discriminatory intent, motive or state of mind was

19   the cause and that but for that discriminatory intent,

20   motive or state of mind, the check would have been cashed.

21         In other words, the bank comes forward and

22   explains what it does by presenting reasons to you that you

23   have to decide were legitimate, nondiscriminatory reasons,

24   but the plaintiff bears the burden of proving by a

25   preponderance of the evidence that the explanation for the

1    conduct was not the legitimate nondiscriminatory reasons but

2    race discrimination.  Plaintiff has to prove that to you.

3          We use the notion that the -- we use the term that

4    discrimination has to have caused the event, and cause means

5    that discriminatory intent was the active efficient cause in

6    bringing about the action, in other words, for plaintiffs to

7    prove that his race was the determinative cause for the

8    decision not to cash his check, plaintiff must prove that

9    the employees at Fleet had a discriminatory intent and that

10   the discriminatory intent contributed significantly to the

11   decision not to cash his check and that it was a material

12   and important ingredient causing Fleet Bank, Bank of America

13   not to cash the check.

14         So with respect to the first, it is that he was

15   denied a restricted access in a place of public

16   accommodation and that he was denied access because of race

17   or natural origin, and as to both the plaintiff has to prove

18   this by a fair preponderance of the evidence.

19         The second claim is under Section 1981, which is

20   the second count which guarantees each person regardless of

21   race or citizenship, freedom from discrimination in the

22   making and enforcing of contracts.  The opportunity to

23   contract or enter agreements like the agreement to cash a

24   check, when on the basis of race or citizenship, a defendant

25   refuses to contract at all or whether on the basis of race

1    or citizenship a defendant varies the terms of his offers or

2    acceptance to contract.

3        If because of his race the plaintiff is denied the

4    right to contract entirely or is given less opportunity to

5    contract or is offered less favorable terms or unequal

6    treatment so as to discourage him from entering the

7    contract, he has made a claim under Section 1981.  In order

8    to prove his claim under Section 1981, again, the plaintiff

9    must prove to you by a fair preponderance of the evidence

10   that he is a member of a protected class, that is conceded,

11   that he sought to enter into a contractual relationship with

12   the bank, that he met the defendant's ordinary requirements

13   to pay for and receive the services ordinarily provided by

14   the defendant to meet similarly situated customers, that he

15   was denied the opportunity to contract that was otherwise

16   afforded white customers again because of intentional

17   discrimination.  The two claims are very similar.

18       Again, the bank has to come forward with evidence

19   that the reasons for their actions are legitimate and

20   nondiscriminatory, and once they do, the burden is on the

21   plaintiff to prove that the reasons for the bank's decision

22   are those legitimate nondiscriminatory, I'm sorry, that the

23   reasons for the decision was discrimination rather than the

24   legitimate business reasons put forth by the bank.

25       Plaintiff again has to prove that the reasons

122

1    offered by the bank were not the real reasons, that the real

2    reasons for their conduct was discrimination.  I should note

3    to you that if you disagree with the bank's policies, that

4    that's irrelevant.  The issue in this case is whether or not

5    the bank's actions were consistent with their policies is

6    what we call -- you can't second guess their business

7    judgment in coming up with these particular policies.  The

8    issue is whether or not they were in fact applied in this

9    case or whether what was motivating the conduct was

10    intentional discrimination.

11         The plaintiff, as I said to you, can prove

12    discriminatory intent by circumstantial evidence, by direct

13    evidence, by showing that in fact the reasons advanced by

14    the bank were not the true reasons at all, that it was

15    something else entirely, namely race discrimination.

16         It is only if you conclude in Count 2 that the

17    plaintiff has proven beyond a reasonable doubt, I'm sorry,

18    proven by a fair preponderance of the evidence that he

19    sought to enter into a contractual relationship with the

20    defendant, that he met the defendant's ordinary requirements

21    to pay for and to receive goods or services ordinarily

22    provided by the defendant to other customers, that he was

23    denied the opportunity to contract for goods and services

24    that was otherwise afforded to white customers.  It's only

25    if the plaintiff has proven each of those elements that you

1    go on to the question of damages.

2         Now, I have to outline for you what the rules are

3    with respect to damages because I have to instruct you as to

4    everything, but you bear in mind that you don't get to this

5    unless you have concluded either yes to Count 1 or yes to

6    Count 2 or yes to both.

7         If you return a verdict for the plaintiff, you

8    must award a sum of money that you believe will fairly and

9    justly compensate him for any injury that you believe he

10   actually sustained as a direct consequence of the conduct of

11   the defendant.

12        You shall award actual damages only for those

13   injuries which you find which the plaintiff has proven by a

14   preponderance of the evidence the same standard.  Moreover,

15   you shall award actual damages only for those injuries which

16   you find the plaintiff to have proven by a preponderance of

17   the evidence to have been a result of the conduct of the

18   defendant in violation of either the State Public

19   Accommodation Statute or Section 1981.

20        That is, you may not simply award actual damages

21   for any injury suffered by the plaintiff, only those that

22   are a result of the actions of the defendant in this case.

23   Actual damages must not be based on speculation or sympathy,

24   they must be based on the evidence presented at trial and

25   only on that evidence.  You may consider physical pain,

1   mental anguish, emotional suffering, whether these damages

2   are permanent or temporary.

3        If you return a verdict for the plaintiff on

4   either ground but find that the plaintiff has failed by a

5   preponderance of the evidence to show that he suffered any

6   actual damages, then you must return an award of damages in

7   some nominal damages or token amount not to exceed one

8   dollar.  Nominal damages may be awarded when the plaintiff

9   has been deprived of a constitutional right.  1981 is

10  essentially the implementation of a constitutional right,

11  and has suffered no damage as a result of that deprivation.

12       You are not ever awarding double damages.  The

13  damages in this case are essentially for the same event, so

14  when you consider damages, you consider damages with respect

15  to both.  You'll have the case for your deliberation.  This

16  jury of eight is what the size of a civil jury is.  You have

17  to be unanimous.  You can, as I said, this is the point in

18  the process that you're in control, I'm not.

19       I suppose that if you wanted to stay to one or two

20  in the morning, I might put my foot down, you know, I would

21  cut off bathroom privileges, but absent that this is the

22  point that you're in control.  You can deliberate as long as

23  you'd like or as short as you like.  Again, the issue is how

24  long do you think the case needs in order for you to be as

25  fair to the parties as you would want them to be to you if

1    you were sitting in their shoes.  So that determines the

2    nature of the deliberation process, it determines how long

3    you deliberate as well.  Now, if you give me a moment to

4    talk to counsel at sidebar.

5         (THE FOLLOWING OCCURRED AT SIDEBAR:)

6         MR. BERGER:  I would indicate that the elements of

7    proof under Section 1981 are more limited to the commercial

8    establishment line for liability set forth in detail in

9    Christian vs. Wal-Mart Stores, 252 F.3d 862 and Judge vs.

10   the City of Lowell, 160 F.3d 155, 67-77, Fifth Circuit case.

11   I would also indicate that the notion of the shifting burden

12   as well generally applying does not apply to this form of a

13   1981 action, and I rely on the civil rights action of 1981,

14   Public Law No. 102, Section 102 and the case law that's

15   developed since 1991.

16        THE COURT:  Are you making claim of mixed motive,

17   if so that was incumbent?

18        MR. BERGER:  No.

19        THE COURT:  That's the 1981 statute.

20        MR. BERGER:  I understand your concern.

21        THE COURT:  Do you want an instruction on mixed

22   motive?

23        MR. BERGER:  I would, but if you say it had to be

24   raised before, I thought that was.

25        THE COURT:  No, I'd be happy to give you.

1          MR. BERGER:  Mixed motive, yes, we should have

2    it.

3          MS. KAMM:  We would object.  There's no evidence

4    of motive.  I don't think there's evidence that the mixed

5    motive instruction be given.  I'd also object to the

6    standard that Mr. Berger was citing.  I don't believe that's

7    the standard.

8          THE COURT:  That's not the standard.  That is not

9    the standard.  Let me think about that.

10         MR. BERGER:  But the other thing is that under

11   272, 98 we really have an absence of law so what I am left

12   with is short authority.  One is Hurley vs. Irish-American

13   GLBG Boston, 515 U.S. 557, 1995 case in the U.S.

14   Supreme Court.  I believe once again that there is no burden

15   shifting mechanism under the statutory.

16          Finally, with respect to damages, in order for the

17   jury instruction we went into emotional pain, suffering and

18   in general mental anguish and noneconomic losses as the

19   items.  I think that is what I tried to do is to spell it

20   out with authority about certain aspects of the case, and

21   the emotional distress could have been more broadly defined

22   to be consistent with Sinai vs. New England Tel. & Tel.

23         THE COURT:  It's my case, yes.

24         MR. BERGER:  So you can answer that question which

25   is 3 F.3d 476, granted that was an employment, back pay,

1    front pay, but I don't know how much detail on emotional

2    distress.  Also the other thing I like to get out there is

3    that I try to -- on this case it may not be really

4    important, but in my joint instructions on damages I try to

5    spell out some of the languages about tax and --

6            THE COURT:  Tax?

7            MR. BERGER:  About the taxation of the individual

8    as part of the process.  I'll just put this on the record

9    that if, and if there's future damages -- strike the taxes.

10   That's absurd, this is what I mean to say, I had indicated

11   that if they find that the plaintiff is entitled to damages,

12   the losses that occur in the future have to reduce this

13   amount, whatever it may be, to its present worth.  The

14   present worth thing there may be somebody who is

15   mathematically inclined.  The reason for that is the sum of

16   money is worth money than the same money paid out in

17   installment periods of time.  I ask you to put some of this

18   language because it's always helpful.

19           MS. KAMM:  Your Honor, I don't think it's within

20   the jury's competentence to determine present worth.

21           THE COURT:  It's not within the jury's competence,

22   it's not remotely evidence to the case at bar.  Thank you

23   very much.

24           (SIDEBAR CONFERENCE WAS CONCLUDED)

25           THE COURT:  If you concluded that there was a

1    discriminatory intent here, then you could take the -- if

2    you concluded that there's a discriminatory intent, it is

3    then the defendant's burden to prove by a preponderance of

4    the evidence that he would have taken the same action in any

5    event.

6            In other words, that the discriminatory intent did

7    not affect even if you conclude that somewhere out there

8    there's discriminatory intent in this case but the defendant

9    then proves to you that the action would have been the same

10   with or without the discriminatory intent, then the

11   defendant proves that to you by a fair preponderance of the

12   evidence, then you likewise would conclude that the

13   plaintiff has not made out its case.

14           In other words, what we have described to you is

15   an either or situation in my earlier instructions, a

16   situation where you find discriminatory intent motivated the

17   action or you find it had nothing to do with the action.

18   Assuming you find discriminatory intent, you might

19   nevertheless also conclude that it wouldn't have made a

20   difference to the outcome in this case, that the actions,

21   that the defendant's have proven to you by a fair

22   preponderance that they would have taken the same actions

23   even if discriminatory intent was somewhere involved in the

24   case.

25           So, the instructions that I initially gave you

1    were either or.  If you find discriminatory intent or you

2    don't, perfect legitimate nondiscriminatory reason as a

3    basis for the action, or if you concluded that in fact

4    discriminatory intent was somewhere in here but that the

5    defendants have proven to you that regardless the outcome

6    would have been the same, that with or without the

7    discriminatory intent the outcome would be the same, then

8    you, nevertheless, would find for the defendant in that

9    situation.  Okay.

10           Again, you communicate with Ms. Molloy in paper.

11   We'll give you pieces up paper.  If you want dinner, you let

12   us know, if you don't want dinner, let us know.  Let us know

13   how wish.  I understand one of you wishes to make a phone

14   call.  We'll make a telephone available for you to anyone

15   who wishes to make a phone call.  You have to pick a

16   foreperson.  Foreperson does not have two votes.  Foreperson

17   is simply the person who signs the documents for us and has

18   the verdict slip.  The verdict slip needs to go to the jury.

19   You can now proceed.

20           MR. BERGER:  Your Honor, can I substitute the

21   original exhibits with photocopies?

22           THE COURT:  I note your objection to the mixed

23   motive instruction.

24           MR. RANDALL:  Thank you, your Honor.

25           THE COURT:  I find that again this is five

130

1  thousand years of initially being a defense lawyer and then

2  being a Judge, life is rarely either or, and so the notion

3  that there could be mixed motive in a situation actually

4  seems much more reasonable to me, and if there isn't that

5  colorable claim then that's purely based on Mr. Odunukwe's

6  testimony, then I think it's easier and fairer to put it in,

7  but I note your objection.  Let us know where you'll be

8  whatever time.

9            (A recess was taken.)

10           MR. RANDALL:  We're handing the court reporter the

11  exhibits which have been agreed upon Exhibits 1 through 9.

12           MS. KAMM:  We want to put on the record that the

13  original check, which is the original of Exhibit No. 1 has

14  been attached to to Exhibit 1.  The original Mass. driver's

15  license of Exhibit 2 has been attached to Exhibit 2, and the

16  original American Express card which is the original of

17  Exhibit 3 has been attached to Exhibit 3.

18           (A recess was taken.)

19           THE CLERK:  All rise for the jury.

20           THE COURT:  You can all be seated.

21           THE CLERK:  Madam foreperson, has the jury reached

22  a unanimous verdict?

23           THE JUROR:  Yes, we have.

24           THE CLERK:  May I take the slip.  Jury verdict

25  slip, Count 1, Massachusetts Public Accommodation Law, has

1    the plaintiff, Jay Odunukwe, proven by a preponderance of

2    the evidence both the following, 1, that he was denied or

3    restricted access in a place of public accommodation; and,

4    2, that he was denied access because of his race on national

5    origin?  Answer:  No.

6          Count 2, has the plaintiff, Jay Odunukwe, proven

7    by a preponderance of the evidence all of the following:  1,

8    that he sought to enter into a contractual relationship with

9    the defendant; 2, that he met the defendant's ordinary

10   requirements to pay for and to receive goods or services

11   ordinarily provided by the defendant to other customers;

12   and, 3, that he was denied the opportunity to contract for

13   goods or services that were otherwise afforded to white

14   customers?  Answer:  No.  So say you madam, foreperson, so

15   say you members of the jury?

16         ALL JURORS:  Yes.

17         THE COURT:  Thank you very much for your service.

18   Ms. Molloy will get you cabs if you need cabs and make it

19   easier for you to leave this beautiful building safely.

20   Thank you very much.  All rise for the jury.

21         THE CLERK:  All rise.

22         (Whereupon, the hearing was suspended at

23   6:05 p.m.)

24

25



1

2                    C E R T I F I C A T E

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    )

5    CITY OF BOSTON               )

6            I, Valerie A. O'Hara, Registered Professional

7    Reporter, do hereby certify that the foregoing transcript

8    was recorded by me stenographically at the time and place

9    aforesaid in No. 05-10324-NG, Jay Odunukwe vs. Bank of

10   America and thereafter by me reduced to typewriting and is a

11   true and accurate record of the proceedings.

12                            /S/ VALERIE A. O'HARA

13                            _____
                              VALERIE A. O'HARA

14                            REGISTERED PROFESSIONAL REPORTER

15

16

17

18

19

20

21

22

23

24

25